# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERNEST MARTIN<br>653 Mulberry Street<br>Reading, PA 19604 | : <br> : <br> : <br> : | |
| Plaintiff, | : <br> : | CIVIL ACTION |
| vs. | : <br> : | No. 12-3665 |
| CITY OF READING<br>815 Washington Street<br>Reading, PA 196010<br>        and | : <br> : <br> : <br> : <br> : | |
| READING POLICE DEPARTMENT<br>815 Washington Street<br>Reading, PA 19601<br>        and | : <br> : <br> : <br> : | JURY TRIAL DEMANDED |
| WILLIAM HEIM, CHIEF OF<br>POLICE OF THE READING POLICE,<br>INDIVIDUALLY AND IN HIS<br>OFFICIAL CAPACITY<br>815 Washington Street<br>Reading, PA 19601<br>        and | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| CAPTAIN DANTE ORLANDI,<br>COMMANDING OFFICER OF<br>PENNSYLVANIA STATE POLICE<br>TROOP 'L', INDIVIDUALLY<br>600 Kenhorst Blvd.<br>Reading, PA 19611<br>        and | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| OFFICER BRIAN ERRINGTON,<br>INDIVIDUALLY AND IN HIS OFFICIAL<br>CAPACITY<br>c/o Reading Police Department<br>815 Washington Street<br>Reading, PA 196010<br>        and | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| CAPTAIN DAMON KLOC<br>INDIVIDUALLY AND IN HIS OFFICIAL<br>CAPACITY<br>c/o Reading Police Department<br>815 Washington Street<br>Reading, PA 196010<br>        and | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| JOHN DOE-1<br>c/o Reading Police Department<br>815 Washington Street<br>Reading, PA 196010<br>        and | : <br> : <br> : <br> : <br> : | |
| JOHN DOE-2 | : | |

c/o Reading Police Department        :
815 Washington Street                :
Reading, PA 196010                   :
        and                          :
JOHN DOE-3                           :
c/o Reading Police Department        :
815 Washington Street                :
Reading, PA 196010                   :
        and                          :
JOHN DOE-4                           :
c/o Reading Police Department        :
815 Washington Street                :
Reading, PA 196010                   :
        and                          :
JOHN DOE-5                           :
c/o Reading Police Department        :
815 Washington Street                :
Reading, PA 196010                   :
        and                          :
JOHN DOE-6                           :
c/o Reading Police Department        :
815 Washington Street                :
Reading, PA 196010                   :
        and                          :
JOHN DOE-7                           :
c/o Reading Police Department        :
815 Washington Street                :
Reading, PA 196010                   :
        and                          :
PENNSYLVANIA STATE                   :
TROOPER MICHAEL PAVELKO,             :
INDIVIDUALLY                         :
c/o Pennsylvania State Police        :
600 Kenhorst Blvd.                   :
Reading, PA 19611                    :
        and                          :
JOHN DOE-8                           :
c/o Pennsylvania State Police        :
600 Kenhorst Blvd.                   :
Reading, PA 19611                    :
        and                          :
JOHN DOE-9                           :
c/o Pennsylvania State Police        :
600 Kenhorst Blvd.                   :
Reading, PA 19611                    :
                                     :
        Defendants.                  :
                                     :

## CIVIL ACTION COMPLAINT

## NATURE OF THE COMPLAINT

1.      This is an action seeking to redress wrongs committed against Plaintiff in
violation of the rights guaranteed to him by the Fourth, Eighth and Fourteenth Amendments of
the United States Constitution, and are actionable against such Defendants pursuant to the Civil
Rights Act of 1871, as amended, 42 U.S.C. Section 1983, as well as pursuant to the Pennsylvania
Constitution and other state laws.  The actions taken against Plaintiff have resulted in severe
physical and emotional injury, monetary damage, and distress, requiring him to be placed under
extensive medical care, and also causing, but not limited to, humiliation, anxiety and other
physical ailments and emotional damages.  Defendants' conduct is so egregious and outrageous
and intentional, that Plaintiff seeks punitive damages.  Plaintiff also seeks immediate injunctive
relief enjoining all Defendants from taking and all actions that violate Plaintiff's Constitutional
rights, including but not limited to conducting any investigation(s) into any of the facts or
circumstances set-forth in the instant matter, including but not limited to any alleged criminal
conduct committed by Plaintiff, and Ordering that such investigation(s) be assigned to a third-
party governmental agency.

## JURISDICTION

2.      This Court retains jurisdiction over this matter pursuant to 28 U.S.C. Sec. 1331,
1343, and also retains supplemental jurisdiction over state law claims pursuant to 28 U.S.C. Sec.
1367.

## PARTIES

3.      Plaintiff, Ernest Martin, is an individual residing at 653 Mulberry Street, Reading,
PA 19604.

4.      Defendant City of Reading is a Municipal Corporation, organized and existing
under the laws of the Commonwealth of Pennsylvania, whose address for the purpose of service
is 815 Washington Street, Reading, PA 19601.  Defendant City of Reading owns, operates and
controls the Reading Police Department.

5.      Defendant Reading Police Department is a municipal police organization,

organized and existing under the laws of the Commonwealth of Pennsylvania, whose address for the purpose of service is 815 Washington Street, Reading, PA 19601.

6.      Defendant William Heim, Chief of Police of the Reading Police Department, individual and in his official capacity, herein referred to as 'Defendant Heim', was in the employment of  Defendant City of Reading and Defendant Reading Police Department at all times material hereto.

7.      Defendant Officer Brian Errington, individually and in his official capacity, is a Reading Police Officer, herein referred to as 'Defendant Errington', was in the employment of Defendant City of Reading and Defendant Reading Police Department at all times material hereto.

8.      Defendant Captain Damon Kloc, individually and in his official capacity, is a Captain with the Reading Police Department, herein referred to as 'Defendant Kloc', and was in the employment of  Defendant City of Reading and Defendant Reading Police Department at all times material hereto.

9.      Defendant John Doe-1 is a Reading Police Officer, who at all times material hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

10.      Defendant John Doe-2 is a Reading Police Officer, who at all times material hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

11.      Defendant John Doe-3 is a Reading Police Officer, who at all times material hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

12.      Defendant John Doe-4 is a Reading Police Officer, who at all times material hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

13.      Defendant John Doe-5 is a Reading Police Officer, who at all times material

hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

14.     Defendant John Doe-6 is a Reading Police Officer, who at all times material hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

15.     Defendant John Doe-7 is a Reading Police Officer, who at all times material hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

16.     Defendant John Doe-8 is a Reading Police Officer, who at all times material hereto was in the employment of Defendant City of Reading and Defendant Reading Police Department.

17.     Defendants John Doe-1, John Doe-2, John Doe-3, John Doe-4, John Doe-5, John Doe-6, John Doe-7, and John Doe-8, are collectively referred to herein as "Defendant Reading John Does".

18.     Defendant Captain Dante Orlandi, Commanding Officer of Pennsylvania State Police Troop 'L', individually, herein referred to as 'Defendant Orlandi', was in the employment of the Commonwealth of Pennsylvania and the Pennsylvania State Police at all times material hereto.

19.     Defendant Pennsylvania State Trooper Michael Pavelko, a Pennsylvania State Trooper with the Pennsylvania State Police, herein referred to as 'Defendant Pavelko', was in the employment of the Commonwealth of Pennsylvania and the Pennsylvania State Police at all times material hereto.

20.     Defendant John Doe-8 is a Pennsylvania State Trooper, who at all times material hereto was in the employment of the Commonwealth of Pennsylvania and the Pennsylvania State Police.

21.     Defendant John Doe-9  is a Pennsylvania State Trooper, who at all times material hereto was in the employment of the Commonwealth of Pennsylvania and the Pennsylvania State

Police.

22.     Defendants John Doe-8 and John Doe-9 are collectively referred to herein as "Defendant PSP John Does".

23.     At all times material hereto Defendants City of Reading, the Reading Police Department, Defendant Heim, and Defendant Kloc acted by and through their duty authorized agents, servants, workmen, contractors, officers and/or employees, who were acting within the course and scope of their employment and authority, at the direction of Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc and at all times material hereto were acting  in concert with all other Defendants.

24.     At all times material hereto Defendant Orlandi, acted by and through duty authorized agents, servants, workmen, contractors, police officers and/or employees who were acting within the course and scope of their employment and authority at the direction of Defendant Orlandi, and at all times material hereto were acting in concert with all other Defendants.

25.     At all times material hereto, Defendant  Reading John Does and Defendant PSP John Does were individuals pursuant to 42 U.S.C. Section 1983, 42 U.S.C. Section 1985, and 42 U.S.C. Section 1986, and acted in their individual and/or official capacity.

26.     At all times material hereto, Defendants Heim, Orlandi, Errington, Kloc and Pavelko were individuals pursuant to 42 U.S.C. Section 1983, 42 U.S.C. Section 1985, and 42 U.S.C. Section 1986, and acted in their individual and/or official capacity.

27.     At all times material and relevant hereto, all Defendants acted in concert and conspiracy with each other to improperly and/or falsely arrest, assault and batter, search, imprison, inflict emotional distress, defame, inflict cruel and unusual punishment, conspire to falsely accuse, improperly interfere with an official investigation, obstruct justice, tamper with witnesses, invade the privacy of Plaintiff, and otherwise deprive Plaintiff of rights guaranteed by the laws and Constitution of the Commonwealth of Pennsylvania and the U.S. Constitution while acting within the course and scope of their agency, servitude and/or employment.

28.     At all times material hereto, all Defendants were acting under the color of state law.

## FACTUAL ALLEGATIONS

29.     On April 19, 2012, Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendants Reading John Does, Defendant Errington and Defendnat Kloc, intentionally caused Plaintiff Ernest Martin to fall from the West Shore Bypass, located in West Reading, PA, through the illegal, unauthorized and unnecessary application of excessive and/or deadly force. Specifically, Defendant Errington intentionally and maliciously attacked and shot Plaintiff with a taser/stun gun while Plaintiff stood at the side of the West Shore Bypass, causing him to plummet approximately forty (40) feet to the concrete below.

30.     As a result of the aforesaid fall, Plaintiff Ernest Martin has suffered injuries which are serious and permanent in nature, including but not limited to: extensive laceration and hematoma involving the entire right hepatic lobe and portions of the left hepatic lobe of the liver requiring placement of surgical clips/embolization coils in the vicinity of the right hepatic artery, causing permanent damage and/or death of the liver; extensive comminuted fracture of the pelvis involving the superior and medial right acetabulum with extension into the right ilium; diffuse swelling/edema and possible small intramuscular hematoma of the right gluteal muscles, right iliacus muscle and distal right psoas muscle; transverse fracture of the right L2 transverse process; multiple right-sided rib fractures of the posterior right 6th, 7th, 8th, 9th, 10th, 11th and 12th ribs with subcutaneous emphysema in the right lateral chest wall requiring placement of a ventrical tube; pleural effusion at the right lung and other injuries requiring a multiple surgical procedures, all or some of which may be known or may still be discovered and all or some of which are or may be permanent in nature.

31.     As a result of these life threatening injuries, Mr. Martin was transported to Reading Hospital and Medical Center as a trauma patient and immediately placed in the intensive care unit. Mr. Martin has been forced to undergo multiple painful surgeries, has been dependent

upon a ventilator to breath and a feeding tube for nourishment, multiple skin grafts, and an extensive abdominal open wound measuring approximately 12 inches circular. Mr. Martin's injuries are life threatening and, at a minimum, require a hospitalization measured in months.

32. Defendants City of Reading, the Reading Police Department, Defendant Heim, and Defendant Kloc had in place, and/or should have had in place, policies regarding the following, but not limited to the following:

a. the preclusion of utilizing excessive force;

b. the preclusion of the inappropriate use of deadly force;

c. the preclusion of inappropriate use of tasers and/or stun-guns;

d. the reporting and documentation requirements for use of deadly force;

e. the reporting and documentation requirements regarding the use of excessive force;

f. the reporting and documentation requirements regarding the use of tasers and/or stun-guns;

g. the requirement to not cover-up or attempt to hide and/or seclude the fact that excessive force was used upon an individual;

h. the requirement to not cover-up or attempt to hide and/or seclude the fact that deadly force was used upon an individual;

i. the requirement to not cover-up or attempt to hide and/or seclude the fact that a taser or stun-gun was used upon an individual;

j. the requirement of all persons, contractors, agents, servants, workmen and employees including but not limited to the employees, agents, servants and workmen of contractors of Defendants City of Reading and Reading Police Department, who participate in the apprehension and arrest of individuals, to follow the policies of the City of Reading and Reading Police Department;

k. the requirement of all persons, contractors, agents, servants, workmen and employees including but not limited to the employees, agents, servants and

workmen of contractors of Defendants City of Reading and Reading Police Department, who participate in the apprehension and arrest of individuals, to be trained with regard to the policies of the City of Reading and Reading Police Department;

l.     training on policies, practices and procedures of each of the categories listed *supra.*

33.    On April 19, 2012, shortly after Plaintiff was tasered over the edge of the bridge, as a result of All Defendants' unlawful actions and inactions, Defendant Orlandi, by and through Defendant Pavelko and Defendant PSP John Does, began an investigation into the circumstances surrounding Plaintiff's fall, in concert with Defendants City of Reading, Reading Police Department, Defendant Heim, Defendant Kloc, Defendant Errington and Defendants Reading John Does. In furtherance of the violation of Plaintiff's civil rights, all Defendants collectively and intentionally conspired to maliciously, vengefully and with bias, violate Plaintiff's constitutional rights, deprive Plaintiff of his right to a fair trial and of liberty without due process of law, by taking a course of conduct that included, but was not limited to, the following:

a.     Attempting to cover-up and hide the facts surrounding the unlawful cause of Plaintiff's fall from the bridge;

b.     intentionally failing to properly preserve physical evidence at the scene in an effort to improperly interfere with an official investigation, obstruct justice, manufacture a cover-up of facts and otherwise deprive Plaintiff of rights guaranteed by the laws and Constitution of the Commonwealth of Pennsylvania and the U.S. Constitution while acting within or beyond the course and scope of their agency, servitude and/or employment;

c.     intentionally failing to obtain/retain the names and contact information of, and intentionally failing to properly question, eye witnesses at the scene in an effort to unlawfully interfere with an official investigation, obstruct justice, manufacture a cover-up of facts and otherwise deprive Plaintiff of rights guaranteed by the laws

and Constitution of the Commonwealth of Pennsylvania and the U.S. Constitution
while acting within the course and scope of their agency, servitude and/or
employment;

d.    in interviewing a witness days later, Defendant Orlandi, by and through Defendant
Pavelko and Defendant PSP John Does, and in concert with Defendants City of
Reading, Reading Police Department, Defendant Heim, Defendant Kloc,
Defendant Errington and Defendants Reading John Does, acted in concert and
conspiracy with each other to improperly interfere with an official investigation,
obstruct justice, manufacture a cover-up of facts and tamper/intimidate witnesses,
by threatening a witness with criminal perjury charges if the witness would not
corroborate Defendants' version of events. Defendants took this action in an
effort to deprive Plaintiff of rights guaranteed by the laws and Constitution of the
Commonwealth of Pennsylvania and the U.S. Constitution while acting within the
course and scope of their agency, servitude and/or employment.

34.    All Defendants had in place, and/or should have had in place, policies regarding
the following, but not limited to the following:

a.    the preclusion of obstructing justice;

b.    the preclusion of intentionally interfering in an official investigation;

c.    the preclusion of tampering/intimidating witnesses;

d.    the preclusion of depriving individuals of their rights as guaranteed by the laws
and Constitution of the Commonwealth of Pennsylvania and the U.S.
Constitution;

e.    the preclusion of conspiring to intentionally interfere with an official
investigation, tamper/intimidate witnesses, obstruct justice, or deprive individuals
of their rights as guaranteed by the laws and Constitution of the Commonwealth
of Pennsylvania and the U.S. Constitution;

f.    the duty to properly interview witness(es) at the scene of an incident and properly

preserve, report and document said interview(s);

g.  the duty to preserve physical evidence at the scene of an incident and properly preserve, report and document said evidence;

h.  the requirement to not cover-up or attempt to hide and/or seclude the existence of physical evidence;

I.  the requirement to not cover-up or attempt to hide and/or seclude witness reports or testimony;

j.  the requirement of all persons, contractors, agents, servants, workmen and employees including but not limited to the employees, agents, servants and workmen of contractors of all Defendants, participate in official investigations,, to follow the policies of the Defendants City of Reading and the Reading Police Department and/or the Commonwealth of Pennsylvania and the Pennsylvania State Police Department

k.  the requirement of all persons, contractors, agents, servants, workmen and employees including but not limited to the employees, agents, servants and workmen of contractors of all Defendants, who participate in official investigations, to be trained with regard to the policies of the Defendants City of Reading and the Reading Police Department and/or the Commonwealth of Pennsylvania and the Pennsylvania State Police Department;

l.  the training, instruction and dissemination of the policies described, *supra.*

35.  As a result of contract, agreement, policy and/or practice, all agents, servants, employees, workmen and or contractors of all Defendants, including but not limited to Defendant Errington, Defendant Kloc, Defendant Reading John Does, Defendant Pavelko, and Defendant PSP John Does, are required to follow, administer, engage, practice and/or enforce the policies of Defendants City of Reading, the Reading Police Department, Defendant Heim, Defendant Kloc, and/or Defendant Orlandi, including but not limited to the above-described policies, giving such policies full force and effect.

36.     In furtherance of the violation of Plaintiff's civil rights, all Defendants, by and through Defendant Errington, Defendant Kloc, Defendant Reading John Does, Defendant Pavelko, and Defendant PSP John Does, individually and acting in concert with each other, maintained a policy and practice of ignoring, disregarding and/or violating, intentionally and/or negligently and/or with deliberate indifference for the rights of Plaintiff, the policies in place for the protection of persons being pursued and/or arrested and/or detained and/or those similarly situated to Plaintiff, which resulted in harm to Plaintiff.

37.     All Defendants, by and through Defendant Errington, Defendant Kloc, Defendant Reading John Does, Defendant Pavelko, and Defendant PSP John Does, individually and/or in concert with each other and in deliberate indifference to the rights of Plaintiff, maintained a policy and practice of failing to inform and/or train their employees, agents, workmen, servants and/or contractors of these policies which were in place for the protection of the rights of plaintiff and persons similarly situated to Plaintiff.

38.     All Defendants, by and through Defendant Errington, Defendant Kloc, Defendant Reading John Does, Defendant Pavelko, and Defendant PSP John Does, individually and/or in concert with each other and in deliberate indifference to the rights of Plaintiff, maintained a policy and practice of failing to inform and/or train their employees, agents, workmen, servants and/or contractors of the proper use of a stun-gun and/or taser, which were in place for the protection of the rights of plaintiff and persons similarly situated to Plaintiff.

39.     All Defendants, by and through Defendant Errington, Defendant Kloc, Defendant Reading John Does, Defendant Pavelko, and Defendant PSP John Does, individually and/or in concert with each other and in deliberate indifference to the rights of Plaintiff, maintained a policy and/or practice of failing to enforce the execution of these policies, intentionally and/or negligently and with deliberate indifference to the rights of Plaintiff which resulted in harm to Plaintiff, that harm being continued, the continued and unnecessary suffering of Plaintiff all resulting in the deprivation of Plaintiff's constitutionally protected rights.

40.     All Defendants knew and/or should have known that the above-described policies

were in place for the protection of Plaintiff's rights and that Defendants City of Reading, Reading Police Department, Defendant Errington, Defendant Kloc, Defendant Reading John Does, Defendant Pavelko, and Defendant PSP John Does actions and/or inactions as above-described presented a substantial risk of, and in fact resulted in, severe harm, injury, suffering, debilitation and permanent damage to Plaintiff and all Defendants took such course of action/inaction, despite such knowledge.

41.    On April 19, 2012, shortly after Plaintiff was tasered over the edge of the bridge, all Defendants caused to be published false statements, writings and allegations as to Plaintiff, with reckless disregard for their falsity and/or with actual knowledge of their falsity.

42.    Specifically, all Defendants provided false and misleading statements to local media outlets, including but not limited to the Reading Eagle Newspaper and Channel 69 Television News, by reporting falsehoods that included, but were not limited to, allegations that Plaintiff intentionally jumped off the West Shore Bypass.

43.    The publication of the statements by all Defendants as to Plaintiff, as above-described, were completely false.

44.    Defendants cannot prove the truth of any of their statements as to Plaintiff.

45.    The publication of the statements, allegations, and writings of all Defendants as to Plaintiff, as above-described, constitute defamation *per se,* casting in a false light, and intentional infliction of emotional distress, and were stated in reckless disregard for their falsity and/or with actual knowledge of their falsity.

46.    Said defamatory *per se* publications were intended to be received and understood by third parties and the public, and in fact were received and understood by third-parties and the public, to have a defamatory meaning as to Plaintiff.

47.    As a direct and proximate cause of All Defendants' conduct, Plaintiff has suffered severe emotional distress and severe and permanent harm to his reputation, which has and will continue to interfere with Plaintiff's professional employment opportunities.

48.    The conduct of all Defendants has been, and remains malicious and outrageous,

and such that it shocks the conscience of the reasonable and ordinary person, warranting the imposition of punitive damages.

## COUNT I

**VIOLATION OF 42 U.S.C.A. SECTION 1983, U.S. CONSTITUTION - THE FOURTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION**

**Plaintiff v. City of Reading, Reading Police Department, William Heim, Chief of Police of the Reading Police Department, individually and in his official capacity, Officer Brian Errington, individually and in his official capacity, Captain Damon Kloc, individually and in his official capacity, and Defendants Reading John Does**

49.    Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as though each were set forth at length herein.

50.    At all times material hereto, Plaintiff possessed a liberty interest to be free from unreasonable seizure, including but not limited to the right to be free from extreme, unwarranted, and unnecessary use of deadly and/or excessive force.  As a result of the actions taken against Plaintiff by Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff's rights pursuant to the Fourth Amendment to the United States Constitution, as secured by 42 U.S.C., Section 1983, were violated.

51.    At all times material hereto, Plaintiff possessed a liberty interest in his bodily integrity which was, and is, protected by the Fourteenth Amendment to the Constitution of the United States, including but not limited to the right to be free from extreme, unwarranted, and unnecessary use of deadly force and/or excessive force.  As a result of the actions taken against Plaintiff by Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff's rights pursuant to the Fourteenth Amendment to the United States Constitution, as secured by 42 U.S.C. Section 1983, were violated.

52.    At all times material hereto, the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant

Reading John Does, Defendant Errington and/or Defendant Kloc as above-described, constituted a willful disregard and/or reckless indifference to the safety of individuals, and intentionally conspired to maliciously, vengefully and with bias violate Plaintiff's constitutional rights, by taking a course of conduct that included, but was not limited to, the following:

    a.    the utilization of excessive force;

    b.    the excessive/inappropriate use of deadly force;

    c.    the excessive/inappropriate use of tasers and/or stun-guns;

    d.    improper documentation and reporting with regard to the use of deadly force;

    e.    improper documentation and reporting with regard to the use of excessive force;

    f.    improper documentation and reporting with regard to the use of tasers and/or stun-guns;

    g.    covering-up or attempting to hide and/or seclude the fact that excessive force was used upon an individual;

    h.    covering-up or attempting to hide and/or seclude the fact that excessive force was used upon an individual;

    I.    covering-up or attempting to hide and/or seclude the fact that a taser or stun-gun was used upon an individual

    j.    using deadly force upon an individual who was not an immediate threat;

    k.    utilizing excessive and/or deadly force through malice;

    l.    utilizing unwise, excessive zeal, constituting an abuse of official power.

    m.    failing to have in place appropriate training on stun-gun use;

    n.    failing to enforce and/or regularly and intentionally disregarding the any and/or all of the above-described policies.

53.    As a result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff has suffered severe and permanent injuries as set-forth *supra.*

54.     As a result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff has suffered and continues to suffer severe and agonizing pain, which will continue throughout his lifetime.

55.     As a result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff has been forced to expend and will continue to expend, large sums of money to care for his injuries, which expenses will continue indefinitely into the future.

56.     As a further result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, the Plaintiff has suffered a severe loss of his earnings and impairment of his earning capacity and power, all of which may continue indefinitely into the future.

57.     As a further result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, the Plaintiff has suffered severe physical pain and trauma, mental upset and anguish and humiliation and may continue to suffer the same for an indefinite time into the future.

58.     As a further result of the actions Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, the Plaintiff has suffered a diminution in his ability to enjoy life and life's pleasures, all of which may continue indefinitely into the future.

59.     The action of the of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, under the color of state law, as more fully

described herein above, deprived Plaintiff in his liberty interest in his bodily integrity in violation Plaintiff's rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, as secured by 42 U.S.C., Section 1983.

60.     As described herein, Defendants' acts or omissions were in willful, malicious wanton, reckless and/or callous disregard of Plaintiff's rights, thereby entitling Plaintiff to punitive damages.


## COUNT II

### VIOLATION OF 42 U.S.C.A. SECTION 1983, U.S. CONSTITUTION - THE EIGHTH AMENDMENT OF THE U.S. CONSTITUTION

**Plaintiff v. City of Reading, Reading Police Department, William Heim, Chief of Police of the Reading Police Department, individually and in his official capacity, Officer Brian Errington, individually and in his official capacity, Captain Damon Kloc, individually and in his official capacity, and Defendants Reading John Does**

61.     Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as though each were set forth at length herein.

62.     At all times material hereto, Plaintiff possessed a liberty interest to not be subject to cruel and unusual punishment. As a result of the actions taken against Plaintiff by Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff's rights pursuant to the Eighth Amendment to the United States Constitution, as secured by 42 U.S.C., Section 1983 were violated.

63.     At all times material hereto, the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, constituted a willful disregard and/or reckless indifference to the safety of individuals, and intentionally conspired to maliciously, vengefully and with bias violate Plaintiff's constitutional rights, by taking a course of conduct that included, but was not limited to, the following:

    a.      the utilization of excessive force constituting cruel and unusual punishment;

b.      the inappropriate use of deadly force constituting cruel and unusual punishment;

c.      the inappropriate use of tasers and/or stun-guns;

d.      improper documentation and reporting with regard to the use of deadly force;

e.      improper documentation and reporting with regard to the use of excessive force;

f.      improper documentation and reporting with regard to the use of tasers and/or stun-guns;

g.      covering-up or attempting to hide and/or seclude the fact that excessive force was used upon an individual;

h.      covering-up or attempting to hide and/or seclude the fact that excessive force was used upon an individual;

i.      covering-up or attempting to hide and/or seclude the fact that a taser or stun-gun was used upon an individual

j.      using deadly force upon an individual who was not an immediate threat constituting cruel and unusual punishment;

k.      utilizing excessive and/or deadly force through malice constituting cruel and unusual punishment;

l.      unwise, excessive zeal, constituting an abuse of official power constituting cruel and unusual punishment.

m.      failing to have in place appropriate training on stun-gun use;

n.      failing to enforce and/or regularly and intentionally disregarding the any and/or all of the above-described. policies.

64.     As a result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff has suffered severe and permanent injuries as set-forth above.

65.     As a result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John

Does, Defendant Errington and/or Defendant Kloc, Plaintiff has suffered and continues to suffer severe and agonizing pain, which will continue throughout his lifetime.

66.     As a result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, Plaintiff has been forced to expend  and will continue to expend, large sums of money to care for his injuries, which expenses will continue indefinitely into the future.

67.     As a further result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, the Plaintiff has suffered a severe loss of his earnings and impairment of his earning capacity and power, all of which may continue indefinitely into the future.

68.     As a further result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, the Plaintiff has suffered severe physical pain and trauma, mental upset and anguish and humiliation and may continue to suffer the same for an indefinite time into the future.

69.     As a further result of the actions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, the Plaintiff has suffered a diminution in his ability to enjoy life and life's pleasures, all of which may continue indefinitely into the future.

70.     The action of the of the Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by and through Defendant Reading John Does, Defendant Errington and/or Defendant Kloc, under the color of state law, as more fully described  herein above, subjected Plaintiff to cruel and usual punishment in violation Plaintiff's rights pursuant to the Eight Amendment to the United States Constitution, as secured by 42

U.S.C., Section 1983.

71.     As described herein, Defendants' acts or omissions were in willful, malicious

wanton, reckless and/or callous disregard of Plaintiff's rights, thereby entitling Plaintiff to

punitive damages.


## COUNT III

### VIOLATIONS OF THE FOURTH, EIGHTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS SECURED BY 42 U.S.C.A SECTION 1983

**Plaintiff v. Plaintiff v. City of Reading, Reading Police Department, William Heim, Chief of Police of the Reading Police Department, individually and in his official capacity, and Captain Damon Kloc, individually and in his official capacity**

72.     Plaintiff hereby incorporates by reference the preceding paragraphs of this

Complaint, as though each were set forth at length herein.

73.     At all times material hereto, Plaintiff possessed a liberty interest to be free from

unreasonable seizure, including but not limited to the right to be free from extreme, unwarranted,

and unnecessary use of deadly and/or excessive force.  As a result of the actions and/or inactions

of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and

Defendant Kloc, by maintaining a policy and practice of failing to inform and/or train their

employees, agents, workmen, servants and/or contractors, including but not limited to Defendant

Reading John Does, Defendant Errington and Defendant Kloc, as set-forth at length above,

Plaintiff's rights pursuant to the Fourth Amendment to the United States Constitution, as secured

by 42 U.S.C., Section 1983, were violated.

74.     At all times material hereto, Plaintiff possessed a liberty interest to not be subject

to cruel and unusual punishment.  As a result of the actions and/or inactions of Defendant City of

Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by

maintaining a policy and practice of failing to inform and/or train their employees, agents,

workmen, servants and/or contractors, including but not limited to Defendant Reading John

Does, Defendant Errington and Defendant Kloc, as set-forth at length above, Plaintiff's rights

pursuant to the Eighth Amendment to the United States Constitution, as secured by 42 U.S.C.,

Section 1983 were violated.

75.    At all times material hereto, Plaintiff possessed a liberty interest in his bodily integrity which was, and is, protected by the Fourteenth Amendment to the Constitution of the United States, including but not limited to the right to be free from extreme, unwarranted, and unnecessary use of deadly force and/or excessive force.  As a result of the actions and/or inactions of Defendant City of Reading, Defendant Reading Police Department, Defendant Heim, and Defendant Kloc, by maintaining a policy and practice of  failing to inform and/or train their employees, agents, workmen, servants and/or contractors, including but not limited to Defendant Reading John Does, Defendant Errington and Defendant Kloc, as set-forth at length above, Plaintiff's rights pursuant to the Fourteenth Amendment to the United States Constitution, as secured by 42 U.S.C. Section 1983, were violated.

76.    Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc have encouraged, tolerated, ratified, and been deliberately indifferent to the following patterns, practices and customs, and to the need for more, different and adequate training, supervision, investigation or discipline in the areas, including but not limited to:

a.    The proper exercise of police powers, including but not limited to the use of force and the use of tasers and/or stun-guns;

b.    The failure to identify, investigate, and take remedial and/or disciplinary action and/or measures against police officers who were the subject of prior complaints of excessive force and/or unwarranted deadly force;

c.    the failure of police officers to follow established policies, procedures, directives, and instructions regarding the use of force and other police powers under such circumstances and the present case;

d.    The failure to properly sanction or discipline officers, agents, employees who are aware of and/or conceal and/or aid and/or abet violations of constitution rights of individuals by police officers, thereby causing and encouraging police officers, including Defendants Reading John Does, Defendant Errington and/or Defendant Kloc, to violate the rights of citizens such as Plaintiff:

e.    the practiced disregard of policies and procedures described *supra* in place to protect citizens from Constitutional violations, civil rights violations and due process violations.

f.    failure to train;

g.    failing to enforce and/or regularly and intentionally disregarding the any and/or all

of the above-described policies.

77.     As a result of the actions of the Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, Plaintiff has suffered severe and permanent injuries as set-forth *supra.*

78.     As a result of the actions of the Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, Plaintiff has suffered and continues to suffer severe and agonizing pain, which will continue throughout his lifetime.

79.     As a result of the actions of the Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, Plaintiff has been forced to expend  and will continue to expend, large sums of money to care for his injuries, which expenses will continue indefinitely into the future.

80.     As a result of the actions of the Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, the Plaintiff has suffered a severe loss of his earnings and impairment of his earning capacity and power, all of which may continue indefinitely into the future.

81.     As a result of the actions of the Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, the Plaintiff has suffered severe physical pain and trauma, mental upset and anguish and humiliation and may continue to suffer the same for an indefinite time into the future.

82.     As a result of the actions of Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, the Plaintiff has suffered a diminution in his ability to enjoy life and life's pleasures, all of which may continue indefinitely into the future.

83.     The actions of Defendants City of Reading, Reading Police Department, Defendant Heim, and Defendant Kloc, under the color of state law, as more fully described herein above, deprived Plaintiff in his liberty interest in his bodily integrity in violation of 42 U.S.C.A. Section 1983.

84.     As described herein, Defendants' acts or omissions were in willful, malicious

wanton, reckless and/or callous disregard of Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

## COUNT IV

### ASSAULT, BATTERY, AND INTENTIONAL
### INFLICTION OF EMOTIONAL DISTRESS UNDER PENNSYLVANIA LAW

**Plaintiff v. Defendant Officer Brian Errington, individually and in his official capacity, and Defendants Reading John Does.**

85.     Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as though each were set forth at length herein.

86.     The acts of Defendant Errington and/or Defendants Reading John Does, in their individual capacities, as set-forth at length above, constitutes assault, battery, and intentional infliction of emotional distress, pursuant to the laws of the Commonwealth of Pennsylvania.

87.     Such assault, battery and intentional infliction of emotional distress was caused by Defendant Errington and/or Defendants Reading John Does' willful disregard and/or reckless indifference to the safety of Plaintiff, as descried *supra,* by taking a course of conduct that included, but was not limited to, the following:

　　　a.　　the utilization of excessive force;

　　　b.　　the inappropriate use of deadly force;

　　　c.　　using deadly force upon an individual who was not an immediate threat;

　　　d.　　utilizing excessive and/or deadly force through malice;

　　　e.　　unwise, excessive zeal, constituting an abuse of official power;

88.     As a result of the intentional actions of Defendant Errington and/or Defendants Reading John Does, Plaintiff has suffered severe and permanent injuries as set-forth above.

89.     As a result of the intentional actions of Defendant Errington and/or Defendants Reading John Does, Plaintiff has suffered and continues to suffer severe and agonizing pain, which will continue throughout his lifetime.

90.     As a result of the intentional actions of Defendant Errington and/or Defendants

Reading John Does, Plaintiff has been forced to expend and will continue to expend, large sums of money to care for his injuries, which expenses will continue indefinitely into the future.

91.     As a result of the intentional actions of Defendant Errington and/or Defendants Reading John Does, the Plaintiff has suffered a severe loss of his earnings and impairment of his earning capacity and power, all of which may continue indefinitely into the future.

92.      As a result of the intentional actions of Defendant Errington and/or Defendants Reading John Does, the Plaintiff has suffered severe physical pain and trauma, mental upset and anguish and humiliation and may continue to suffer the same for an indefinite time into the future.

93.     As a result of the intentional actions of Defendant Errington and/or Defendants Reading John Does, the Plaintiff has suffered a diminution in his ability to enjoy life and life's pleasures, all of which may continue indefinitely into the future.

94.     As described herein, Defendants' acts or omissions were in willful, malicious wanton, reckless and/or callous disregard of Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

## COUNT V

### VIOLATION OF 42 U.S.C.A. SECTION 1983, U.S. CONSTITUTION - THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

### Plaintiff v. All Defendants

95.     Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as though each were set forth at length herein.

96.     The acts and omissions of all Defendants, as alleged herein deprived Plaintiff of his clearly established and well-settled rights to personal liberty under the Fourteenth Amendment to the United States Constitution.

97.     The conduct of all Defendants', as described *supra*, includes, but is not limited to, the following acts or omissions:

a.      Obstructing justice;

b.  Improperly interfering with an official investigation;

c.  Tampering with a witness;

d.  Intimidating a witness;

e.  Depriving Plaintiff of rights guaranteed by the laws and Constitution of the Commonwealth of Pennsylvania and the U.S. Constitution while acting within the course and scope of their agency, servitude and/or employment;

f.  Failing to properly collect, preserve, and report physical evidence at a crime scene;

g.  Failing to properly interview witnesses at a crime scene;

h.  Conspiring to obstruct justice;

i.  Conspiring to improperly interfere with an official investigation;

j.  Conspiring to tamper with a witness;

k.  Conspiring to intimidate a witness;

l.  Conspiring to deprave Plaintiff of rights guaranteed by the laws and Constitution of the Commonwealth of Pennsylvania and the U.S. Constitution while acting within the course and scope of their agency, servitude and/or employment;

98.  All Defendants' acts and omissions complained of herein constitute a policy, pattern, practice, custom, final policymaking act, and/or ratification of a subordinate's action that deprived Plaintiff of particular Constitutional rights.

99.  Further, Defendants City of Reading, Reading Police Department, Defendant Heim, Defendant Kloc, and Defendant Orlandi have failed in their duties to properly hire, train, instruct, monitor, supervise, evaluate and investigate, all of their respective agents, servants, employees, workmen and or contractors, including but not limited to Defendant Reading John Does, Defendant PSP John Does, Defendant Errington, Defendant Kloc, and Defendant Pavelko. All Defendants were deliberately indifferent to the obvious consequences of these failures, and these failures directly resulted in the deprivation of Plaintiff's Constitutional rights.

100. All Defendants' acts and omissions reflect a gross lack of professional judgment and deliberate indifference to Plaintiff's Constitutional rights and caused the violation of Plaintiff's Constitutional rights and caused significant physical and emotional harm, in an amount to be determined at trial. These damages are compensable pursuant to 42 U.S.C. Section 1983.

101. Plaintiff is entitled to injunctive relief against All Defendants' conduct as described herein because he is suffering and will continue to suffer substantial and immediate irreparable injury from such conduct unless and until Defendants are restrained.

102. As described herein, Defendants' acts or omissions were in willful, malicious, wanton, reckless and/or callous disregard of Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

## COUNT VI

### DEFAMATION, CASTING IN A FALSE LIGHT INVASION OF PRIVACY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER PENNSYLVANIA STATE LAW

### Plaintiff v. All Defendants

103. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as though each were set forth at length herein.

104. The publication of the statements by All Defendants as to Plaintiff, as above-described, were completely false.

105. All Defendants cannot prove the truth of any of its/their statements as to Plaintiffs.

106. The publication of the statements, allegations, and writings of All Defendants as to Plaintiff, as above-described, constitute defamation *per se,* casting in a false light invasion of privacy, and intentional infliction of emotional distress pursuant to Pennsylvania law, and were stated in reckless disregard for their falsity and/or with actual knowledge of their falsity.

107. Said defamatory *per se* publications were intended to be received and understood by third parties and the public, and in fact were received and understood by third-parties, to have

a defamation meaning as to Plaintiff.

108.    As a direct and proximate cause of All Defendants' conduct, Plaintiff has suffered severe emotional distress and severe and permanent harm to his reputation, which has and will continue to interfere with Plaintiff's professional employment opportunities.

109.    As a direct and proximate cause of All Defendants' conduct, Plaintiff has suffered and will continue to suffer great mental anguish, as well as loss of enjoyment of life's pleasures and activities.

110.    The conduct of all Defendants has been, and remains malicious and outrageous, and such that it shocks the conscience of the reasonable and ordinary person, warranting the imposition of punitive damages.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial in this matter.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Ernest Martin respectfully pray that this Court award the following relief:

a.    Exercise jurisdiction over this matter;

b.    Award Plaintiff damages, with statutory interest, that are necessary and proper to compensate him for his injuries and damages;

c.    Award Plaintiff punitive damages;

d.    Declare unconstitutional and unlawful Defendants' violations of Plaintiff's rights.

e.    Preliminarily and permanently enjoin Defendants from subjecting Plaintiff to practices that violate his rights including but not limited to conducting any investigation(s) into any of the facts or circumstances set-forth in the instant matter, including but not limited to any alleged criminal conduct committed by Plaintiff, and Ordering that such investigation(s) be assigned to a third-party governmental agency.

f.    Award Plaintiff his reasonable attorney fees and costs; and,

g.    Grant such other relief as the Court deems just,

proper and equitable;

all of which is in excess of $150,000.00.

Respectfully submitted,


 s/   EAP2098
Edith A. Pearce, Esquire
Attorney for Plaintiff
The Pearce Law Firm, P.C.
1429 Walnut Street, 14th Floor
Philadelphia, PA   19102
(215) 557-8686

# EXHIBIT B

## United States District Court
## Eastern District of Pennsylvania

Ernest Martin

       Plaintiff

    v.

City of Reading, et al

       Defendants.

No. 12-3665

### DECLARATION OF MARK KROLL, PhD, FACC, FHRS, FIEEE, FAIMBE

I, Mark Kroll, being of legal age and under the penalties of perjury, state as follows:

1.  I am a competent adult and have personal knowledge of the following facts, or believe them to be true based on information and belief.  Facts about which I do not have personal knowledge are of the type reasonably relied upon by experts in this field and have probative value to me in rendering my opinions.

2.  Attached hereto is a true and accurate copy of my expert report in this litigation.

3.  The report summarizes my analysis and findings and includes a statement of my opinions.  The report also includes data and other information considered by me in forming my opinions and sets out my qualifications (including my resume).

4.  My opinions are expressed to a reasonable, or higher, degree of professional certainty.

5.  I affirm under the penalties of perjury that the foregoing statements are true and correct.

Mark Kroll, PhD, FIEEE, FAIMBE                27 May 2015

Pages 7-16 have important information in color and should only be printed or copied in color.

## *Table of Contents*

*Figures:* ..................................................................................................... *3*

*Tables:* ...................................................................................................... *3*

*Narrative* ................................................................................................... *4*

*Summary of Case Specific Opinions:* ........................................................ *4*

   1. Basic CEW Probe-Mode Technology ................................................5

   2. The TASER CEW Has Led to Dramatic Reductions in Injury. .........6

   3. The TASER CEW Dramatically Reduces Arrest-Related Fatalities ...........7

   4. What Marks Are Left With an Arcing Connection From A CEW? ...........7

   5. A Single Probe Contacted Mr. Martin ..............................................8

   6. Had Both Probes Connected, He Would Have Immediately Dropped. ...........10

   7. How Far was Mr. Martin From the Railing at the Time of the CEW discharge? .........12

   8. What Is The Effect Of a CEW With Probes In The Back? ...........14

   9. Where Would Mr. Martin Have Landed had There Been A Connection?.....................15

   10. Was Mr. Martin Launched Over the Railing or Did He Jump? ...........16

   11. The Location Of The Remaining Blast Door Provides No Evidence.............17

   12. Witness Alexis Vidal Misinterpreted Some Events of the Incident ...........18

   13. This was Not a Dangerous use of the TASER CEW. ...........19

*Expert Report of Lt. Col. Robert Johnson* ............................................ *21*

*Case Specific Materials Reviewed or Considered* ................................... *23*

*Exhibits* .................................................................................................. *24*

*General Comments* .................................................................................. *25*

   My Qualifications ...............................................................................25

   Previous Testimony ............................................................................28

   Fees: ..................................................................................................29

   Right To Amend: ...............................................................................29

   Further Development: .........................................................................29

   Specific References: ............................................................................29

   Opinion Methodology: .......................................................................29

*References:* .............................................................................................. *30*

# Figures:

*Figure 1. TASER X26 CEW* ............................................................................................ 5
*Figure 2. Blistering seen 15 minutes after arcing from probe lodged in shirt.* ............... 7
*Figure 3. Blistering seen 15 minutes after arcing from probe lodged in shorts.* ............ 8
*Figure 4. Notation from report of Tpr. Pavelko.* ............................................................ 8
*Figure 5. Notation from report of Tpr. Pavelko of interview with Ofc. Emerich.* ......... 8
*Figure 6. Typical fresh probe wound.* ............................................................................ 9
*Figure 7. Details of typical fresh probe wound* ............................................................ 9
*Figure 8. Locations of the 2 CEW probes in Mr. Martin's outer shirt* ......................... 10
*Figure 9. Subjects are stopped cold with a 12-inch probe spread on the back.* ........... 11
*Figure 10. With a 12-inch probe spread, almost all control of the arms is lost.* ........... 11
*Figure 11. Conservative analysis of the distance to the railing at probe impact.* ....... 13
*Figure 12. Effect of a back application of a CEW as seen from the back.* ................... 14
*Figure 13. Effect of a back application of a CEW as seen from the front.* ................... 14
*Figure 14. Effect of a back application of a CEW with no support.* ............................. 15
*Figure 15. Best estimate of Martin's falling position had the CEW delivered current to him.* ................... 16
*Figure 16. Slide 137 of TASER training materials v17.* ............................................. 20
*Figure 17. Subject vaulting head first over a railing.* ................................................. 21

# Tables:

*Table 1. Witness Recollections of Voluntary Actions of Mr. Martin* ........................... 17

## Narrative

On 19 April 2012, Mr. Ernest Martin was fleeing from Reading police officers in a stolen car when he crashed it on a bridge. He then left the car and proceeded over the median barrier and moved into the oncoming lanes. Reading PD Officer Errington attempted electronic control by discharging his TASER X26 CEW (Conducted Electrical Weapon) towards Mr. Martin's back. Apparently only 1 probe made contact and no electronic control was effected. Mr. Martin proceeded to the bridge railing and vaulted over it resulting in injuries from his fall.

## Summary of Case Specific Opinions:

1. I present a brief background on the X26 CEW technology.

2. The use of the CEW significantly reduces subject injuries over other uses of force.

3. The use of the CEW significantly reduces subject death over other uses of force.

4. Had both TASER CEW probes connected with Mr. Martin, he would have immediately dropped to the roadway.

5. A single probe contacted Mr. Martin and no electrical current was delivered by the TASER CEW to him.

6. The TASER CEW did not propel Mr. Martin over the bridge.

7. The location of the single remaining blast door provides no evidence of the exact spot from which the CEW was deployed.

8. Witness Alexis Vidal misinterpreted some of the events of the incident.

9. This was not a dangerous use of the TASER CEW.

10. Until discovery closes, I reserve the right to supplement or amend my report and opinions.

## 1. Basic CEW Probe-Mode Technology

In probe mode, the TASER handheld CEW uses compressed nitrogen to fire 2 small probes at typical distances of up to 7.7 m (meters) or 25 feet.[1,2] (Other TASER cartridge models can reach a distance of 11 m or 35 feet.)  When the CEW trigger is pulled, the high voltage first serves to open the nitrogen cartridges to release the nitrogen to propel the probes as directed. See Figure 1. These probes themselves are designed to pierce or become lodged in most light clothing. The sharp portion of the probe is 9-13 mm (millimeters) long and will typically penetrate the epidermis and dermis to a depth of ~6 mm for a good electrical connection. The device delivers very short — 100 microsecond (100 µs) — pulses of 600 V each.

   If there is no direct contact to the skin the device delivers  even shorter (5 µs) arcs (sparks) of 50,000 V to "jump" thru the air and clothing to complete the circuit.



Figure 1. TASER X26 CEW

Even as a strong static electrical shock will temporarily incapacitate someone, a series of 19 very short duration shocks per second can cause temporary muscle incapacitation. The short-duration electrical pulses applied by TASER CEWs are intended to stimulate Type A-α motor neurons, which are the nerves that control skeletal muscle contraction, but without a high risk of stimulating cardiac muscle. This typically leads to a loss of regional muscle control and a fall to the ground to end a violent confrontation or suicide attempt.[3,4]

### 2. The TASER CEW Has Led to Dramatic Reductions in Injury.

Numerous published studies have now clearly demonstrated substantial injury reductions from the use of TASER CEWs compared to alternative control techniques.[5-15]

A partial list of these studies includes:

1. MacDonald which compared the CEW to pepper spray and "physical force."[7]
2. Taylor which compared the CEW to pepper spray, baton strikes, and "hands-on."[6]
3. Mesloh who studied CEW usage in comparison to many control options.[14]
   a. Gentle hold
   b. Handcuff
   c. Leg restraints
   d. OC (Pepper) spray
   e. Compliance holds
   f. Takedown
   g. Empty hand strike
   h. FN303/Pepperball
   i. Impact weapon
   j. Canine

The largest epidemiological study was the 2009 MacDonald study of 24,380 uses of force.[7] This study found that CEW usage dramatically reduced both suspect and officer injury compared to alternative force options. Additional studies demonstrating injury reduction are memorialized in the papers of Taylor (13,983 subjects), Mesloh (n = 4303), Smith (n = 1645), Butler (n = 562), and White (n = 243).[2,6,7,14,16,17]

On average, the use of the CEW reduces suspect injuries by about 2/3. To put it another way, the use of alternative control techniques triples (3x) the risk of injury to subjects.

a. The deployment and use of TASER CEWs has been shown to reduce injuries to suspects over other force options, including physical force.
b. The deployment and use of TASER CEWs has been shown to reduce use-of-force citizen complaints and law-enforcement internal affairs complaints against law enforcement officers.[18]
c. Rates of injury from TASER CEWs is less than several other common law enforcement force options, including, but not limited to: physical force, batons, impact tools, canines, rubber bullets, and bean bags.
d. The deployment and use of TASER CEWs has been found to be a lower risk than most personal force options, including: baton, chemical spray, and OC (pepper) spray.
e. TASER CEWs are a safer alternative than other comparable law enforcement force options tools or techniques.

f.  TASER CEWs are shown to reduce suspect injuries when compared to physical force options.
g.  TASER CEWs are more effective in gaining volitional compliance through presence intimidation than other force options.
h.  TASER CEWs have greater accountability features than any other force option.
i.  TASER CEWs are the most studied force option available to law enforcement.
j.  TASER CEWs are the most effective force option in accomplishing intended effects for U.S. law enforcement.
k.  According to peer-reviewed literature, the TASER CEW causes less-severe physiologic and metabolic effects than other force options.
l.  According to peer-reviewed literature, the TASER CEW is the safest force option available to law enforcement.

### 3. The TASER CEW Dramatically Reduces Arrest-Related Fatalities

Eastman et al studied 426 CEW uses in Dallas and found that 5.4% of uses obviated the need for a firearm discharge.[19] The Portland, Oregon experience was that every 63 CEWs eliminated 1 shooting per year.[20]

Ferdik et al studied 518 US Law Enforcement Agencies over several years with a total of 3015 CEW deployments and 378 fatal Officer-involved shootings.[21] They found that a low-restriction CEW-usage policy resulted in a reduction of 2/3 in the shooting fatality rate.

### 4. What Marks Are Left With an Arcing Connection From A CEW?



Figure 2. Blistering seen 15 minutes after arcing from probe lodged in shirt.

When a probe is lodged in clothing, yet within 1 inch of the skin, a connection can be made by arcing.[22] In this case, small burns are created which lead to very obvious blistering within minutes of the exposure. This is seen with either probe applications or poor-contact drive-stun applications.[23] Published examples are seen in Figure 2 and Figure 3.



**Figure 3. Blistering seen 15 minutes after arcing from probe lodged in shorts.**

Note that investigating Trooper Pavelko specifically noted the absence of any burns which would have indicated a completed circuit.

> **Physical Evidence:**
>    Physical Evidence was collected at the scene by Troop L FSU members.  MARTIN was examined and only one puncture mark was discovered from the Taser probe.  There were no burns located on his body from the second probe lodged in his clothing.

**Figure 4. Notation from report of Tpr. Pavelko.**

> He related after he was checked for weapons he was unhand cuffed and they began providing first aid to him. He related he was on his stomach so they did not move him.  He related he held his head in a "c-Spine" position. He related he observed the male was having a difficult time breathing.  He related he observed one Taser probe in the male's shirt.  He related the probe looked as if it was just in the clothing and did not penetrate the skin. He related when they cut his shirt off he didn't see any puncture marks where the Taser probe would have contacted the skin. He related he did not observe any burns on the individual either that would have been caused by the Taser.  He related the probe was in the area of the left shoulder blade.

**Figure 5. Notation from report of Tpr. Pavelko of interview with Ofc. Emerich.**

*A probe-mode arcing connection would have left obvious blistering burns; none were found.*

### 5. A Single Probe Contacted Mr. Martin

As seen in Figure 6, a CEW probe wound has a very distinct appearance. There is a 2 mm puncture wound made by the dart and a 6 mm diameter ring from the impact of the probe collar.[24,25]

Page 8



Figure 6. Typical fresh probe wound.

Presumably qualified witnesses noted the single probe injury to Mr. Martin. Fire-fighter David Williams reported:

> With the patient's back exposed, I did observe a small puncture wound in the area of his left shoulder that seemed to correspond with the position of the Taser probe in his shirt although I never actually observed the probe in his skin. At no time during the assess-ment did I observe a second Taser probe or any puncture injury that would have corre-sponded to a second Taser probe.



Figure 7. Details of typical fresh probe wound

Pennsylvania State Police Trooper Heather Heffner reported:

> On 04/24/12 at 0904 hrs., Tpr. Mike PAVELKO and I went to the Reading Hospital to view the suspect. The suspect was rolled onto his right side by Lift-team assist Rich NOWOTARSKI, RN Susan OBRIEN and RN Susan KERSCHNER. A small puncture hole was observed on the suspect's left shoulder. This mark was photographed by Tpr. PAVELKO. The suspect was then rotated onto his left side, but no other marks were ob-served on the suspect's back.

A fundamental tenet of the delivery of electrical current is that a closed circuit of 2 wires is required. This is obvious to anyone that has plugged an appliance into a

wall outlet. It is true that a probe lodged in clothing can sometimes deliver current arcing through the air to the skin.[26] However, that capability is largely limited to a gap of 25 mm (~1 inch).[22] Also, in the event of such arcing, an obvious local burn is generated in the skin closest to the probe tip.[25] No such burn mark was observed on Mr. Martin and hence we can conclude that no circuit was completed.

*The lower probe was captured in the clothing and never made contact with Mr. Martin. Therefore no TASER CEW current was ever delivered.*

### 6. Had Both Probes Connected, He Would Have Immediately Dropped.

As seen in  Figure 8, the probes were about 12.3 inches apart in Mr. Martin's outer shirt. The probes begin 1 inch apart in the CEW muzzle and fly apart at an angle of 8°. Hence the spread is given by:

S(spread) = 1 + sin 8° X D(flight distance) (in inches)

Since sin 8° = 0.14 this becomes:

S = 1 + 0.14D

where we can solve for D as:

$$D = (S - 1) \div 0.14$$

Substituting in S = 12.3 we have:

D = 80.7 inches or 6.7 feet.



Figure 8. Locations of the 2 CEW probes in Mr. Martin's outer shirt

If the shirt was somewhat "bunched" up during Mr. Martin's run then the probe spread at impact would have been less and thus the distance could have been

as little as 6 feet. Thus the muzzle of Ofc. Errington's CEW was 6-7 feet from Mr. Martin when he pulled the trigger.

The impact of various probe spreads has been reported in the peer-reviewed literature.[3] As seen in Figure 9, subjects are completely stopped with a 12-inch spread on the back.



Figure 9. Subjects are stopped cold with a 12-inch probe spread on the back.

Occasionally, a subject will be able to achieve some very limited control of the right arm.[3,4] Regardless, there would still be an immediate fall to the ground and a subject would not be able to raise both arms.



Figure 10. With a 12-inch probe spread, almost all control of the arms is lost.

The TASER CEW used (SN X00-456776) was tested; its pulse output was 106.6 microcoulombs which is well within specifications. Hence, had there been a closed circuit Mr. Martin should have been immediately dropped to the ground.

All witnesses (except, in part, Ms. Vidal, whose impressions will be discussed later) agree that Mr. Martin continue to move after the CEW was deployed and was able to step up on the curb on the side of the roadway.  Even Ms. Vidal recalled the raising of the arms which is a voluntary motion not caused by CEW current. None of this would have been possible with a completed circuit of probes to the back.[3]

Ofc. Errington's report observations are very consistent with the forensic evidence of a single probe landing and the lack of any current flowing.

> I fired my Taser at the suspect's back. When I fired my Taser the suspect was in the area of the right side fog (white) line. He was approximately 4-5 feet away from the side of the bridge. When I fired the Taser the suspect did not drop. He continued moving forward with his feet under him. He shuffled several steps over to the bridge.

Ofc. Errington added the following in his deposition (p 62):

```
 7   Q.  And then what happened next?
 8   A.  When I initially deployed my Taser, I was
 9   coming at this angle, he was going at that angle.
10   When I hit him he kind of jerked a little bit.
11   Q.   When you said jerked a little bit, the
12   motion that you gave was sort of your body going
13   straight up, like your shoulders back?
14   A.   He twinged a bit.  His shoulders came back
15   a little bit.  And then he continued to move towards
16   -- with his feet moving under him, towards the
17   guardrail, probably three to five steps to get to the
18   guardrail.
```

The observation of a little "jerk" or "twinge" is consistent with a spinal reflex reaction to the ballistic impact of the probe in the left shoulder region. This is not seen when electrical current is delivered — by the CEW — as there is a systemic muscular response and loss of control.

*Had both probes connected with Mr. Martin, he would have been immediately dropped to the roadway. The fact that he did not drop proves that there was no connection to the CEW.*

### 7. How Far was Mr. Martin From the Railing at the Time of the CEW discharge?

Lt. Andrew Winters placed Ofc. Errington in the center of the left lane when he had his TASER electric weapon out and pointed at Mr. Martin.  It is clear that Ofc. Errington was very close to the median as this was the recollection of witness O'Connor. Witness Godek was not sure what side of the median he was on. We can assign a large circle of diameter 50% of the lane width (green in the figure) for Ofc. Errington's location when he fired his electrical weapon.

Lt. Winters (deposition) recalled Mr. Martin running at an angle to [his] left. Ofc. Errington recalled him running at a "light angle." This is consistent with an

angle of ~30° off of the most direct path to the railing. This is shown in blue in the figure.



**Figure 11. Conservative analysis of the distance to the railing at probe impact.**

As discussed earlier, the probe spread shows that the electrical weapon muzzle was about 6.7 feet from Mr. Martin's back at the time of firing.  Generously assuming a full extension of Ofc. Errington's arm we need to add about 3 feet to estimate the distance from the center of his body to the weapon muzzle. This gives a total distance of about 10 feet from Ofc. Errington's body to Mr. Martin's body at the time of the firing. This is shown in red as the "10 ft arm and probe flight" arrow in the drawing. From this point of impact to the point where Mr. Martin jumped is then about 10 feet.

This analysis gives the closest distance estimate for Mr. Martin's distance to the railing where he jumped. If we assume that Ofc. Errington was in the center of the green circle then this distance becomes about 15 feet. Thus, in my opinion, Mr. Martin was 10-15 ft from the railing when the single TASER probe impacted his body. I will use a representative estimate of 12.5 feet for the remainder of this analysis. We can use the national adolescent physical education standards for a 30-meter sprint of 4.3 seconds to estimate a running speed for Mr. Martin.  This gives a rate of 22.9 ft/s so he should have covered that 12.5 feet in 0.56 seconds. In other words, it took him about ½ second to cover the distance from the probe impact to the railing. With a typical 4-foot running pace, Mr. Martin was 3 steps from the railing at the time of the single probe impact.

Recall that Ofc. Errington estimated that Mr. Martin was at the fog line at the time of the weapon discharge. My analysis shows that Mr. Martin was about ¼ second, and about 1 ½ paces, away from the fog light at the time of discharge.

This short time duration explains why Ofc. Errington's estimate of Mr. Martin's location was slightly skewed.

*Mr. Martin was 10-15 feet from the railing at the time of the TASER probe impact.*

## 8. What Is The Effect Of a CEW With Probes In The Back?



Figure 12. Effect of a back application of a CEW as seen from the back.



Figure 13. Effect of a back application of a CEW as seen from the front.

Page 14

With sufficient probe spread in the back, the TASER electrical weapon will cause the entire body to stiffen.  This effect has been referred to as becoming "plywood" as the body basically becomes a stiff as a board. There is no control over the extremities. Specifically, there is no ability to voluntarily turn the head as was observed with Mr. Martin at the bridge railing.



Figure 14. Effect of a back application of a CEW with no support.

*With sufficient probe spread in the back, the Taser electrical weapon will cause the entire body to stiffen up like a sheet of plywood.*

## 9. Where Would Mr. Martin Have Landed had There Been A Connection?

Had there been a connection from the Taser CEW, Mr. Martin would have lost control of his legs and would have fallen immediately to the ground. With his forward running momentum he would have fallen just short of the fog line or possibly with his upper body on the fog line. He would not have impacted the curb or the railing. This is shown in Figure 15.

If I am called to testify, I reserve the right to present several videos to the jury demonstrating how runners fall with TASER probes in the back. These include but are not limited to the following YouTube videos:

https://youtu.be/0MIR47kWzlQ
https://youtu.be/VqtPUhYdz6M

I specifically reserve the right to present videos showing that a runner would:

1. Go down and not up
2. Have no ability to voluntarily turn the head around, and

3. Have no ability to raise the arms.



**Figure 15. Best estimate of Martin's falling position had the CEW delivered current to him.**

*Had there been a connection from the TASER CEW, Mr. Martin would have fallen immediately to the ground well before the bridge railing.*

## 10. Was Mr. Martin Launched Over the Railing or Did He Jump?

The evidence makes it very clear that the Taser CEW delivered no electrical current to Mr. Martin, and hence could not have caused him to fall from the bridge. Let us assume *arguendo* that the weapon had, in fact, been able to deliver a current. The weapon would still not have been able to propel Mr. Martin over the railing. When Taser CEW current is delivered, the body loses control and goes immediately down to the ground. There is essentially no muscle control in order to do anything deliberate.

No less than 9 eyewitnesses recalled voluntary actions on the part of Mr. Martin when at the bridge railing. Impressively, 6 of the 9 use the verb "jump" to describe his actions at the railing. Other witnesses described turning of the head to look back, climbing, placing hands on the railing, and climbing. None of these voluntary actions would have been possible with a completed circuit to the back with an electrical weapon.

The eyewitness testimony is summarized in Table 1.

**Table 1. Witness Recollections of Voluntary Actions of Mr. Martin**

| | Witness | Recollection | Action |
|---|---|---|---|
| 1 | Jessica Godek | … ran across the path of oncoming traffic (422W) and then jumped head first off the road/bridge….She explained that it looked like the suspect actually dove over the side… | Jump |
| 2 | Jeanne O'Connor | …the black male appeared to turn his head and look at the officer….[then] the black male appeared to jump over the edge of the road | Turned head, Jump |
| 3 | Christina Merris | She related she then saw the man jumping over the railing. She related the man's body did not touch the railing. | Jump |
| 4 | Ofc. Niebel | …then saw the black male appear to jump off the bridge. | Jump |
| 5 | Sgt. Liggett | …the driver climbed the railing, appeared to stand straight up, and went over the edge of the railing head first. | Climb |
| 6 | Sgt. Winters (deposition) | He got to the railing I watched him put his hands on it. He turned and looked back and then he went over the railing…. He had his hands on the railing, he looked back, and then he just went forward. | Placed hands on railing. Looked back. |
| 7 | Ofc. Erring-ton (deposition) | After he landed I got on the radio and told him that a male jumped off the bridge and that they needed to send EMS right away… If I was asked to interpret it, it wouldn't be a fall, it would be he deliberately putting his shoulder forward, and making his weight heavy on top to slide over. If someone is falling they would be falling into it. | Jump |
| 8 | Alexis Vidal | And I saw his hands go up. | Hands went up. |
| 9 | Dena Die-trich | I saw him run, jump the median, run across the bridge, jump up on the thing and jump….He had no hesitation, did not slow down, and looked like he was intending to jump off the edge of the bridge. | Jump |

*Mr. Martin made a voluntary decision to jump over the railing and he was not launched over the railing by some speculated electrical weapon exposure.*

## 11. The Location Of The Remaining Blast Door Provides No Evidence.

When the probes are launched from a TASER CEW, dozens of small serialized confetti pieces are also launched.[27,28] These are called AFIDs (anti-felon identification device) to discourage the criminal use of the weapon. They are very noticeable with an indoor use but are easily blown away by any wind or motor-vehicle traffic.

There are also 2 very light-weight (1 gram) plastic glass doors that are launched with a deployment.[27,28] These are again easily blown away by wind or traffic.

When Corp. Dupree arrived at the incident scene he noted:

> I observed an expended Taser cartridge in the right-hand eastbound lane to the rear of
> Unit 35 along with a Taser wire on the center median. There was one green plastic blast
> door and another section of wire from the expended cartridge between the fog line and
> the curb on the westbound side of the roadway. I did not locate or observe identification

(AFID) tags from the expended cartridge anywhere on the roadway, center median, shoulder, concrete guide rail or at any location at the scene. It should be noted that traffic was still flowing on the westbound side of the roadway upon my arrival and any evidence or items in the westbound lanes would've been compromised by passing traffic.

*Thus, the location of the single remaining blast door — which had not blown away — is of no significance. It provides no evidence of the location of the CEW at the time of firing.*

## 12. Witness Alexis Vidal Misinterpreted Some Events of the Incident

Consistent with the recollections of other witnesses, Ms. Alexis Vidal recalled Mr. Martin going to the railing and then going over it. However, her impressions are not consistent with the operation of a CEW in 3 areas.

In her deposition (p 10) Ms. Vidal described this sequence of events:

> 9 I had my
> 10 window down, so I could hear everything. I could
> 11 see everything. I didn't have any music on. And
> 12 then one of the police officers shot him with a
> 13 taser gun -- a stun gun in the back. And I saw
> 14 his hands go up. And he kind of-- he fell
> 15 forward, but he was so close to the railing that
> 16 it hit his midsection. And he just flipped over
> 17 the railing kind of like a rag doll.

On page 18 of her deposition she recalled:

> 11 So he did stop. He
> 12 didn't-- it wasn't like a full motion. But
> 13 as soon as he stopped was when he was, like,
> 14 tasered. And had I saw his arms come and --
> 15 yeah.

And on page 29 we learn:

> 21 A. Well, since he was, like, close to
> 22 the railing, I just saw his hands go up and his
> 23 chest come out.

1. Ms. Vidal's recollection — of Mr. Martin's arms and hands going up at the railing — is consistent with that of Ofc. Errington. However, her impression that this occurred *simultaneously* with a TASER CEW exposure does not comport with the effects of a CEW exposure. As discussed above, a CEW exposure to the back deprives the subject of voluntary muscle control.[3,4] Mr. Martin would not have been able to raise his arms and hands but would have instead collapsed to the ground immediately.

2. It is also very telling that Ms. Vidal had no recollection of the sound of the TASER CEW being deployed. When the trigger is pulled, there is a loud explo-

sive bang when the compressed nitrogen launches the probes.[28,29] This is so loud, that it is sometimes confused with gunfire by other police officers. For this reason officers are trained to yell, "TASER, TASER," when in an group of officers and if time permits. Note that Ms. Vidal had her music off and her window down so she *should* have heard that distinctive sound. Thus Ms. Vidal actually had no idea when the CEW probes were launched.

On page 41 of her deposition, she relates another highly improbable recollection:

> 9 Q. What made you believe it was a stun
> 10 gun?
> 11 A. When the -- well, the little -- the
> 12 line that has the things attached to them, I saw
> 13 them kind of shoot out.
> 14 Q. You were able to see that?
> 15 A. Yes.
> 16 Q. Okay. Did you see where they went?
> 17 A. Yeah. They hit him in the back.

The probes are launched at a velocity of about 200 fps (feet per second). They would have closed the 6.7-foot gap between the muzzle and Mr. Martin in about 1/30 of a second. (6.7 ft ÷ 200 FPS = 0.0335 seconds) This is equivalent to a single frame in a movie and is not discernible by human being. In fact, standard movie cameras cannot capture a probe in flight and special high-speed movie cameras are required in order to capture a launched probe. Mr. Martin most likely *did* have probe wires hanging from his shirt when he was at the bridge railing and that is probably what Ms. Vidal noted.

3. Ms. Vidal's impression — that she saw the probes "shoot out" — is incompatible with Taser CEW technology and the limits of human visualization.

In my opinion, Ms. Vidal failed to note the distinctive bang of the CEW probes being launched when Mr. Martin was in the roadway near the fog line. Whether this was due to a stress reaction or some other distraction is immaterial. She then first noticed the probe wires attached to Mr. Martin when he was at the bridge railing preparing to jump over. This caused her to form the false impression that the CEW was deployed while Mr. Martin was at the bridge railing.

*Ms. Vidal's interpretation — of the sequence of events — fails in 3 material ways and thus cannot be taken seriously as evidence.*

### 13. This was Not a Dangerous use of the TASER CEW.

Ofc. Errington's attempted use of the TASER CEW was highly appropriate. In fact, had it succeeded, Mr. Martin would have been prevented from jumping over the bridge railing and severely injuring himself.

The relevant recommendations from the TASER Version 17 training material (Slide 137) is as follows:



Figure 16. Slide 137 of TASER training materials v17.

The related warning (30 Nov 2011) points out the risks for a subject who:

> Is on an elevated or unstable surface (e.g., tree, roof, ladder, ledge, balcony, porch, bridge, crane, dock, chair, bunk bed, or stair)

At the time of the CEW attempted deployment, Mr. Martin was not at the edge of an elevated surface and hence this usage did not present an increased risk. It would have been a different matter, had Mr. Martin been sitting and balancing himself on the bridge railing. He was not.

*In my opinion, there was no dangerous use of the TASER CEW in this incident.*

## Expert Report of Lt. Col. Robert Johnson

I read the expert report of Lt. Col. Robert Johnson and wish to comment on it.

Lt. Col. Johnson is apparently of the opinion that Mr. Martin was under the control ("under power") of the TASER electrical weapon at the time that he was at the railing at the time he "fell" over the railing. The statement (page 10 of his report) is:

> My experience is people go over barriers normally do so in a fashion to land on their feet not their head or front side. The descriptions more likely fit someone under power of a Taser than a purposeful manner. If under power at the time he reached the edge of the bridge, Martin would have not had the muscular control to intentionally jump over the guardrail or place his hand on the guardrail and use his arms to lift himself over the guardrail.

This speculation is contrary to the facts of the case and to the operation of an electrical weapon.

1. No witnesses placed Mr. Martin at the railing at the time of the weapon discharge. Some thought he was at the fog line. My calculations show that he was actually 1 ½ steps short of the fog line.
2. A successful probe deployment to the back make a standing person fall backwards due to the contractions of the back muscles. Had Mr. Martin been standing at the railing he would have fallen *away* from it — not over it.
3. A successful probe deployment to the back would have prevented the voluntary motions that Mr. Martin exhibited.
4. Vaulting with the head first does not indicate that a subject desired to land on the head. Google Images provided several examples of subjects vaulting over a railing with their head first. See Figure 17 for a single example.



**Figure 17. Subject vaulting head first over a railing.**

On page 10 of his report, Lt. Col. Johnson stated:

> Furthermore the probes do not leave signature marks (contact burn marks) when used in probe mode, only when used in drive stun mode.

This is simply incorrect, as described and illustrated earlier in this report. If a probe-mode circuit is completed by an arc then there are definitely burn marks.[23,24] This confusion suggestion an unfamiliarity with the effects of electrical weapons. The lack of an arc burn clearly shows that no electrical weapon current was delivered to Mr. Martin.

On page 11 of his report, Lt. Col. Johnson stated:

> The Taser was not a reasonable choice of weapons under the circumstances of this incident before or after Martin was in close proximity to the side of the bridge.

At the time of the attempted use of the electrical weapon, Mr. Martin was at least 2 body lengths away from the edge of the bridge and thus not sufficiently close to raise a safety issue.

Notably, Lt. Col. Johnson does not explicitly support the allegations found in the Complaint in paragraphs 29, 33, and 41 that the TASER electrical weapon somehow caused Mr. Martin to go over the bridge railing.

## Case Specific Materials Reviewed or Considered

Pleadings
    Complaint
Reading Police Report
Pennsylvania State Police Report
Hospital Records
TASER X26 CEW Download
Depositions
    Ofc. Errington
    Mr. Martin
    Capt. Kloc
        19 March 2014
        4 April 2014
    Ms. Vidal
    Sgt. Winters
    Ofc. Ring
    Sgt. Stone
    Ms. Merris
    Ms. Dietrich
    Corp. Hoy
Photographs
    Scene
    Wounds
    Car search
    Hospital
Expert Reports
    Kathleen Murray
    Col. Robert Johnson
Witness Statement
    Christina Morris

I also personally studied the scene of the incident.

# Exhibits

The exhibits or list of references used as a summary of or support for the information and opinions in this report specifically include each illustration, graphic, chart, and video in this report, referenced in this report, or included in any of the references to this report, as well as any documents, or portions thereof, referenced or cited, or any compilation of documents, are to be considered exhibits to this report and may be utilized as exhibits at deposition and/or trial. These exhibits specifically include, but are not limited to: any document, information, illustration, Microsoft® PowerPoint®, lesson plan, drawing, graphic, video, compilation, etc., that is on, or included in, any of the TASER International, Inc. (TASER) training CDs/DVDs (versions 1 through the current release – which is presently version 19), TASER CEW Research Index, TASER Fact Sheets (TFSs), as well as the TASER* Research Compendium, the Arrest-Related Death (ARD) Research Index and Compendium, TASER ECD Field Data and Risk Benefit PowerPoint presentations and Analyses, Volunteer Exposure Reports, spreadsheets, and analyses, Field Use Reports, data, summaries, and appendices, the TASER website (including updates and additions), the www.ecdlaw.info and www.ipicd.com websites, etc. Exhibits also include an ADVANCED TASER M26™ (M26) ECD, TASER X26™ ECD (X26), TASER X2™ ECD, TASER X3™ ECD, fully kitted M26 ECD, fully kitted X26 ECD, fully kitted X2 ECD, fully kitted X3 ECD, TASER cartridges, TASER cartridge wire, TASER probes, a Van de Graff generator, 8 AA cells, 2 Duracell® CR123 cells, an X26 Digital Power Magazine (DPM, an X26 ECD eXtended Digital Power Magazine (XDPM), stacks of 10,000, 25,000, 50,000, and 100,000 sheets of copy-type paper, vehicle battery jumper cables, 110 V alternating current (AC) electrical cords/cables, ground fault circuit interrupter (GFCI), a full can of soft drink, an empty soda can, a Nikon® F6 camera, and other exhibits and demonstrative aids.

Electric fence energizers of various brands

Electroconvulsive therapy (ECT) generator

Transcutaneous electronic nerve stimulators (TENS) of various brands

Sound recordings of CEWs played at both normal and slow speed

Videos of subjects receiving CEW applications

---

* AIR TASER, M26, X26, X2, and X3 are trademarks of TASER International, Inc. TASER® and ADVANCED TASER® are registered trademarks of TASER International, Inc.

# General Comments

## *My Qualifications*

My scientific specialty is bioelectricity or the interaction of electricity and the body. This led to my involvement in the Conducted Electrical Weapons in 2003 and many publications on the effects of these weapons. I have invested most of my career researching and developing electrical devices to diagnose and treat disease. The primary focus is the effect of electrical shocks on the human body. This investment has resulted in every Implantable Cardioverter Defibrillator (ICD) made anywhere in the world licensing some of my patented improvements.

This involves researching, lecturing, and publishing on electric shocks and their effects on the human body. It includes lectures throughout Europe, South America, and Asia (in over 30 countries) as well as at many of the major universities and medical centers of the United States (U.S.). Usually, the typical audience member is a cardiologist electrophysiologist or medical examiner. With over 360 issued U. S. patents and numerous pending and international patents, I currently hold the most patents on electrical medical devices of anyone in the world. Over 1 million people have devices with some of these patented features in their chest, monitoring every heartbeat.

http://www.startribune.com/business/22114119.html

In 2010 was awarded the Career Achievement Award by the Engineering in Medicine and Biology Society which is arguably the most prestigious award given internationally in Biomedical Engineering.

http://tc-therapeutic-systems.embs.org/whatsnew/index.html

Believed to be the only individual to receive the high "Fellow" honor from both Cardiology and Engineering societies. To wit:

1. 1997    Fellow, American College of Cardiology
2. 2009    Fellow, Heart Rhythm Society
3. 2011    Fellow, IEEE Engineering in Medicine and Biology Society
4. 2013    Fellow, American Institute for Medical and Biological Engineering

Author of over 200 abstracts, papers, and book chapters and also the co-editor of 4 books:

1. Implantable-Cardioverter Defibrillator Therapy: The Engineering-Clinical Interface. Kluwer 1996
2. Cardiac Bioelectric Therapy: Mechanisms and Practical Implications. Springer-Kluwer 2008
3. TASER® Conducted Electrical Weapons: Physiology, Pathology and Law. Springer-Kluwer 2009.
4. Forensic Atlas of Conducted Electrical Weapons: Springer-Kluwer 2012

Directly relevant paper publications include 40 papers, book chapters, and in-dexed letters relating to TASER CEWs as well as numerous CEW scientific ab-stracts:

1.  Brewer J, Kroll MW. Field Statistics Overview. In: Kroll M, Ho J, eds. TASER Conducted Electrical Weapons: Physiology, Pathology, and Law. New York City: Springer-Kluwer, 2009.
2.  Dawes D, Kroll M. Neuroendocrine Effects of CEWs. In: Kroll M, Ho J, eds. TASER Conduct-ed Electrical Weapons: Physiology, Pathology, and Law. New York City: Springer-Kluwer, 2009.
3.  Dawes DM, Ho JD, Kroll MW, Miner JR. Electrical Characteristics of an Electronic Control Device Under a Physiologic Load: A Brief Report. Pacing Clin Electrophysiol 2010;33(3):330-336
4.  Kroll MW, Calkins H, Luceri RM, Graham MA, Heegaard WG. Electronic control devices (Re-sponse to Editorial). Cmaj 2008;179:342-3.
5.  Kroll MW, Calkins H, Luceri RM, Graham MA, Heegaard WG. Sensitive swine and TASER conducted electrical weapons. Acad Emerg Med 2008;15:695-6; author reply 696-8.
6.  Kroll MW, Calkins H, Luceri RM, Graham MA, Heegaard WG. TASER safety. CMAJ 2008;179:677-8.
7.  Kroll MW, Calkins H, Luceri RM. Electronic control devices and the clinical milieu. J Am Coll Cardiol 2007;49:732; author reply 732-3.
8.  Kroll MW, Luceri RM, Calkins H. A very interesting case study involving a TASER Conducted Electrical Weapon (CEW) used on a patient with a pacemaker. J Cardiovasc Electrophysiol 2007;18:E29-30; author reply E31.
9.  Kroll MW, Panescu D, Brewer J, Lakkireddy D, Graham M. Weight Adjusted Meta-Analysis of Fibrillation Risk From TASER Conducted Electrical Weapons. Proceedings of the American Academy of Forensic Science 2009.
10. Kroll MW, Panescu D, Carver M, Kroll RM, Hinz AF. Cardiac effects of varying pulse charge and polarity of TASER(R) conducted electrical weapons. Conf Proc IEEE Eng Med Biol Soc 2009;1:3195-8.
11. Kroll MW, Panescu D, Ho J, Luceri R, IR E, Calkins H, Tchou P. Potential Errors in Autopsy Reports of Custodial Deaths Temporally Associated With Electronic Control Devices: A Car-diovascular Prospective American Academy of Forensic Sciences. San Antonio, TX, 2007:284-285.
12. Kroll MW, Wetli CV, Mash D, Karch S, Graham M, Ho J. Excited Delirium Syndrome Check-list. In: Kroll MW, Ho J, eds. TASER Conducted Electrical Weapons: Physiology, Pathology, and Law. New York City: Springer-Kluwer, 2009.
13. Kroll MW. Crafting the Perfect Shock. IEEE Spectrum 2007;44:27-30.
14. Kroll MW. Physiology and pathology of TASER conducted electrical weapons. J Forensic Leg Med 2009;16:173-7.
15. Kroll MW. TASER Conducted Electrical Weapons. Chapter in Clinical Forensic Medicine 3rd Ed, edited by Margaret Stark. Humana Press 2011.
16. Kroll MW. TASER® Electronic Control Devices. In: Fish R, Geddes L, eds. Electrical Injuries: Medical and Bioengineering Aspects. Tucson, AZ: Lawyers and Judges Publishing Company, Inc., 2009:455-491.
17. Panescu D, Kroll MW, Efimov IR, Sweeney JD. Finite element modeling of electric field ef-fects of TASER devices on nerve and muscle. Conf Proc IEEE Eng Med Biol Soc 2006;1:1277-9.
18. Panescu D, Kroll MW, Stratbucker RA. Medical safety of TASER conducted energy weapon in a hybrid 3-point deployment mode. Conf Proc IEEE Eng Med Biol Soc 2009;1:3191-4.
19. Panescu D, Kroll MW, Stratbucker RA. Theoretical possibility of ventricular fibrillation during use of TASER neuromuscular incapacitation devices. Conf Proc IEEE Eng Med Biol Soc 2008;1:5671-4.
20. Stratbucker RA, Kroll MW, McDaniel W, Panescu D. Cardiac current density distribution by electrical pulses from TASER devices. Conf Proc IEEE Eng Med Biol Soc 2006;1:6305-7.

21. Sweeney J, Kroll MW, Panescu D. Analysis of Electrical Activation of Nerve and Muscle by TASERs American Academy of Forensic Sciences. Seattle, WA, 2006:142-143.
22. Vanga SR, Bommana S, Kroll MW, Swerdlow C, Lakkireddy D. TASER conducted electrical weapons and implanted pacemakers and defibrillators. Conf Proc IEEE Eng Med Biol Soc 2009;1:3199-204.
23. Kroll M, Panescu D, Hinz A, Lakkireddy D. A Novel Mechanism for Electrical Currents Inducing Ventricular Fibrillation: The Three-Fold Way to Fibrillation Engineering in Medicine and Biology Society Proceedings. Sept 2010:1990-1996.
24. Walcott G, Kroll M, Ideker R. Ventricular Fibrillation Threshold of Rapid Short Pulses. *Conf Proc IEEE Eng Med Biol Soc. 2011:255-258.*
25. Kroll M, Panescu D. Physics Of Electrical Injury. In: Ho J, Dawes D, Kroll M, eds. *Forensic Atlas of Conducted Electrical Weapon Injury.* New York City: Springer; 2012.
26. Kroll M, Lakkireddy D, Rahko P, Panescu D. Ventricular Fibrillation Risk Estimation for Conducted Electrical Weapons: Critical Convolutions. *Conf Proc IEEE Eng Med Biol Soc. 2011:271.*
27. Kroll M, Walcott GP, Ideker RE, et al. The Stability of Electrically Induced Ventricular Fibrillation *EMBS Proceedings.* 2012; 34: 6377-6381.
28. Kroll M, Fish R, Lakkireddy D, Luceri R, Panescu D. Essentials of Low-Power Electrocution: Established and Speculated Mechanisms. *Conf Proc IEEE Eng Med Biol Soc.* 2012; 34: 5734-5740.
29. Kroll M, Fish R, Calkins H, Halperin H, Lakkireddy D, Panescu D. Defibrillation Success Rates for Electrically-Induced Fibrillation: Hair of the Dog. *EMBS Proceedings.* 2012; 689-693.
30. Panescu D, Nerheim M, Kroll M. Electrical Safety of Conducted Electrical Weapons Relative to Requirements of Relevant Electrical Standards. *Conf Proc IEEE Eng Med Biol Soc.* 2013;5342-5347.
31. Kroll M, Lakkireddy D, Stone J, Luceri R. TASER® electronic control devices and cardiac arrests: Coincidental or causal? Circulation. 2014;129:93-100
32. Criscione JC, Kroll MW. Incapacitation recovery times from a conductive electrical weapon exposure. Forensic Sci Med Pathol. Mar 26 2014.
33. Dorin Panescu, Mark Kroll, Carlyn Iverson, Michael Brave. The Sternum as an Electrical Shield. Conf Proc IEEE Eng Med Biol Soc. 2014. 36: 4464-4470
34. Dorin Panescu, Mark Kroll, Michael Brave. Transthoracic Cardiac Stimulation Thresholds for Short Pulses. Conf Proc IEEE Eng Med Biol Soc. 2014. 36: 4471-4474
35. Walcott GP, Kroll MW, Ideker RE. Ventricular Fibrillation: Are Swine a Sensitive Species? In Press. J Interventional Cardiac Electrophysiology
36. Michael Brave, DJ Lakkireddy, Mark Kroll, Dorin Panescu. Limitations of Animal Electrical Cardiac Safety Models. Conf Proc IEEE Eng Med Biol Soc. 2014. 36: 6483-6486
37. Kroll M. Baseball, Poison, and Soup Recipes: The TASER Trio of Popular Myths. Technical Note: ResearchGate.net. 2015:1-3.
38. Kroll M. Conducted Electrical Weapon Drive-Stun Mode: Skin Rub vs. Injection. Technical Note: ResearchGate.net. 2015.
39. Kroll M, Brave M. Conducted Electrical Weapons, CEW Temporal Deaths: In-Custody Deaths. . In: Vilke Ra, ed. In-Custody Deaths. : Humana; 2015:in press.
40. Kroll M. Significance of Sound During CEW Application. Technical Note: ResearchGate.net. 2015.
41. Panescu D, Kroll M, Brave M. Cardiac Fibrillation Risks with TASER Conducted Electrical Weap-ons. . IEEE EMBC Conference Proceedings. 2015:under review.
42. Panescu D, Kroll M, Andrews C, Pratt H. Transthoracic Ventricular Fibrillation Charge Thresholds. IEEE EMBC Conference Proceedings. 2015:under review.
43. Kroll M, Ritter M, Guilbault R, Panescu D. Infection Risk From Conducted Electrical Weapon Probes. . 2015:under review.
44. Kroll M, Perkins P, Panescu D. Electric Fence Standards Comport with Human Data and AC Limits. . IEEE EMBC Conference Proceedings. 2015:under review.

There have also been many presentations on CEWs to scientific and medical audiences. These include: 2007 AAFS (American Academy of Forensic Science) conference major presentation in San Antonio, Texas[30] and the 2007 BEMS (Bi-oelectromagnetic Society) meeting Plenary Address in Kanazawa, Japan.[31]

1. Major invited lecture at the 2006 NAME (National Association of Medical Examiners) conference in San Antonio, Texas.[32]
2. Advanced Death Investigation Course of St. Louis University (2007) as faculty lecturer to full audience.[33]
3. Faculty lecturer to full audience at Institute for the Prevention of In-Custody Death Conferences (2006 and 2007), Las Vegas, Nevada.
4. Chair of special session on TASER CEW at 2006 Cardiostim meeting in Nice, France.
5. Guest lecture to U.S. Military on CEW in 2006.
6. "Presenting Rhythm in Sudden Custodial Deaths After Use of TASER® Electronic Control Device," was presented at the 2008 scientific conference of the Heart Rhythm Society.[34]
7. "Can Electrical-Conductive Weapons (TASER®) alter the functional integrity of pacemakers and defibrillators and cause rapid myocardial capture?" was presented at the 2008 scientific conference of the Heart Rhythm Society.[35]
8. "Weight-Adjusted Meta-Analysis Of Fibrillation Risk From TASER® Conducted Electrical Weapons" presented at the 2009 AAFS conference.[36]
9. "Meta-Analysis Of Fibrillation Risk From TASER® Conducted Electrical Weapons as a Function of Body Mass" presented at the 2009 scientific conference of the Heart Rhythm Society.[37]
10. Oral presentation at the 2014 NAME (National Association of Medical Examiners) conference in Portland, Oregon.

In addition to the major addresses above, there have been lectures at the United States Department of Justice (2007), AAFS (2006), and BEMS (2006) regarding the TASER CEW.

I have shot various TASER CEW models numerous times and have personally experienced an X26 CEW probe deployment discharge directly to the center of my chest, a drive-stun to my hand, and an "angled" discharge across my arms and chest. I have sat on the TASER corporate board since Jan 2003 and their scientific and medical advisory board since Aug 2004.

For more details please see attached 73-page curriculum vitae.

## Previous Testimony

I have testified as an expert at trial or by deposition within the preceding 4 years in:

1. wrongful death case of *Carlock v. Sangamon County, Illinois*. (Jul 2011)
2. wrongful death case of *Batchan v. City of Vernon, CA* (Dec 2011)
3. wrongful death case of *Piskura v. TASER International, Inc.* (Dec 2011)
4. wrongful death case of *Allen v. Gee (Hillsborough Cty, FL)* (Jan 2012)
5. product injury case of *Fahy v. TASER International, Inc.* (Aug 2012)
6. wrongful death case of *Russell v TASER International, Inc.* (Oct 2012)
7. wrongful death case of *Firman v Del Norte County, CA.* (Jan 2013)
8. injury case of *Barnes v Manatee County, FL.* (Jan 2013)
9. injury case of *Jones v City of Chicago* (April 2013)
10. wrongful death case of *Veloz v Bonetti et al (Orange Cty, FL)* (April 2013)
11. patent case of *Philips v Zoll (Boston, MA)* (April and Dec 2013)
12. Coroner's inquest for *Firman (Barrie, Ontario)* (Jul 2013)
13. wrongful death case of *Downen v Columbia Falls, MT* (Feb 2014)

14. excessive force case of Pennington v Seward, AK (Feb 2014)
15. Criminal case of Crown v. Eric Lim, Damian Ralph, Scott Edmondson and Daniel Barling, Sydney, Australia (Nov 2014)

## Fees:

My fees for this expert witness report are $400 per hour for the research and preparation. My fees for testimony are $480 per hour, with a minimum of $2000, and $240 per hour for travel, plus actual out-of-pocket expenses. Deposition fees and expenses are due prior to the commencement of the deposition.

## Right To Amend:

The opinions in this report are living opinions. Should additional discovery material be received, or additional research be completed, and then reviewed, these opinions may be altered or reinforced depending upon what information is obtained, reviewed, or studied. If new issues are opined, identified, or developed subsequent to submission of this report, I reserve the right to supplement, or further supplement, this report. I especially reserve the right to amend my report after receiving the Plaintiff's expert reports or new forensic evidence.

## Further Development:

Further, the opinions, which are expressed in this report, are not necessarily fully developed. Rather, they are listed to comply with current report requests. Each opinion may be further developed through research, investigation, during deposition or trial testimony.

## Specific References:

Some of the opinions in this report may list specific references to some of the case specific documents reviewed or considered. These listings are not intended to be all-inclusive. I specifically reserve the right to supplement the support for each of the opinions in this report.

## Opinion Methodology:

The following opinions were developed using the disciplines of bioelectricity, electrophysiology, biomedical engineering, cardiovascular physiology, scientific methods, mathematics, and physics and are to a reasonable degree of professional, scientific, or medical certainty.

Additionally, the opinions provided in this case were developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review.

# References:

1. Vilke GM, Chan TC. Less lethal technology: medical issues. *Policing*. 2007;30(3):341-357.
2. White M, Ready J. The TASER as a Less Lethal Force Alternative. Findings on Use and Effectiveness in a Large Metropolitan Police Agency. *Police Quarterly*. 2006.
3. Ho J, Dawes D, Miner J, Kunz S, Nelson R, Sweeney J. Conducted electrical weapon incapacitation during a goal-directed task as a function of probe spread. *Forensic science, medicine, and pathology*. 2012;8(4):358-366.
4. Criscione JC, Kroll MW. Incapacitation recovery times from a conductive electrical weapon exposure. *Forensic science, medicine, and pathology*. 2014;10(2):203-207.
5. Rosenbaum S, Vilke G, Chan T, Bozeman W. Clinical Practice Statement: What Evaluations Are Needed in Emergency Department Patients after a TASER Device Activation? *American Academy Emergency Medicine*. 2010.
6. Taylor B, Woods D, Kubu B, et al. Comparing safety outcomes in police use-of-force cases for law enforcement agencies that have deployed conducted energy devices and a matched comparison group that have not: A quasi-experimental evaluation. *Police Executive Research Forum*. 2009.
7. MacDonald JM, Kaminski RJ, Smith MR. The effect of less-lethal weapons on injuries in police use-of-force events. *Am J Public Health*. 2009;99(12):2268-2274.
8. Bovbjerg V, Kenny J, Heal C, Murray W. Field-based Evaluation of Non-lethal Weapons: Conducted Energy Weapons. *Office of Naval Research Monograph*. 2007.
9. Ho JD, Clinton JE, Lappe MA, Heegaard WG, Williams MF, Miner JR. Introduction of the conducted electrical weapon into a hospital setting. *The Journal of emergency medicine*. 2010.
10. Jenkinson E, Neeson C, Bleetman A. The relative risk of police use-of-force options: evaluating the potential for deployment of electronic weaponry. *J Clin Forensic Med*. 2006;13(5):229-241.
11. Bozeman WP, Hauda WE, 2nd, Heck JJ, Graham DD, Jr., Martin BP, Winslow JE. Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects. *Ann Emerg Med*. 2009.
12. Bartlett R. Stun guns credited for fewer injuries, less firearm use. *Palatka Daily News*. MArch 22, 2008.
13. Strote J, Verzemnieks E, Walsh M, Hutson HR. Use of force by law enforcement: an evaluation of safety and injury. *The Journal of trauma*. 2010;69(5):1288-1293.
14. Mesloh C, Henych M, Wolf R. Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis. *Report to the National Institute of Justice*. 2008.
15. Haileyesus T, Annest JL, Mercy JA. Non-fatal conductive energy device-related injuries treated in US emergency departments, 2005-2008. *Inj Prev*. 2011.
16. Smith M, Kaminski R, Rojek J, Alpert G, Mathis J. The impact of conducted energy devices and other types of force and resistance on officer and suspect injuries. *Policing: An International Journal of Police Strategies & Management*. 2007;30(3):423-446.
17. Butler C, Hall C. Police/Public Interaction: Arrests, Use of Force by Police, and Resulting Injuries to Subjects and Officers—A Description of Risk in One Major Canadian City *Law Enforcement Executive Forum*. 2008;8(6):139-155.
18. Brandl S. An Analysis Of 2010 Use Of Force Incidents In The Milwaukee Police Department2011:21, Milwaukee.
19. Eastman AL, Metzger JC, Pepe PE, et al. Conductive electrical devices: a prospective, population-based study of the medical safety of law enforcement use. *The Journal of trauma*. 2008;64(6):1567-1572.
20. Kroll MW, Panescu D, Carver M, Kroll RM, Hinz AF. Cardiac effects of varying pulse charge and polarity of TASER(R) conducted electrical weapons. *Conference proceedings : ... Annual International Conference of the IEEE Engineering in Medicine and Biology Society. IEEE Engineering in Medicine and Biology Society. Annual Conference*. 2009;31:3195-3198.
21. Ferdik FV, Kaminski RJ, Cooney MD, Sevigny EL. The Influence of Agency Policies on Conducted Energy Device Use and Police Use of Lethal Force. *Police Quarterly*. 2014:1098611114548098.
22. Reilly J, Diamant A, Comeaux J. Dosimetry considerations for electrical stun devices. *Phys. Med. Biol*. 2009;54:1319-1335.
23. Ho J, Dawes D. Conducted Electrical Weapon Drive-Stun Wounds. In: Ho J, Dawes D, Kroll M, eds. *Atlas of Conducted Electrical Weapons and Forensic Analysis*. New York City: Springer; 2012.
24. Dawes D, Ho J. Conducted Electrical Weapon Deployed Probe Wounds. In: Ho J, Dawes D, Kroll M, eds. *Atlas of Conducted Electrical Weapons and Forensic Analysis*. New York City: Springer; 2012.
25. Kroll MW. TASER ® Conducted Electrical Weapons. 2011:233-275.

26. Kroll MW. Physiology and pathology of TASER electronic control devices. *Journal of forensic and legal medicine.* 2009;16(4):173-177.

27. Wyant R, Burns T, Geil K. Crime Scene Considerations: Electronic Control Device (TASER) Deployment. *Journal of the Association for Crime Scene Reconstruction.* 2011;17(3):37-47.

28. Mesloh C, Henych M, Thompson L. A Qualitative & Quantitative Analysis of Conducted Energy Devices: TASER X26 vs. Stinger S200. *NIJ Monograph.* 2008:1-115.

29. Maier A, Nance P, Price P, Sherry C, Reilly J. Human Effectiveness and Risk Characterization of the Electromuscular Incapacitation Device - A Limited Analysis of the TASER. Part 2. Appendices. *Storming Media Pentagon Reports.* 2005:31.

30. Kroll M, Panescu D, Ho J, et al. Potential Errors in Autopsy Reports of Custodial Deaths Temporally Associated With Electronic Control Devices: A Cardiovascular Prospective. Paper presented at: American Academy of Forensic Sciences2007; San Antonio, TX.

31. Kroll M. Designing the Waveform of the Electronic Control Device to Replace the Police Club. The Bioelectromagnetics Society 29th Annual Meeting; June 10-15, 2007; Kanazawa, Japan.

32. Kroll M. In-Custody Death with TASER Electronic Control Device Involvement National Association of Medical Examiners; Oct 16, 2006; San Antonio, TX.

33. Kroll M. Physiology and Pathology of Electronic Control Devices. Masters Conference; July 24, 2007; St. Louis University, St. Louis, MO.

34. Swerdlow C, Kroll M, Williams H, Biria M, Lakkireddy D, Tchou P. Presenting Rhythm in Sudden Custodial Deaths After Use of TASER® Electronic Control Device. *Heart Rhythm* 2008;5(5):S44.

35. Lakkireddy D, Biria M, Baryun E, et al. Can Electrical-Conductive Weapons (TASER®) alter the functional integrity of pacemakers and defibrillators and cause rapid myocardial capture? . *Heart Rhythm.* 2008;5(5):S97.

36. Kroll M, Panescu D, Brewer J, Lakkireddy D, Graham M. Weight Adjusted Meta-Analysis of Fibrillation Risk From TASER Conducted Electrical Weapons. *Proceedings of the American Academy of Forensic Science.* 2009:177-177.

37. Kroll M, Panescu D, Brewer J, Lakkireddy D, Graham M. Meta-Analysis Of Fibrillation Risk From TASER Conducted Electrical Weapons as a Function of Body Mass. *Heart Rhythm.* 2009;6:AB20-21.

# EXHIBIT C

ALEXIS VIDAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

ERNEST MARTIN,                 :  CIVIL ACTION
                               :  NO. 12-CV-03665
          PLAINTIFF,           :
                               :
          -vs-                 :
                               :
CITY OF READING; READING       :
POLICE DEPARTMENT;             :
WILLIAM HEIM, CHIEF OF         :
POLICE OF THE READING          :
POLICE, INDIVIDUALLY AND       :
IN HIS OFFICIAL CAPACITY;      :
OFFICER BRIAN ERRINGTON,       :
INDIVIDUALLY AND IN HIS        :
OFFICIAL CAPACITY;             :
CAPTAIN DAMON KLOC,            :
INDIVIDUALLY AND IN HIS        :
OFFICIAL CAPACITY;             :
JOHN DOE-1; JOHN DOE-2;        :
JOHN DOE-3; JOHN DOE-4;        :
JOHN DOE-5; JOHN DOE-6;        :
JOHN DOE-7; PENNSYLVANIA       :
STATE TROOPER MICHAEL          :
PAVELKO, INDIVIDUALLY;         :
JOHN DOE-8;                    :
AND JOHN DOE-9,                :
                               :
          DEFENDANTS.          :
                   - - -

***DEPOSITION***

**COPY**

DEPONENT:   Alexis Vidal

DATE:       Monday, October 20, 2014

TIME:       10:10 a.m.

PLACE:      101 Lindenwood Drive, Suite 160
            Malvern, Pennsylvania 19355

REPORTER:   Valerie D. Lawrence, Notary Public
              KARASCH & ASSOCIATES
   NATIONALLY REGISTERED PROFESSIONAL REPORTERS
              (800) 621-5689

ALEXIS VIDAL

Page 2

```
 1   APPEARANCES:
 2   THE PEARCE LAW FIRM, P.C.
     BY:  EDITH A. PEARCE, ESQUIRE
 3   1429 Walnut Street, 14th Floor
     Philadelphia, Pennsylvania 19102
 4   (215) 557-8686
          Representing Ernest Martin
 5
 6   MACMAIN LAW GROUP, LLC
     BY:  TRICIA AMBROSE, ESQUIRE
 7   101 Lindenwood Drive, Suite 160
     Malvern, Pennsylvania 19355
 8   (484) 318-7106
          Representing City of Reading; Reading Police
 9        Department; William Heim, chief of police of
          the Reading Police, individually and in his
10        official capacity; Officer Brian Errington,
          individually and in his official capacity;
11        Captain Damon Kloc, individually and in His
          Official Capacity; John Doe-1; John Doe-2;
12        John-Doe-3; John Doe-4; John Doe-5; John
          Doe-6; John Doe-7; John Doe-8; and John
13        Doe-9
14
     BY:  RANDALL J. HENZES, ESQUIRE
15   Office of Attorney General
     21 South 12th Street, 3rd Floor
16   Philadelphia, Pennsylvania 19107
     (215) 560-2136
17        Representing Michael Pavelko, Individually
18
19
20
21
22
23
24
25
```

ALEXIS VIDAL

Page 3

1                           INDEX

2     WITNESS                                    PAGE

3     ALEXIS VIDAL
      Examination by Ms. Ambrose          4, 54
4     Examination by Mr. Henzes                33
      Examination by Ms. Pearce                50
5

6

7

8

9

10                        EXHIBITS

11    Vidal-1        April 23, 2012 Pennsylvania State    26
                     Police Victim/Witness Statement
12                   Form

13    Vidal-2        April 24, 2012 Pennsylvania State    26
                     Police Incident Interview
14
      Vidal-3        May 10, 2012 Statement               29
15
      Vidal-4        Photograph                           53
16

17

18

19

20

21

22

23

24

25

ALEXIS VIDAL

Page 4

1          (It is hereby stipulated and agreed by

2    and among counsel for the respective parties that

3    sealing, filing, and certification are waived;

4    and that all objections, except as to the form of

5    the question, will be reserved until the time of

6    trial.)

7          ......ALEXIS VIDAL, was called as a

8    witness, and after having been duly sworn,

9    according to the law, was examined and testified

10   as follows:

11               --EXAMINATION--

12   BY MS. AMBROSE:

13      Q.      Good morning, Ms. Vidal.

14              Do you mind if I call you Alexis?

15      A.      That's fine.

16      Q.      Okay.  My name is Tricia Ambrose.  I

17   represent the Reading Police Department and some

18   Reading police officers that have been sued by

19   Ernest Martin.

20              You're here today because we

21   understand that you were a witness to the

22   incident.  So we're here because we want to ask

23   you some questions and find out what you recall

24   that occurred on November 19th, okay?

25              Now, you're here not represented by

ALEXIS VIDAL

1  an attorney; is that correct?

2      A.      Yes.

3      Q.      You have to speak up for the court

4  reporter, okay?

5      A.      Yes.

6      Q.      You have the opportunity, once this

7  is completed and a transcript is typed up of your

8  testimony, to have it mailed to you and review

9  it, make sure it's accurate, make sure it

10 reflects what you intended to -- the information

11 that you intended to give us today.  Would you

12 like the opportunity to do that?

13     A.      Sure.

14     Q.      Okay.  Have you ever had your

15 deposition taken before?

16     A.      I don't believe so, no.

17     Q.      All right.  I'm going to give you a

18 few instructions.  First is to keep your voice

19 up --

20     A.      Okay.

21     Q.      -- just so everybody can hear you.

22 And there's only a few of us, so we should be

23 okay, but just keep your voice up.

24              If you could answer the question

25 after I'm done giving it to you, okay.  Make sure

ALEXIS VIDAL

Page 6

1    I get my full question out before you answer.

2    And you may anticipate what I'm going to ask.

3    And sometimes that happens.  Just wait for me to

4    ask the question before you answer --

5         A.     Okay.

6         Q.     And I'll wait for you to give your

7    answer before I ask the next question, okay?

8                The next instruction is -- I can see

9    your head nodding yes and up and down.  If you

10   could just make sure your answers are verbal so

11   that the court reporter can take down exactly

12   what you say, okay?

13        A.     Okay.

14        Q.     I don't expect we'll be here long,

15   but if for any reason you need to take a break,

16   you have to use the bathroom, you get a phone

17   call, don't hesitate to just stop and let us know

18   that you need to take a break, okay?

19        A.     Okay.

20        Q.     Why don't we start with your name --

21   your full name?

22        A.     Alexis Vidal.

23        Q.     And where do you live, Ms. Vidal?

24        A.     233 Gunhart Road, Mohnton, PA.

25        Q.     Mohnton, you said?

ALEXIS VIDAL

1   A.      Yeah.

2   Q.      And what's your date of birth?

3   A.      March 14th, 1995.

4   Q.      And who do you live with at 233

5   Gunhart Road?

6   A.      My mother and my grandfather.

7   Q.      Okay.  And how long have you lived

8   there?

9   A.      Eighteen years.

10  Q.      Okay.  And do you currently work or

11  are you in school?

12  A.      I am a full-time student.

13  Q.      Okay.  Where do you go to school?

14  A.      Penn State Berks.

15  Q.      Penn State Berks?

16  A.      Yes.

17  Q.      What are you studying?

18  A.      I'm studying kinesiology and premed.

19  Q.      And what year are you in at Penn

20  State Berks?

21  A.      I'm in my second year.

22  Q.      Are you employed at all, too, part-

23  time or anything like that?

24  A.      No.

25  Q.      Are you taking any medications today

ALEXIS VIDAL

1  that might affect your ability to testify

2  truthfully or clearly?

3      A.      No.

4      Q.      Now, I'm just going to get right

5  into.

6              If we could go back to, I believe the

7  date was April --

8      A.      19th.

9      Q.      -- April 19th, 2012.  Can you tell me

10  what you were doing on that afternoon that you

11  ended up on 422?

12     A.      I was driving home from picking up

13  senior gifts for the tennis team at Target.

14     Q.      Okay.  Were you in high school at the

15  time?

16     A.      Yes.

17     Q.      Okay.  Where did you go to high

18  school?

19     A.      Twin Valley High School.

20     Q.      And what time of day was it

21  approximately that you were coming home from the

22  Target?

23     A.      It was later in the afternoon.

24     Q.      Okay.

25     A.      Because I believe that was a school

ALEXIS VIDAL

Page 9

1  day -- like, a weekday.

2      Q.      Do you remember if there was a lot of

3  traffic on the road that day?

4      A.      Not -- there wasn't.  It was just

5  regular.  It wasn't heavy or anything like that.

6      Q.      Okay.  Now, prior to April 19th,

7  2012, had you ever had any contact with the

8  Reading Police Department?

9      A.      No.

10     Q.      How about Pennsylvania State Police?

11     A.      No.

12     Q.      Okay.  Now, tell me what happened on

13  April 19th, 2012 as you were driving home.

14     A.      Okay.  I was driving home.  And I was

15  in the right -- I was driving in the right lane.

16  And I -- I could see a swarm of police officers

17  drive on the bridge that goes from Reading into

18  West Reading.

19              So first I was, Oh, I wonder what's

20  going on.

21              Then I see them go on the exit ramp,

22  so I get into the left lane so that they would be

23  able to get on.  And then a car came flying up on

24  the right lane past me and eventually crashed

25  into the back of a Budweiser truck.  And it came

ALEXIS VIDAL

Page 10

1    to a stop.  It crossed on an angle in the left

2    lane -- came to a stop at the concrete median.

3              And a guy got out.  It was Ernest

4    Martin.  And he jumped over the median and kind

5    of hobbled and limped to the side.  It was on the

6    bridge.  And he stopped just, like, right before

7    the railing.

8              And there was, like, police officers

9    everywhere.  They came behind me.  I had my

10   window down, so I could hear everything.  I could

11   see everything.  I didn't have any music on.  And

12   then one of the police officers shot him with a

13   taser gun -- a stun gun in the back.  And I saw

14   his hands go up.  And he kind of -- he fell

15   forward, but he was so close to the railing that

16   it hit his midsection.  And he just flipped over

17   the railing kind of like a rag doll.

18   Q.       Okay.  And we're just going to back

19   up a little bit.  And we're going to go into a

20   little bit more detail.

21             Do you recall the color of the car

22   that he was driving -- Mr. Martin?

23   A.       No.  I don't remember.

24   Q.       How about the police cars, did they

25   have their sirens and lights on?

ALEXIS VIDAL

1      A.      Yes.

2      Q.      How many police cars, if you recall?

3      A.      I would say at least five, but there

4  could have been a lot more than that.  I just

5  remember there being a lot.  I couldn't really

6  count because they were mainly behind me.

7      Q.      Okay.  Okay.  You said he had struck

8  a truck in front of you.

9      A.      Yeah.

10      Q.      How far in front of you did the

11  accident occur?

12      A.      I would say about maybe a hundred

13  feet.

14      Q.      Okay.  Were there any cars between

15  you and where he struck the truck?

16      A.      No.

17      Q.      Could you estimate how fast

18  Mr. Martin was driving in the car when he went

19  past you?

20      A.      Well, I would probably say -- I was

21  doing 55, the speed limit.  And he came -- he

22  was, like, flying past me.  So I would say at

23  least 65 -- definitely over the speed limit.

24      Q.      And you said he hit the Budweiser

25  truck -- or the -- I think you said Budweiser

ALEXIS VIDAL

Case 5:12-cv-03665-JFL   Document 94-1   Filed 06/15/15   Page 74 of 86

Page 12

1  truck.

2      A.      Yeah.

3      Q.      And hit -- then crossed into the
4  other lane.

5      A.      Yeah.

6      Q.      Is that what happened?

7      A.      It -- when he crashed, like, didn't
8  even, like, stop, right into the back of it, it
9  kind of -- the car just kind of, like, popped up.
10 And then it -- it was, like, disabled.  And it
11 just rolled.  And the front end just kind of,
12 like, hit the center median.  And it kind of,
13 like, cut me off in my lane, but I was -- I could
14 stop in time so I wouldn't, like, be involved and
15 hit the car or anything.

16     Q.      So the Budweiser truck was in the
17 right lane?

18     A.      Yeah.

19     Q.      You were in the left?

20     A.      Yeah.

21     Q.      It hits the truck and kind of crosses
22 in front of you?

23     A.      Yes.

24     Q.      Okay.  And at that point you said he
25 got out of the car?

KARASCH & ASSOCIATES
800-621-5689      WWW.KARASCH.COM

ALEXIS VIDAL

Page 13

1    A.        Um-hmm.

2    Q.        Did he look -- did Mr. Martin look

3 like he was injured in any way?

4    A.        Yeah.  He was limping.  It kind of

5 looked like he was kind of, like, holding his leg

6 a little bit.

7    Q.        Okay.  Now, where did the police car

8 stop?

9    A.        One came up on my right side.  And

10 then most of them were on -- like, behind me.

11   Q.        Okay.

12   A.        And then they -- the police officer

13 -- like, I guess traffic -- I wasn't really

14 paying much attention to the traffic in the

15 westbound lane, but they had stopped pretty far

16 back, I guess.

17   Q.        You were going westbound or

18 eastbound?

19   A.        I was eastbound.

20   Q.        Okay.  So they stopped traffic on the

21 other side of the road as well?

22   A.        Yeah.

23   Q.        Is there -- I'm not really that

24 familiar with that area.

25             Is there a guardrail, or are you able

ALEXIS VIDAL

Page 14

1   to just walk on the other side of the road and go

2   westbound?

3       A.      There's a concrete -- there's, like,

4   a concrete median with a, like, railing over top

5   of it.

6       Q.      At any point did Mr. Martin end up in

7   the westbound lanes?

8       A.      Yeah.  He jumped over the concrete

9   median and kind of -- he wasn't running fast, but

10  he tried to run over to the side of the bridge.

11      Q.      Okay.  So you're going eastbound.

12  Mr. Martin is going eastbound.  The crash

13  happens.  He jumps and runs across the other lane

14  of travel?

15      A.      Yeah.

16      Q.      Okay.  So did the police stop in your

17  lane on the eastbound lanes?

18      A.      I'm not sure if there was officers in

19  the westbound lanes.  I wouldn't imagine there

20  would be, but I'm not a hundred percent sure.

21      Q.      Okay.  That's fine.  And that's

22  another instruction I wanted to give you.  If you

23  don't remember --

24      A.      Yeah.

25      Q.      -- that's perfectly acceptable.  I

ALEXIS VIDAL

Page 15

1   don't want you to assume anything.  Just let me

2   know you don't remember.  That's fine.

3       A.      Okay.

4       Q.      So after the police stopped, did any

5   of the officers exit their vehicle?  What

6   happened once they stopped?

7       A.      Yeah.  A bunch of officers kind of

8   ran over towards him.  I heard one officer -- I'm

9   not going to say because I'm not a hundred

10  percent sure.  But there was a bunch of commotion

11  going on.  And an officer ran -- and the car that

12  had pulled up to the right side of me ran in

13  front of me.  And he's the one that pulled out

14  the stun gun and shot him in the back.  But there

15  was lots of commotion.  I couldn't really make

16  out anything, so...

17      Q.      Okay.  Did you hear any of the

18  officers yelling or saying anything to

19  Mr. Martin?

20      A.      I'm not sure.  I'm not a hundred

21  percent sure because there was just, like, tons

22  of commotion.  And being in that situation it was

23  kind of frightening, so I don't want to say that

24  -- I don't want to say that they said, Stop;

25  freeze; put your hands up because I'm not sure if

ALEXIS VIDAL

1    they said that or not, so...

2        Q.       Okay.  How many officers got out of

3    their vehicle after the crash occurred and after

4    Mr. Martin exited his car; do you remember?

5        A.       No.

6        Q.       Okay.  You just recall the one that

7    ran in front of your car?

8        A.       Yeah, and the few that were over --

9    that were eventually over at the railing, they

10   were all kind of, like, looking over for him, but

11   I don't know how many.  It was just a handful.

12       Q.       Okay.  Do you recall what the officer

13   that ran in front of your car with the stun gun

14   looked like?

15       A.       Well, in my statement I said that it

16   was a bald man.  I don't really remember because

17   it was so long ago.  But that was right after the

18   incident, so I'm going to go with what I have in

19   my original statement.

20       Q.       Was this officer running after

21   Mr. Martin?

22       A.       Yes.

23       Q.       Okay.  And Mr. Martin was able to get

24   away -- get to the edge of the --

25       A.       Yeah.

ALEXIS VIDAL

1      Q.        Did Mr. Martin at any time stop

2   running or turn around and --

3      A.        Yeah.

4      Q.        -- stop fleeing the police?

5      A.        He stopped once he got to the edge of

6   the bridge.  But by the time -- it was just the

7   way the timing worked out.  As soon as he got

8   there it was when he was tasered because it all

9   kind of happened so quickly.  They were, like,

10  right on his tail.  So he wasn't able to, like,

11  jump or anything, but I don't think he was going

12  to jump.

13     Q.        I'm sorry?

14     A.        I don't think he was going to jump.

15     Q.        But until he got to the edge of the

16  bridge he didn't stop from running?

17               MS. PEARCE:  Objection.  She did

18      not say the edge of the bridge.

19               MS. AMBROSE:  She can clarify.

20               MS. PEARCE:  Make sure you

21      understand what she's asking, okay?

22  BY MS. AMBROSE:

23     Q.        If you don't understand, just --

24               MS. PEARCE:  And make sure that you

25      agree with the wording because it's your

ALEXIS VIDAL

Page 18

1      statement and you can say it as you

2      understand it.

3              THE WITNESS:  I believe on the side

4      of the bridge where the railing is, there

5      is, not really the sidewalk, but it kind of

6      just, like, has the steps up -- maybe a

7      little bit, like, concrete.  But he did

8      stop.  It looks like he was going to, like,

9      kind of look over the bridge to see if there

10     was water.  Because as far as I know,

11     there's pavement there.  So he did stop.  He

12     didn't -- it wasn't like a full motion.  But

13     as soon as he stopped was when he was, like,

14     tasered.  And had I saw his arms come and --

15     yeah.

16 BY MS. AMBROSE:

17     Q.     Okay.  How many lanes of traffic are

18 going to eastbound on 422?

19     A.     Two.

20     Q.     Okay.  How about westbound?

21     A.     Two.

22     Q.     Was there any traffic coming

23 westbound as he was -- after he jumped over the

24 median and ran across the westbound side?

25     A.     I'm not entirely sure.  I just

ALEXIS VIDAL

Page 19

1  remember there was -- after the incident

2  happened, there was -- I saw two cars.  And

3  traffic behind them had stopped.

4      Q.      Okay.  And what happened after you

5  saw Mr. Martin go over the side of the railing?

6      A.      All of the police officers just kind

7  of, like, looked over -- were looking over the

8  railing, arguing with each other.  The one -- I

9  believe there was a female officer that was

10  yelling at the officer who had shot the stun

11  gun.  I don't know what she was saying.  I was,

12  at that point, like, hysterical.  But there was

13  debris from the accident and glass all over.

14          And no one had approached me.  I was

15  kind of, like, the only car sitting there.  No

16  officers approached me for a few minutes.  And

17  then one guy finally -- one officer came, looked

18  at me, and left -- I guess spoke with other

19  officers.  And then he came back and just told me

20  to leave and just drive over.  They didn't ask

21  for any identification, none of my information.

22  They didn't ask me if I was hurt or okay.  They

23  saw that I was hysterical crying, but they just

24  told me to leave.

25      Q.      Do you know what officers they were?

ALEXIS VIDAL

Page 20

1               Were they from Reading or

2    Pennsylvania State Police; do you know?

3         A.      I'm not a hundred percent sure.

4         Q.      Okay.  What did their uniforms look

5    like, if you remember?

6         A.      I'm pretty sure they were navy.

7         Q.      How about the female officer, can you

8    describe her in a little more detail?

9         A.      No, I can't.

10        Q.      Height, hair color, nothing?

11        A.      She was -- I know she was white.  And

12   I believe she had dark blond to brown hair, not

13   dark brown, but it was a lighter colored hair.

14        Q.      Okay.  How about her uniform?

15        A.      I believe it was navy.

16        Q.      Did any of the officers who

17   approached your car that day say anything aside

18   from telling you to go?

19        A.      No.

20        Q.      And was that a male or a female

21   officer?

22        A.      Male officer.

23        Q.      Do you recall what he looked like?

24        A.      He was Spanish and he had glasses.

25   I'm not sure if they were sunglasses or reading

ALEXIS VIDAL

Page 21

1    glasses.   I think he was wearing sunglasses
2    though.
3         Q.        Okay.   What color was his uniform?
4         A.        Navy.
5         Q.        Do you happen to recall if you were
6    able to see, like, the pins on their shirts that
7    told you their names?
8         A.        No.
9         Q.        All right.   Now, tell me what
10   happened after you got home on April 19th.   Did
11   you tell anybody about what you saw?
12        A.        Yeah.   I came home.   I told my mom.
13   And she kind of -- we were sitting out back, I
14   remember.   I was telling her everything that
15   happened.   And I guess she pulled up an article
16   because it was, I guess, a couple of hours after
17   it happened.   I guess it was an article by the
18   Reading Eagle online that said -- the title was A
19   Man Jumps Off Bridge or something.   And it had
20   nowhere in the article stated that a taser had
21   been used.   It just said a man jumped off a
22   bridge that was on a high speed car chase from
23   Reading in a stolen car.   And my mom, she said,
24   well, you know, if this article is wrong, you
25   need to call them and tell them, like, that --

ALEXIS VIDAL

Page 22

1   like, what actually happened.

2          So we called -- I forget who exactly

3   we called regarding -- I think we might have

4   called the paper first and said -- and then they

5   told us to call the police.

6          And I ended up going to the state

7   police in Reading in, I guess, Kenhorst area --

8   the state police at the Reading --

9   Q.     Barracks?

10  A.     Yeah.

11  Q.     Okay.

12  A.     And I went in there.  And I gave a

13  statement for them.

14         And I was -- when I was done there --

15  I guess, I remember a man came to my house.  He

16  wasn't with the police or anything, but he had

17  called.  I think he might have been, like, not a

18  private investigator, but some type.  And he -- I

19  told him -- because when I gave my statement at

20  the state police, the guy that I gave my

21  statement to was pretty much, like, telling me

22  what I can and can't say in my statement.  And

23  that if I wrote that he fell off of the bridge,

24  that technically that's lying because I have to

25  say, like, he went over the bridge.  I can't say,

ALEXIS VIDAL

Page 23

1   like, he fell off the bridge.  But I just -- I

2   remember being very intimidated.  I was 17.  They

3   wouldn't even let my mom in the back with me.

4   And I -- like, he said I can't have -- that

5   everything that we talked about was confidential

6   and that I couldn't tell anybody what happened --

7   like, what we talked about in there.  And I don't

8   know.  I just remember being very scared and

9   intimidated to like even tell my mom, but I

10  eventually did.

11              I was just, like, you know, like, he

12  told me that I can't say this; I can't say that.

13              And she was, like, concerned.  She

14  was, like, Oh, well, you had your rights

15  violated.

16              I mean, I was only 17.  I'm still

17  really not sure about -- I'm not familiar with,

18  like, law type stuff.

19      Q.      Okay.  I want to back up a little

20  bit.

21              Do you recall, aside from you stopped

22  eastbound on 422, was there any other cars or

23  people that witnessed the incident, as far as you

24  could tell?

25      A.      At first, no, but I do believe that

ALEXIS VIDAL

Page 24

1   there was a few -- at least one other witness

2   that I think went in and gave a statement.  I'm

3   not sure though.

4       Q.      Okay.  How about westbound?  Did you

5   see cars stopped going westbound?

6       A.      That's who I think was one of the

7   witnesses.  I'm not sure.

8       Q.      After the incident, did you see if

9   anybody -- any of the officers stopped any of

10  those cars, or did they waive everybody through?

11      A.      I'm not sure because I left before

12  anything -- I really knew what was going on.

13      Q.      Okay.  Do you recall about how many

14  minutes from the time you saw the incident happen

15  until the police officers told you to leave?

16      A.      It was probably within five minutes.

17      Q.      So you see the article in the Reading

18  Eagle, and that prompts you to call the state

19  police?  Is that how you ended up there to give

20  your statement?

21      A.      Yeah.  Pretty much, yes.

22      Q.      Okay.  I want to give you the

23  statement that you gave to the state police.

24  It's that section up there.  And then this is the

25  handwritten portion of it.  If you want to just