UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| ERNEST MARTIN, | : |
| | : |
| Plaintiff, | : |
| v. | :   No. 5:12-cv-03665 |
| | : |
| CITY OF READING; READING POLICE | : |
| DEPARTMENT; WILLIAM HEIM, Chief of | : |
| Police of the Reading Police, individually and | : |
| in his official capacity; OFFICER BRIAN | : |
| ERRINGTON, individually and in his official | : |
| capacity; CAPTAIN DAMON[1] KLOC, | : |
| individually and in his official capacity; | : |
| PA STATE TROOOPER MICHAEL | : |
| PAVELKO; JOHN DOES 1-9, | : |
| | : |
| Defendants. | : |

_____

**MEMORANDUM OPINION**

**Plaintiff's Motion for Partial Summary Judgment, ECF No. 86 – Denied
Defendant Michael Pavelko's Motion for Summary Judgment, ECF No. 84 – Granted
Defendants City of Reading et al.'s Motion for Summary Judgment, ECF No. 87 – Granted
in Part and Denied in Part**

**Joseph F. Leeson, Jr.**                                                      **July 31, 2015**
**United States District Judge**

I.      **Introduction**

        Presently before the Court is Plaintiff Ernest Martin's Motion for Partial Summary

Judgment, ECF No. 86, Defendant Michael Pavelko's Motion for Summary Judgment, ECF No.

84, and Defendants City of Reading, Reading Police Department,[2] William Heim, Damond Kloc,

_____

[1]         Plaintiff's initial Complaint and Amended Complaint specified this Defendant's name as "Damon Kloc,"
but the correct spelling of his first name appears to be "Damond." See, e.g., Reading Defs.' Br. Supp. Mot. Summ. J.
1, ECF No. 87-2.
[2]         The Reading Defendants seek to have the Reading Police Department dismissed from this action because
the Department "has no separate existence apart from the City itself." See Reading Defs.' Br. Supp. Mot. Summ. J.

and Brian Errington's ("Reading Defendants") Motion for Summary Judgment, ECF No. 87. For the following reasons, the Court denies Plaintiff's Motion, grants Defendant Pavelko's Motion, and grants the Reading Defendants' Motion in part and denies the Motion in part.

## II.     Factual Background and Procedural History

On April 19, 2012, Plaintiff fell from the West Shore Bypass, an elevated portion of U.S. Route 422 that passes through the Borough of West Reading, Pennsylvania and landed forty feet below on a concrete surface. See Am. Compl. ¶ 29, ECF No. 21. This action arises out of the circumstances that led to his fall.

Plaintiff claims that Defendant Brian Errington, a police officer employed by the City of Reading, caused him to fall after Defendant Errington "shot Plaintiff with a taser/stun gun while Plaintiff stood at the side of the West Shore Bypass." Id. ¶¶ 7, 29. Plaintiff claims that he suffered serious and permanent injuries, including permanent damage to his liver, a fracture to his pelvis, and numerous fractured ribs. Id. ¶ 30. He was treated for his injuries in the intensive care unit at Reading Hospital and Medical Center and has undergone a number of surgical procedures. Id. ¶ 31. At the time of his complaint, he alleged that he was dependent upon a ventilator and a feeding tube and expected months of additional hospitalization. See id.

After the incident, Plaintiff claims that Captain Dante Orlandi, Commanding Officer of Troop "L" of the Pennsylvania State Police, Defendant Michael Pavelko, a Pennsylvania State Trooper, and other Pennsylvania State Troopers,[3] together with the City of Reading, the Reading

---

1, ECF No. 87-2.  Plaintiff does not respond to this argument and there is no suggestion that the Reading Police Department has any separate corporate existence from the City of Reading. See Mitros v. Cooke, 170 F. Supp. 2d 504, 507 (E.D. Pa. 2001); Setchko v. Twp. Of Lower Southampton, No. CIV.A. 00-3659, 2001 WL 229625, at *2 (E.D. Pa. Mar. 8, 2001). Therefore, summary judgment will be entered in favor of the Reading Police Department as a party to this action.

[3]     In addition to Defendant Pavelko, Plaintiff named as defendants two unknown "John Doe" Pennsylvania State Troopers. See Am. Compl. ¶¶ 20-22.

Police Department, and various City of Reading police officers, including Defendant Errington,[4]
commenced an investigation into the circumstances surrounding Plaintiff's fall. Id. ¶¶ 6-22, 33.
Plaintiff claims that during the course of this investigation, these individuals and entities
attempted to "cover-up and hide the facts surrounding the unlawful cause of Plaintiff's fall[,] . . .
intentionally fail[ed] to properly preserve physical evidence at the scene," and "intentionally
fail[ed] to obtain/retain the names and contact information of, and intentionally fail[ed] to
properly question, eye witnesses at the scene." See id. ¶ 33. Plaintiff also claims that Captain
Orlandi, "by and through Defendant Pavelko" and two unknown Pennsylvania State Troopers
and "in concert with" the Reading Defendants, "threaten[ed] a witness with criminal perjury
charges if the witness would not corroborate" their version of the events. See id. ¶ 33.

 In addition to these alleged investigatory missteps, Plaintiff claims that Defendants
"provided false and misleading statements to local media outlets" suggesting that Plaintiff
intentionally jumped from the West Shore Bypass—statements that Plaintiff alleges were then
published by those local media outlets. See id. ¶¶ 41-42.

 Based on these events, Plaintiff advances the following claims: (1) pursuant to 42 U.S.C.
§ 1983, a claim that Defendant Errington used excessive force against him in violation of his
Fourth Amendment rights, as incorporated against the states by the Fourteenth Amendment; (2)
tort claims against Defendant Errington for assault, battery, and intentional infliction of

---

[4]    Among those City of Reading police officers are Defendant Errington, Defendant William Heim, the Chief
of Police of the Reading Police Department, and Defendant Damon Kloc, a Captain of the Reading Police
Department. Plaintiff also named as defendants a series of "John Doe" City of Reading police officers. See id. ¶¶ 6,
9-17. On June 2, 2014, Plaintiff sought to amend his Amended Complaint to replace four of these John Doe
Defendants with officers of the Reading Police Department that Plaintiff had identified. See Martin v. City of
Reading, No. 12-cv-03665, 2015 WL 390611, at *2 (E.D. Pa. Jan. 29, 2015). The Honorable James Knoll Gardner,
to whom this case had previously been assigned, denied Plaintiff's motion on the grounds that the statute of
limitations had expired on claims arising out of the events of April 19, 2012, and that Plaintiff could not satisfy the
requirements of Rule 15(c) that are necessary to show that his intended amendment to his complaint would relate
back to his original pleading. See id. at *6-9.
       Plaintiff had also named Captain Orlandi as a defendant to this action, see Am. Compl. ¶ 6, but on January
29, 2013, Judge Gardner entered an order dismissing Plaintiff's claims against Captain Orlandi without prejudice
pursuant to a stipulation Plaintiff entered into with all identified Defendants. See Order, ECF No. 34.

emotional distress; (3) pursuant to § 1983, a claim that Defendant City of Reading, Defendant Heim, and Defendant Kloc were each deliberately indifferent to a need to train and supervise the City of Reading police officers to avoid the constitutional harm Plaintiff alleges he suffered; (4) pursuant to § 1983, a claim that all Defendants violated a protected liberty interest of Plaintiff under the Fourteenth Amendment by virtue of Defendants' alleged investigatory misconduct; and (5) tort claims against all Defendants, with the exception of Defendant Pavelko,[5] for defamation, false light invasion of privacy, and intentional infliction of emotional distress arising out of the publication of allegedly false statements about Plaintiff by local media outlets.[6] See id. ¶¶ 49-110.

Defendants cast Plaintiff's claims in a starkly different light. According to the Reading Defendants, Plaintiff's arrival on the West Shore Bypass was the culmination of a series of alleged criminal acts Plaintiff committed that day. Defendants assert that Plaintiff stole a car, was located by City of Reading police officers a few hours later—still in possession of the stolen vehicle—and proceeded to lead the officers on a chase "through the city streets of Reading in an attempt to flee apprehension." See Reading Defs.' Br. 1-2. Once on U.S. Route 422, Plaintiff "crashed the stolen car, . . . ran through traffic on Route 422 eastbound, climbed over the median barrier and began to run onto the westbound lanes of Route 422." Id. at 2. At this point in time, according to the Reading Defendants, Defendant Errington issued a verbal warning to stop and warned Plaintiff that he would deploy his Taser if Plaintiff did not comply. Id.

---

[5]    Defendant Pavelko filed a Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 31, which Judge Gardner granted in part to the extent that Defendant Pavelko sought to dismiss those of Plaintiff's claims that sounded in state tort law. Judge Gardner concluded that the doctrine of sovereign immunity barred Plaintiff's tort claims against Defendant Pavelko, an employee of the Commonwealth of Pennsylvania. See Martin v. City of Reading, No. 12-CV-03665, 2013 WL 5429358, at *9-11 (E.D. Pa. Sept. 30, 2013).

[6]    Plaintiff had also pled an additional § 1983 claim against the Reading Defendants founded on an alleged violation of his Eighth Amendment rights, which Plaintiff withdrew after the Reading Defendants moved to dismiss that claim. See id. at *5-6.

There is no dispute that Defendant Errington deployed his Taser, but the Reading Defendants claim that the Taser "did not connect" with Plaintiff. Id. After that failed attempt to halt Plaintiff's flight, the Reading Defendants state that Plaintiff "took several additional steps to the overpass abutment beyond the shoulder and then jumped over the barrier," leading to Plaintiff's fall forty feet to the ground. Id. The Reading Defendants allege that Plaintiff leapt from the roadway to evade the officers, either misjudging the distance to the ground, misjudging his proximity to the Schuylkill River, which travels alongside that portion of the West Shore Bypass, or acting in disregard of the possible harm he might suffer from the fall. Id. The Reading Defendants, therefore, maintain that Defendant Errington's discharge of his Taser played no role in Plaintiff's fall from the Bypass. See id. at 3. With respect to Plaintiff's other claims, the Reading Defendants contend that Defendant has failed to produce sufficient facts to survive summary judgment. See id.

On May 29, 2015, Plaintiff, Defendant Pavelko, and the Reading Defendants each filed their respective motions that are presently before the Court.

## III.    Standard of Review – Motions for Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id. When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely

disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**IV.     Claims against Defendant Officer Brian Errington**

**A.     § 1983 Claim for use of Excessive Force in Violation of Plaintiff's Fourth Amendment Rights**

**1.     There is a Genuine Dispute over the Material Facts Concerning Whether Defendant Errington Violated Plaintiff's Fourth Amendment Rights.**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Excessive force claims that "arise in the context of an arrest or investigatory stop" invoke the protections conferred by the Fourth Amendment, because the "'reasonableness' of a particular seizure depends . . . on how it is carried out." Graham v. Connor, 490 U.S. 386, 394-95 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)).

Evaluating a claim of excessive force demands "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Because the Fourth Amendment's standard of "reasonableness" "is not capable of precise definition or mechanical application," see id. (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)), the totality of the circumstances must be

considered to determine if the seizure was justified, see id. (quoting Garner, 471 U.S. at 8-9). The inquiry is objective: the reasonableness of a seizure must be evaluated "in light of the facts and circumstances confronting [the officers], without regard to their intent or motivation." Id. at 397 (citing Scott v. United States, 436 U.S. 128, 137-39 (1978); Terry v. Ohio, 392 U.S. 1, 21 (1968)). But those facts and circumstances "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (citing Terry, 392 U.S. at 20-22). This is so because the standard of reasonableness imposed by the Fourth Amendment accounts for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." See id. at 397.

In addition to those factors enumerated by the Supreme Court in Graham, the United States Court of Appeals for the Third Circuit has acknowledged other considerations that may be relevant, including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." See Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other grounds by Curley v. Klem, 499 F.3d 199, 209-11 (3d Cir. 2007). In addition, "the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered." Id. But none of these factors are alone controlling: "[t]he Supreme Court made clear in Graham that each case alleging excessive force must be evaluated under the totality of the circumstances." See id.

The evidence the parties have cited in connection with Defendant Errington's Motion for Summary Judgment on this claim show the existence of a genuine dispute over the material facts

bearing on the reasonableness of Defendant Errington's use of force, and Defendant Errington's

Motion for Summary Judgment with respect to this claim will therefore be denied.

Plaintiff cites the deposition testimony of Alexis Vidal, who was present at the time

Defendant Errington discharged his Taser. She testified that she was driving her car on U.S.

Route 422 as another car, driven by Plaintiff, "came flying up on the right lane past [her] and

eventually crashed into the back of a Budweiser truck." See Pl.'s Resp. Reading Defs.' Statement

Undisputed Facts ¶ 13, ECF No. 92-2. She stated that Plaintiff emerged from the car, crossed the

median of Route 422, "and kind of hobbled and limped to the side" where he "stopped just, like,

right before the railing" on the edge of the elevated roadway. Id. She continued:

> [T]here was like, police officers everywhere. They came behind me. I had my
> window down, so I could hear everything. I could see everything. I didn't have
> any music on. And then one of the police officers shot [Plaintiff] with a taser
> gun—a stun gun in the back. And I saw his hands go up. And he kind of—he fell
> forward, but he was so close to the railing that it hit his mid-section. And he just
> flipped over the railing kind of like a rag doll.

Id. If a reasonable jury finds Ms. Vidal's testimony to be credible, that jury could find that

Defendant Errington's decision to use his Taser on Plaintiff posed a risk of serious injury or

death, and such use of force under the circumstances violated Plaintiff's Fourth Amendment

rights.

The use of Tasers by law enforcement has proved to be an active area of litigation for

claims alleging excessive uses of force. In this district alone, dozens of cases have been filed

based on claims that police officers improperly used Tasers during the course of arrests or other

investigatory stops. See, e.g., Hill v. Borough of Doylestown, No. 14-2975, 2015 WL 1874225

(E.D. Pa. Apr. 23, 2015); Geist v. Ammary, 40 F. Supp. 3d 467 (E.D. Pa. 2014); Stroud v.

Boorstein, No. 10-3355, 2014 WL 2115499 (E.D. Pa. May 20, 2014); Boyden v. Twp. Of Upper

Darby, 5 F. Supp. 3d 731 (E.D. Pa. 2014); Dotterer v. Pinto, No. 13-06903, 2014 WL 535156

(E.D. Pa. Feb. 11, 2014); Garey v. Borough of Quakertown, No. 12-0799, 2013 WL 3305222 (E.D. Pa. July 1, 2013). The question usually presented by these cases is whether the infliction of pain caused by the electrical charge of the Taser is reasonable in light of the need for the use of force to effect a Fourth Amendment seizure. See Brown v. Cwynar, 484 F. App'x 676, 681 (3d Cir. 2012) (observing that, at the time of the arrest at issue in that case, "multiple courts of appeals had approved the use of taser guns to subdue individuals who resist arrest or refuse to comply with police orders") (citations omitted). Here, however, Plaintiff's claim arises not out of the harm inflicted by the electrical charge of the Taser but by the decision of Defendant Errington to use the Taser at the place he sought to effectuate Plaintiff's arrest.

Thus, the focus of this action is not on the harm the discharge from a Taser is capable of inflicting but on the context in which the Taser was used. See Scott v. Harris, 550 U.S. 372, 384 (2007) (recognizing that the use of the front bumper of a police car to impact the rear bumper of a fleeing vehicle in an attempt to bring the vehicle to a stop posed, in the context of a high-speed chase, "a high likelihood of serious injury or death" to the fleeing motorist). While the electrical discharge of a Taser may only "constitute an 'intermediate or medium, though not insignificant, quantum of force'" under ordinary circumstances, see Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (quoting Sanders v. City of Fresno, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008)), the amount of force the use of a Taser represents changes when the Taser is used under circumstances that pose a risk of serious injury or death. See Harper v. Perkins, 459 F. App'x 822, 826 (11th Cir. 2012) ("While the Defendants point to case law suggesting that tasers emit a moderate, non-lethal level of force, none of the cases deal with its use on a suspect standing with his hands in the air and at least four feet off the ground in a tree, which clearly exacerbated the risk of serious injury resulting from the application of the taser."); see also Brown v. Burghart,

9

No. 10-3374, 2012 WL 1900603, at *8 (E.D. Pa. May 25, 2012) ("[T]he level of force must take into account the totality of the circumstances, not simply the type of force usually associated with a particular weapon. . . . [I]n a normal situation, a shove would be a very insignificant amount of force, but when a suspect is perched on the ledge of a building, a shove can be deadly force.") (citing Snauer v. City of Springfield, No. 09-CV-6277, 2010 WL 4875784, at *4-5 (D. Or. Oct 1, 2010), report and recommendation adopted by 2010 WL 4861135 (D. Or. Nov. 23, 2010)).

        In Patrick v. Moorman, the Court of Appeals for the Third Circuit recognized that the circumstances under which a Taser is used bears on the reasonableness of the decision to use the Taser. The court observed that a sheriff deputy's use of the Taser conformed to the sheriff department's policy on Taser usage, which "warn[ed] against aiming a taser at a suspect's head and against taser use if a running suspect might 'fall from a significant height,' 'fall into the path of oncoming vehicles or into operating machinery,' or 'fall into water where the suspect is likely to drown.'" See 536 F. App'x  255, 257, 259 (3d Cir. 2013). The court determined that the decision of the deputy to use a Taser in that case was reasonable in part because "there was no risk of [the arrestee] falling from a significant height or into oncoming traffic or water."[7] See id. at 259. Plaintiff here has cited to evidence that the Reading Police Department has in place a similar policy, which requires officers to "consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use the [electronic control weapon] on a fleeing subject." See Pl.'s Resp. Reading Defs.' Statement

_____

[7]        The Reading Defendants cite to Patrick for support, claiming that the case presented "facts quite similar to the present case," but the present case features a scenario that was not present in Patrick: an officer's decision to use a Taser under circumstances where there was a "risk of [the arrestee] falling from a significant height." See Patrick, 536 F. App'x at 259.

Undisputed Facts ¶ 18. Specifically, the policy forbids officers from using a Taser "[w]hen the subject is in a position where a fall may cause substantial injury or death."[8] Id.

The Reading Defendants cite to various cases, including Patrick, for the proposition that Plaintiff's injuries "have little bearing" on whether Defendant Errington's use of force was constitutionally permissible, but Defendants read these cases too broadly. The principle these cases espouse is that an evaluation of a use of force is an "objective analysis [that] cannot be skewed by 20/20 hindsight since courts must appreciate that officers are forced to make split-second decisions." See Patrick, 536 F. App'x at 259. Thus, when an officer's use of force results in "tragic, unforeseen consequences" that the officer "could not have reasonably anticipated," those unforeseen consequences do not bear on the reasonableness of the officer's conduct. See Mohney v. Hageter, No. 11-340, 2013 WL 391155, at *9 (W.D. Pa. Jan. 30, 2013) (concluding that the use of a Taser did not constitute an excessive use of force where the electrical discharge from the Taser appeared to have ignited a fire that led to the arrestee's death after the arrestee, unbeknownst to the officers, had placed gasoline on his clothes). These cases do not stand for the proposition that the decision to deploy force under circumstances in which an officer would have reasonably recognized that the force would pose a risk of serious injury or death should not be evaluated in light of that risk. See Mohney, 2013 WL 391155, at *9 (concluding that the officers "could not have reasonably anticipated that the use of the taser would result in [the plaintiff's] death"). Rather, "in judging whether [Defendant Errington's] actions were reasonable, [this Court] must consider the risk of bodily harm that [Defendant's] actions posed to [Plaintiff] in

---

[8]    The fact that Defendant Errington may have violated a Reading Police Department policy is not, of course, the reason why his conduct may have violated the Fourth Amendment. See Whren v. United States, 517 U.S. 806, 815 (1996). Rather, the policy merely recognizes the fact that the use of a Taser—which is ordinarily a non-lethal weapon—may, under certain circumstances, create a risk of serious injury or death that could make the use of the Taser under those circumstances constitutionally unreasonable.

light of the threat to the public that [Defendant] was trying to eliminate." See Scott, 550 U.S. at 383-84.[9]

A case decided in this district provides a more appropriate analogy. In Brown v. Burghart, the court confronted a claim of excessive force arising out of an officer's use of a Taser following a "relatively low-speed chase" involving a motorist operating a motor scooter. 2012 WL 1900603, at *1. During the chase, the motorist fell from the motor scooter, and when the motor scooter fell to the ground, the gas cap detached, causing gasoline to spill from the scooter. Id. When an officer used his Taser on the motorist, who was near the overturned motor scooter, the motorist became engulfed in flames. Id. at *2.  In response to the motorist's claim that he used excessive force, the officer argued that "he should not be held responsible for [the motorist's] extraordinary injuries." Id. at *7-8. But as the court explained, the risk that the Taser may ignite a fire "may well have been foreseeable by a reasonable officer." Id. at *8. The court observed that while a Taser may ordinarily constitute only an "intermediate level of force," "knowingly using . . . a taser near flammable material could be construed as a use of deadly force." See id. at *9 n.9.

---

[9]     The Reading Defendants also cite to McKenney v. Harrison, a case from the Court of Appeals for the Eighth Circuit that appears, at first glance, to be factually similar to the present action. In McKenney, officers seeking to execute an arrest warrant encountered the suspect on the second floor of a house. 635 F.3d 354, 356-57 (8th Cir. 2011). The officers ordered the suspect, who was unclothed, to dress himself. Id. at 357. The suspect, who was standing approximately six to eight feet from a window, "suddenly lunged toward the window," at which time one of the officers "deployed her Taser as [the suspect] was passing her but before he reached the window. The Taser's two probes lodged in [his] back, but [he] continued through the window," and later died from the injuries he sustained from the fall. Id. at 357-58.

While both McKenney and the present case involve the use of a Taser on individuals who fell from elevated locations, that is where the similarities end. In McKenney, the Eighth Circuit reasoned that "a reasonable officer, knowing that a Taser is designed to incapacitate instantly, could have believed that the force would incapacitate [the suspect] before he reached the window, while he was not in an 'elevated position' and likely to fall." Id. at 360.  Here, according to Plaintiff's account of the facts, Plaintiff was not attempting to leap from the West Shore Bypass; rather, Defendant Errington's decision to deploy his Taser was responsible for causing him to plummet to the ground below. Considered in a light most favorable to Plaintiff, the facts suggest that, at the time Defendant Errington deployed his Taser, Plaintiff was already in an "'elevated position' and likely to fall," which would mean that Defendant Errington's conduct was responsible for placing Plaintiff at risk for serious injury or death.

A case cited by the court from outside of this district provides an even closer analogy. In Snauer v. City of Springfield, the court addressed a claim of excessive force that arose out of an officer's use of a Taser on a fleeing suspect who, after leading the officer on a brief vehicular chase, abandoned his vehicle and "began climbing a six or seven foot high wooden fence." 2010 WL 4875784, at *2. The Taser caused the suspect to fall from the fence, who "plunged head-first to the other side unable to break his fall" and suffered multiple spinal fractures as a result. Id. The court concluded that use of a Taser under those circumstances, which created "a substantial risk of death or serious bodily injury," precluded the officer's motion for summary judgment. See id. at *5-6. A number of other courts have recognized that the use of a Taser on a person at risk of falling creates readily apparent risks of serious harm that make such uses of force constitutionally infirm. See Baker v. Union Twp., 587 F. App'x 229, 236 (6th Cir. 2014) (affirming a denial of summary judgment for an officer who used a Taser on a suspect standing at the top of a staircase, which caused the suspect to fall to the basement below, breaking his neck); Harper, 459 F. App'x at 826-27 (concluding that allegations that a police officer used a Taser on a suspect located "in a tree at least four feet off the ground," which caused the suspect to fall and be rendered a paraplegic, was unreasonable under the circumstances); Rockwell v. Rawlins, No. RDB-13-3049, 2014 WL 5426716, at *4 (D. Md. Oct. 23, 2014) (denying a motion for summary judgment by a detective who used a Taser on a suspect who had "exited his second story bedroom window and stood on a ledge or overhang of the house," which caused the suspect to fall to ground and fracture his vertebrae); Negron v. City of N.Y., 976 F. Supp. 2d 360, 369 (S.D.N.Y. 2013), appeal docketed, No. 13-4220 (2d Cir. Oct. 31, 2013) (denying a motion for summary judgment by an officer who used a Taser on a suspect who was "standing on a small, unenclosed ledge ten feet off the ground," which caused the suspect to the ground, fatally

injuring him); <u>Peabody v. Perry Twp., Ohio</u>, No. 2:10-cv-1078, 2013 WL 1327026, at *6 (S.D. Ohio Mar. 29, 2013) (denying a motion for summary judgment by an officer who used a Taser on a fleeing suspect who had scaled an eight-foot fence, which caused the suspect to fall from the fence and suffer serious head injuries); <u>Cook v. Riley</u>, No. 1:11CV24, 2012 WL 2239743, at *12 (M.D.N.C. June 15, 2012) (recommending that a motion for summary judgment be denied where an officer used a Taser on a suspect who had climbed onto a platform in a tree located approximately fifteen feet above the ground, causing the suspect to fall to the ground).

Accordingly, a jury could reasonably conclude that Defendant Errington's decision to use his Taser at a location where it was apparent that Plaintiff was at risk of serious injury or death was an excessive use of force under the circumstances.[10] Defendant Errington's Motion for Summary Judgment on this claim is therefore denied.[11]

---

[10]     The crime Plaintiff was suspected of committing—the theft of an automobile—is serious, which bears on the level of force Defendant Errington was permitted to use to apprehend Plaintiff. The parties dispute the extent to which Plaintiff was fleeing from the officers and the extent to which this possible flight may have endangered the officers or bystanders at the scene, and the Reading Defendants emphasize the "reckless and dangerous" car chase—a characterization that Plaintiff disputes—that Plaintiff led the officers on that day to support the force Defendant Errington used. But at the time Defendant Errington chose to use his Taser, the car chase, to the extent one had occurred, had ceased. By then, Plaintiff found himself on foot, on an elevated roadway, with "police officers everywhere." <u>See</u> Pl.'s Resp. Reading Defs.' Statement Undisputed Facts ¶ 13. Thus, Defendant Errington was not faced with the need to bring an end to "a Hollywood-style car chase" that was "placing police officers and innocent bystanders alike at a great risk of serious injury," which may justify a use of force that "places the fleeing motorist at risk of serious injury or death." <u>See</u> Scott, 550 U.S. at 379, 385. The Reading Defendants also do not cite to any evidence to suggest that Plaintiff was acting in a threatening manner to the officers or any bystanders at the scene. Thus, construing the facts in a light most favorable to Plaintiff, a jury could conclude that the totality of the circumstances did not justify a use of force that placed Plaintiff at risk of serious bodily injury or death at the time Defendant Errington discharged his Taser.

[11]     The Reading Defendants also seek the entry of summary judgment on this claim for all Reading Defendants other than Defendant Errington, to the extent Plaintiff is asserting this excessive force claim against them. <u>See</u> Reading Defs.' Br. 15 n.5. Plaintiff does not contest this aspect of the Reading Defendants' Motion and indeed attributes the use of force only to Defendant Errington in his opposition to the Reading Defendants' Motion for Summary Judgment. <u>See</u> Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 4-16, ECF No. 92-1. There also does not appear to be any evidence in the record from which a jury could conclude that any other Reading Defendant was directly involved in the use of force against Plaintiff. Therefore, the Motion of the Reading Defendants is granted in this respect.

2.        **There is a Genuine Dispute over the Material Facts Concerning Whether Defendant Errington is entitled to Qualified Immunity.**

Defendant Errington contends that even if his actions are found to have violated Plaintiff's Fourth Amendment rights, he is nonetheless entitled to qualified immunity. Qualified immunity protects an official from a suit for money damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." See Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011). A right is "clearly established" when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" See id. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alterations in original). Thus, the Court must answer the question of "whether 'reasonable officials in [Defendant Errington's] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be unlawful.'" See Giuffre v. Bissell, 31 F.3d 1241, 1255 (3d Cir. 1994) (quoting Abdul-Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993)).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). However, as the Court of Appeals for the Third Circuit recently observed in a case involving a claim of excessive force that arose out of the use of a Taser, "if there are facts material to the determination of reasonableness in dispute, then that issue of fact should be decided by the jury." See Geist v. Ammary, No. 14-3966, 2015 WL 4366795, at *2 (3d Cir. July 16, 2015) (citations omitted); see also Geist v. Ammary, 40 F. Supp. 3d 467, 485 n.65 (E.D. Pa. Aug. 22, 2014)

(collecting cases denying summary judgment on the basis of qualified immunity where factual disputes remained about the events giving rise to the claim of immunity).

For Defendant Errington, there are material issues of fact bearing on his entitlement to qualified immunity. As Defendant Errington observes, numerous courts have affirmed the constitutionality of the use of Tasers to subdue arrestees. See Brown v. Cwynar, 484 F. App'x 676, 681 (3d Cir. 2012) (observing that, at the time of the arrest at issue in that case, "multiple courts of appeals had approved the use of taser guns to subdue individuals who resist arrest or refuse to comply with police orders" and that "no decision by the Supreme Court, this Circuit, or by a majority of other federal circuits had foreclosed the use of taser guns when suspects resist arrest in an aggressive and combative matter"). But the constitutionality of Defendant Errington's conduct does not depend on a determination of whether a Taser is an appropriate weapon to use to subdue a resisting suspect. Instead, the constitutionality of Defendant Errington's conduct hinges on whether he used his Taser under circumstances that posed a grave risk of injury or death because of Plaintiff's location on the West Shore Bypass, a question whose answer depends upon the resolution of a genuine dispute of fact between the parties over the events that transpired that day. Thus, observations that the constitutionality of Taser usage is "developing" and "the fact that their use has been both sanctioned and proscribed in a variety of cases" that have discussed whether a Taser is an appropriate method of subduing an individual are not controlling in this case. See Kalinowski v. Kotowski, No. 3:13-CV-2291, 2014 WL 5493290, at *6 (M.D. Pa. Oct. 30, 2014) (concluding that qualified immunity attached where an officer used "a taser to subdue an agitated and aggressive party" who was "unreceptive, uncooperative and greeted [the officer] with obscenities" and repeatedly struck the officer with a swinging gate).

Unlike the majority of cases charging law enforcement officers with using Tasers unreasonably, the question here is not whether a reasonable officer would know whether the pain inflicted by the electric shock of a Taser crosses the "hazy border between excessive and acceptable force." See Rudlaff v. Gillispie, No. 14-1712, 2015 WL 3981335, at *5 (6th Cir. July 1, 2015) (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)). The focus here is not on the qualitative characteristics of the particular type of weapon Defendant Errington chose to employ, but whether a reasonable officer would understand that attempting to effect Plaintiff's arrest by using force that carried with it a risk of serious injury or death violated Plaintiff's rights. "Every time the police employ a new weapon, officers do not get a free pass to use it in any manner until a case from the Supreme Court or from this circuit involving that particular weapon is decided." Phillips v. Cmty. Ins. Corp., 678 F.3d 513, 529 (7th Cir. 2012); see Meyers v. Balt. Cnty., Md., 713 F.3d 723, 734-35 (4th Cir. 2013) ("The fact that the force used in the present case emanated from a taser, rather than from a more traditional device, is not dispositive."). Thus, it matters not that no judge of this district or panel of the Third Circuit appears to have passed on the legality of using a Taser on an individual at risk of injury from a fall. Based on the Reading Police Department's policy that forbids the use of Tasers when "the subject is in a position where a fall may cause substantial injury or death" and the fact that "[i]t is widely known among law enforcement . . . that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall," see Baker, 587 F. App'x at 234, this Court cannot say that "reasonable officials in [Defendant Errington's] position at the relevant time could have believed," under Plaintiff's version of the events, that Defendant's Errington's choice to deploy his Taser was lawful, see Giuffre v. Bissell, 31 F.3d at 1255 (quoting Abdul-Akbar, 4 F.3d at 202); Anderson v. Creighton, 483 U.S. 635, 640 (1987) (recognizing that the

decision to deny qualified immunity does not require "the very action in question [to have] previously been held unlawful" if "in light of the pre-existing law the unlawfulness [is] apparent").

Again, the case of Burghart is persuasive. There, the officer "point[ed] to the paucity of case law involving taser use and argue[d] that, even if he did violate [the plaintiff's] constitutional rights, those rights were not clearly established at the time of the events in question." 2012 WL 1900603, at *10. The court concluded that the officer was not entitled to qualified immunity for his decision to deploy a Taser in proximity to a motor scooter leaking gasoline, observing that "the police do not need judges to explain the obvious to them before they can be held accountable for an unreasonable or excessive use of force." Id. at *11 (quoting Snauer, 2010 WL 485784, at *5).

Thus, affording Defendant Errington qualified immunity at this time is inappropriate in light of the genuine dispute between the parties of the facts bearing on his entitlement to immunity. This conclusion is consistent with the views of at least two Courts of Appeals and a number of district courts that have confronted excessive force claims arising out of the use of Tasers on suspects who were at a risk of falling. See Snauer, 2010 WL 4875784, at *5 ("It does not take a panel of judges to alert a reasonable police officer that causing a paralyzed man to tumble head first onto the ground from a platform six to seven feet above the ground 'creates a substantial risk of causing death or serious bodily injury.'" (quoting Smith v. City of Hemet, 394 F.3d 689, 706 (9th Cir. 2005))); accord Baker, 587 F. App'x at 236; Harper, 459 F. App'x at 827 (concluding that allegations that officers used a taser "on a person standing with his hands in the air at least four feet off the ground in a tree" was "obviously and clearly excessive"); Rockwell, 2014 WL 5426716, at *4 n.12 ("While [the defendant-detective] has offered some legal support

for his contention that a police officer may tase a fleeing suspect, this Court finds that it is clearly established that an officer may <u>not</u> tase a cooperating suspect where the tasing presents a very real risk of serious bodily harm."); <u>Negron</u>, 976 F. Supp. 2d at 371 (concluding that the defendant officers "should have known that using a taser under the particular circumstances at issue [t]here was unreasonable even despite the lack of precedent involving tasers used under similar circumstances," particularly because the officers' department had adopted a policy on taser use that "should have alerted the defendant officers to the severe dangers of using a taser, without warning, on an individual who could fall from an elevated and precarious position"); <u>Peabody</u>, 2013 WL 1327026, at *7 (characterizing the use of a Taser on an individual who had climbed an eight-foot-tall fence as "lethal force"); <u>Cook</u>, 2012 WL 2239743, at *12 (recommending the denial of qualified immunity for defendant-officers who used a Taser on an individual located on a platform fifteen feet above the ground).[12]

Accordingly, Defendant Errington's Motion for Summary Judgment based on the doctrine of qualified immunity is denied.

---

[12]     The Reading Defendants cite to the opinion of this Court in <u>McNeil v. City of Easton</u>, where an officer used a Taser on a suspect who was attempting to climb a staircase inside of a house. <u>See</u> 694 F. Supp. 2d 375, 383-84 (E.D. Pa. 2010). But the relative positions of the officers and the suspect in that case suggests that the suspect was not at risk of a dangerous fall at the time the officer chose to deploy his Taser. Two officers, who were in the process of searching the house for the suspect, began to climb a staircase leading to the second floor when the suspect appeared at the top of the staircase. <u>Id.</u> at 384. The suspect descended three steps before refusing to descend the rest of the stairs. <u>Id.</u> When the suspect turned to ascend the stairs to return to the second floor, one of the officers used his Taser "to immobilize plaintiff and to prevent him from reaching the second floor," at which time "Plaintiff fell to the floor with his hands underneath himself." <u>Id.</u> Based on the proximity of the two officers to the suspect and the positioning of the two officers below the suspect on the staircase, it does not appear that the suspect was at risk of serious injury or death from a fall. Indeed, the focus of the court's evaluation of the suspect's excessive force claim centered on the fact that "[f]ederal district courts in Pennsylvania have found use of a taser to overcome a suspect's resistance to be reasonable," and there is no mention in the opinion of any suggestion that the suspect was in a precarious position at the time the officer used his Taser. <u>See id.</u> at 392-95.

**B.**     **Tort Claims**

**1.**     **There is a Genuine Dispute over the Material Facts Concerning Whether Defendant Errington Committed the Torts of Assault and Battery.**

In light of the Court's conclusion that Plaintiff may proceed with his claim of excessive force against Defendant Errington, the Court will deny Defendant Errington's request to have judgment entered in his favor on Plaintiff's tort claims of assault and battery.

Under Pennsylvania law, "[a] police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive," because "[t]he reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." See Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). Because "there are genuine disputes of material fact regarding whether Defendant['s] use of force vis-à-vis Plaintiff was reasonable," Defendant Errington is not entitled to summary judgment on Plaintiff's assault and battery claims. See Garey v. Borough of Quakertown, No. 12-0799, 2013 WL 3305222, at *7 (E.D. Pa. July 1, 2013) ("The question of whether an officer is liable for assault and battery under Pennsylvania law turns on whether he or she has used an excessive degree of force, as a matter of Fourth Amendment law, in dealing with an arrestee." (citing Russoli v. Salisbury Twp., 126 F. Supp. 2d 821, 870 (E.D. Pa. 2000))).

**2.**     **Defendant Errington is entitled to Summary Judgment on Plaintiff's Claim of Intentional Infliction of Emotional Distress.**

Under Pennsylvania law, a plaintiff seeking to prevail on a claim of intentional infliction of emotional distress "must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff" and the "plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." Swisher v. Pitz, 2005 PA Super 56, ¶ 7 (quoting Reeves v. Middletown Athletic Ass'n, 2004 PA Super

475, ¶ 16); see Reedy v. Evanson, 615 F.3d 197, 231-32 (3d Cir. 2010).[13] To rise to the level of

outrageous or extreme conduct, "[t]he conduct must be so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized society." See Hoy v. Angelone, 720 A.2d 745, 754

(Pa. 1998) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super.

Ct. 1987)).

In addition to these substantive requirements, Pennsylvania courts have also established

an evidentiary requirement for relief: the "existence of the alleged emotional distress must be

supported by competent medical evidence." Kazatsky v. King David Mem'l Park, Inc., 527 A.2d

988, 197 (Pa. 1987) ("[T]he requirement of some objective proof of severe emotional distress

will not present an unsurmountable obstacle to recovery. Those truly damaged should have little

difficulty in procuring reliable testimony as to the nature and extent of their injuries."); see

Bolden v. Se. Pa. Transp. Auth., 21 F.3d 29, 35 (3d Cir. 1994) ("Under Pennsylvania law, expert

medical evidence must be presented before a plaintiff can recover for intentional infliction of

emotional distress." (citing Williams v. Guzzardi, 875 F.2d 46, 51-52 (3d Cir. 1989))).

In his opposition to the Reading Defendants' collective Motion for Summary Judgment,

Plaintiff fails to direct this Court to any competent medical evidence to support his claim that

Defendant Errington's conduct caused him to suffer from severe emotional distress. Instead, the

only reference Plaintiff makes to any severe emotional distress is in the form of a single,

unattributed allegation in Plaintiff's brief that, "[a]s a result of Defendants' actions, Plaintiff was

---

[13]     The Pennsylvania Superior Court has recognized the viability of a cause of action for intentional infliction of emotional distress, but the Pennsylvania Supreme Court has yet to formally do the same. See Reedy, 615 F.3d at 231 (citing Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000)). The Pennsylvania Supreme Court has, however, cited to section 46 of the Restatement of the Law Second, Torts "as setting forth the minimum elements necessary to sustain such a cause of action." See Taylor, 754 A.2d at 652 (citing Kazatsky v. King David Mem'l Park, 527 A.2d 988 (1987)).

caused to suffer severe emotional distress, including an increased paranoia and fear of police, which will require treatment with a psychotherapist."[14] See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 28. Unsubstantiated allegations do not amount to competent medical evidence, and Plaintiff's failure to direct the Court to any such evidence to support those allegations is fatal to his claim.[15] See Paith v. Cnty. of Wash., 394 F. App'x 858, 861 (3d Cir. 2010); Televandos v. Vacation Charters, Ltd., 264 F. App'x 190, 192 (3d Cir. 2008); Morgan v. Gifford, No. 13-cv-1252, 2014 WL 5038385, at *7 (E.D. Pa. Oct. 8, 2014); Wilson v. Dewees, 977 F. Supp. 2d 449, 460 (E.D. Pa. 2013) (observing that  plaintiff "d[id] not even mention the treatment that he sought for emotional distress in his opposition to summary judgment"). Accordingly, Defendant

---

[14]    Plaintiff's "Counter-Statement of Undisputed Facts," which he filed in connection with his opposition to the Reading Defendants' Motion for Summary Judgment, contains an extensive list of injuries that Plaintiff alleges he sustained and an equally extensive list of medical procedures to which Plaintiff claims he has endured, but they contain no reference to any emotional or psychological injuries or any treatment Plaintiff has received for them. See Pl.'s Counter-Statement Undisputed Facts ¶¶ 39-41, ECF No. 92-3. As the Reading Defendants observe, Plaintiff testified at his deposition that he had not sought "any type of psychological, psychiatric, [or] mental health counseling of any sort" since the events of April 19, 2012. See Martin Dep. 54:10-16, ECF No. 87-15.

    To the extent Plaintiff relies on certain statements contained in the independent medical examination report of Kathleen T. Murray—which Plaintiff cited not in connection with any allegation of psychological or emotional injury but rather in connection with his recitation of physical injuries—those statements fall well short of amounting to competent medical evidence from which a jury could conclude that Plaintiff has suffered from severe emotional distress. Ms. Murray, who appears to be a registered nurse practitioner, states that Plaintiff "may have traumatic brain injury and adjustment disorder," and that Plaintiff "admits to depression since the incident" and "was deeply saddened by the loss of his independence" but "compensates with humor." See Pl.'s Resp. Opp'n Reading Defs.' Mot. Summ. J. Ex. P, ECF No. 92-19. These statements do not appear to correspond to the emotional distress from which Plaintiff claims he suffers; namely, that he suffers from "an increased paranoia and fear of police." Nor would the content of these statements provide a sufficient factual basis to permit a jury to conclude that Plaintiff is or was suffering from severe emotional distress, particularly because there is no indication that Ms. Murray has any special qualifications or training related to the diagnosis or treatment of psychological or emotional conditions. See Kazatsky, 527 A.2d at 197 ("Given the advanced state of medical science, it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually suffered the claimed distress."). To the extent Plaintiff relies on Ms. Murray's observation that Plaintiff himself "admits to depression," a plaintiff's own testimony does not qualify as competent medical evidence. See Wilson v. Dewees, 977 F. Supp. 2d 449, 460 (E.D. Pa. 2013) (granting summary judgment to defendant officers where there was no evidence in the record demonstrating that plaintiff had suffered emotional distress other than the plaintiff's uncorroborated deposition testimony).

[15]    "District Courts are not required to search through the record for evidence to support a party's assertion of the existence of a genuine issue of material fact." McCann v. Kennedy Univ. Hosp., Inc., 596 F. App'x 140, 145-46 (3d Cir. 2014); see Fed. R. Civ. P. 56(c)(1)(A), (c)(3) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .") (emphasis added). "Judges are not like pigs, hunting for truffles buried in briefs." Boomer v. Lewis, 541 F. App'x 186, 191 (3d Cir. 2013) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

Errington is entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress.

**V.      Plaintiff's § 1983 Claims against Defendants City of Reading, William Heim, and Damond Kloc for Failing to Adequately Train or Supervise.**

In addition to Plaintiff's claims against Defendant Errington, Plaintiff asserts claims under § 1983 against Defendant City of Reading, Defendant Heim, and Defendant Kloc in connection with Defendant Errington's use of his Taser, alleging that these Defendants failed to adequately train or supervise City of Reading police officers on the use of Tasers. For the following reasons, these Defendants are entitled to summary judgment on these claims.

**A.      Defendant City of Reading is entitled to Summary Judgment on Plaintiff's § 1983 Claim.**

Plaintiff claims that Defendant City of Reading should be liable for failing to properly train and supervise officers in the use of Tasers. When a municipality is charged with liability for a constitutional violation pursuant to § 1983, liability can attach to the municipality only "where the municipality <u>itself</u> causes the constitutional violation at issue." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989) (citing <u>Monell v. N.Y.C. Dep't of Soc. Serv.</u>, 436 U.S. 658, 694-95 (1989)). Thus, the municipality cannot be held liable simply because it employs a constitutional tortfeasor, which would amount to liability premised on the theory of respondeat superior. <u>See</u> <u>id.</u> Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." <u>See</u> <u>id.</u>

In addition to challenges to the constitutionality of specific policies or customs, a municipality may also be subject to liability for a constitutional violation committed by an employee if that "employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." <u>See</u> <u>id.</u> at 387. However, not all inadequate police training

23

gives rise to liability. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388. Put differently, "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 389. Thus, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Court's] prior cases—can a city be liable for such a failure under § 1983." Id.; see also Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." (citing Okla. City v. Tuttle, 471 U.S. 808, 822-23 (1985))).

The mere observation, with the benefit of hindsight, that "an injury or accident could have been avoided if an officer had had better or more training" is not sufficient.[16] See id. at 391 ("Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal."). Rather, the "need for more or different training" must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." See id. at 390. Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for the purposes of failure to train." Connick, 131 S. Ct. at 1360 (citing Bd. of Cnty. Comm'rs v. Brown, 520 U.S.

---

[16]     Nor does the mere fact that a constitutional violation occurred suffice to show that a municipality was deliberately indifferent to the need to train, for "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." See City of Canton, 489 U.S. at 391.

397, 409 (1997)). But there is a "possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." Id. at 1361 (quoting Brown, 520 U.S. at 409). In City of Canton, the Court suggested that a city's decision to arm its officers with firearms, in part to enable the officers to arrest fleeing felons, would present a need for training "on the constitutional limitations on the use of deadly force" that "can be said to be 'so obvious,' that the failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." See 489 U.S. at 390 n.10. Thus, the Court has not "foreclose[d] the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." See Connick, 131 S. Ct. at 1361.

The City of Reading argues that Plaintiff has not produced any evidence from which a jury could conclude that the City failed to adequately train its police officers on the use of Tasers. The City observes that Defendant Errington was required to attend a one-day training session on the use of Tasers, which included "instructor discussion" and training with an actual Taser device. See Reading Defs.' Reply Supp. Mot. Summ. J. 11, ECF No. 98. The City also points to Defendant Errington's testimony at his deposition that "he was given written materials and upon completion of the training [he] had to take a test before receiving a certificate of completion," as well as his testimony that he had read the police department's policies on Taser use. See id.

In response, Plaintiff appears to contend that the training program was inadequate, pointing to Defendant Errington's testimony that he received only one half-day of training on Tasers. As an initial matter, Plaintiff's contention is inaccurate: when asked whether the training lasted for more than one-half of one day or less than one half of one day, Defendant Errington

stated, "I believe more than half a day." <u>See</u> Errington Dep. 12:21-13:2. Regardless, the precise duration of the training has little bearing on whether the training program was constitutionally deficient, and Plaintiff cites to no evidence that would inform the factfinder of the proper length of a Taser training program.

Plaintiff's primary contention is that the training program failed to train officers "not to target individuals who are in a position where a fall may cause substantial injury." <u>See</u> Pl.'s Br. Opp'n Reading Defs. Mot. Summ. J. 24. Plaintiff's sole support for this contention is the testimony of Defendant Errington at his deposition that he "was not sure if he was required to actually read or review the Department's policies with regard to Taser use before receiving a certificate of training, whether the Taser Training manual was ever issued to him, or whether the Police Department ever went over the material." <u>See</u> Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 24. However, this testimony does not address whether the training program included a discussion of the risks associated with using a Taser on a person at risk of falling, and none of the parties have produced any evidence regarding the content of the training program, other than Defendant Errington's testimony that the training program "consisted of instructor discussion and a hands on portion that involves using the Taser on targets." <u>See</u> Reading Defs.' Reply Supp. Mot. Summ. J. 10-11. Plaintiff's ability to succeed on this claim, therefore, relies upon the ability of a jury to infer—without any evidence of the training program's contents—that a training program that lasted for more than half of one day failed to mention, at any point, the risk of using a Taser on a person in an elevated position—a conclusion that would approach the point of speculation. Plaintiff bears the burden of producing evidence sufficient to support that conclusion, and without a "sufficient showing on an essential element of [his] case," Defendant is entitled to summary judgment. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

Even if a jury could reach that conclusion, Plaintiff has not produced evidence sufficient to show that this failure was the cause of Defendant Errington's allegedly excessive use of force. To succeed in holding a municipality liable for failing to adequately train its employees, a plaintiff must show not only that the municipality was deliberately indifferent to the need for training but also that "the deficiency in training actually caused" the constitutional harm. See City of Canton, 489 U.S. at 391; Thomas v. Cumberland Cnty., 749 F.3d 217, 226 (3d Cir. 2014) (recognizing that "[c]ausation is a requirement for failure-to-train liability that is separate from deliberate indifference"). In other words, this Court must ask, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" See City of Canton, 489 U.S. at 391.

The problem Plaintiff's failure to train claim encounters is the lack of this "causal nexus" between the purported deficiencies in the City's Taser training program and Defendant Errington's alleged misuse of his Taser. See Thomas, 749 F.3d at 226 (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1030 (3d Cir. 1991)). The Reading Defendants point out that, regardless of whether the training program specifically instructed Defendant Errington on the risk of using a Taser on a person at risk of falling, Defendant Errington testified that he had read the Reading Police Department's Taser policies either "[d]uring the training or right after" the training. See Errington Dep. 16:8-17. As the Court has already discussed, the City's general order on the use of "electronic control weapons" states that such weapons shall not (with the words "shall not" set in bold, underlined text) be used "[w]hen the person is in a position where a fall may cause substantial injury or death." See Pl.'s Resp. Opp'n Reading Defs.' Mot. Summ. J. Ex. J, at 3, ECF No. 92-13 (emphasis in original). Thus, even if the training program did not mention this particular risk, his review of the Taser policy would have communicated that risk to

him. Plaintiff cites to no evidence to contest Defendant Errington's testimony that he read the policy. Instead, Plaintiff repeatedly contends in his opposition to the Reading Defendants' Motion that Defendant Errington was aware that deploying his Taser against Plaintiff could result in serious bodily harm. See, e.g., Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 10 ("It is . . . clear that Defendant Errington was aware that his actions would lead Mr. Martin to suffer serious bodily injury."); Pl.'s Counter-Statement Undisputed Facts 10, ECF No. 92-3 ("Defendant Errington . . . was aware that tasering Mr. Martin could result in serious bodily harm.").

Because Plaintiff has not cited to any evidence to dispute the Reading Defendants' contention that Defendant Errington had read the City of Reading's Taser policy and therefore was aware of the risk of harm that could result from using his Taser on a person susceptible to a dangerous fall, Plaintiff has failed to produce evidence sufficient to give rise to a genuine dispute over the existence of a causal nexus between any deficiencies in the City's training program and the constitutional harm of which Plaintiff complains. See Fed. R. Civ. P. 56(c)(1). Defendant City of Reading is therefore entitled to summary judgment on Plaintiff's § 1983 claim.

**B.      Defendants William Heim and Damond Kloc are entitled to Summary Judgment on Plaintiff's § 1983 Claims.**

Plaintiff also claims that Defendants Heim and Kloc should be subject to liability under § 1983 for failing to adequately train or supervise City of Reading police officers in connection with their use of Tasers. As with § 1983 claims asserted against municipalities, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Santiago v. Warminster Twp., 128 (3d Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). "In either case, a 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate . . . unless that 'person'—whether a natural

28

one or a municipality—has exhibited deliberate indifference to the plight of the person deprived. Sample v. Diecks, 885 F.3d 1099, 1118 (3d Cir. 1989) (quoting City of Canton, 489 U.S. at 379) (citing Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988)). There are generally two different theories under which a supervisor may be held liable for the constitutional acts of a subordinate. See Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds sub nom. Taylor v. Barkes, 135 S. Ct. 2042 (2015); A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004).

The first relates to a supervisor's role as a policymaker, and supports liability where the supervisor "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." See Luzerne, 372 F.3d at 586 (alteration in original) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)). The second relates to situations where a supervisor had a certain personal connection to a constitutional violation by "participat[ing] in violating the plaintiff's rights, direct[ing] others to violate them, or, as the person in charge, ha[ving] knowledge of and acquiesc[ing] in his subordinate's violations." See id. (citing Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995)). Claims that a supervisor failed to train or supervise—City of Canton claims in the municipal liability sphere—are also viable in the context of supervisory liability, and "are generally considered a subcategory of policy or practice liability." Barkes, 766 F.3d at 316-17 (citing Rosalie Berger Levinson, Who Will Supervise the Supervisors? Establishing Liability for Failure to Train, Supervise, or Discipline Subordinates in a Post-Iqbal/Connick World, Harv. C.R.-C.L. L. Rev. 273, 280 (2012)).

As with municipal liability § 1983 claims, a plaintiff may prevail on a supervisory liability claim only if the plaintiff can establish a causal link between the allegedly defective

supervision and the constitutional violation. See id. at 317 (stating, in the context of a supervisory liability claim under the "policy or practice" theory of supervisory liability, that a plaintiff must prove that "the constitutional injury was caused by the failure to implement the supervisory practice or procedure"); Santiago, 629 F.3d at 130 (stating, in the context of a claim under the "participating or directing" theory of supervisory liability, that "a plaintiff must establish a causal connection between the supervisor's direction and that violation, or, in other words, proximate causation").

Plaintiff's claim against these two individual Defendants mirrors Plaintiff's claim against the City of Reading: Defendants Heim and Kloc failed to adequately train or supervise City of Reading police officers on the use of Tasers.[17] Plaintiff has not suggested that either Defendant Heim or Defendant Kloc directed or participated in Defendant Errington's use of his Taser on Plaintiff, meaning that Plaintiff's supervisory liability claims fall within the "policy or practice" theory of liability. Plaintiff must, therefore, show that his "constitutional injury was caused by the failure to implement" adequate training or supervisory practices, just as Plaintiff was required to establish a casual nexus to link the City of Reading's purported training deficiencies to his constitutional injury. See Barkes, 766 F.3d at 317. As with Plaintiff's claim against the City of Reading, even if the training program omitted instruction "not to target individuals who are in a position where a fall may cause substantial injury"—the deficiency in training that Plaintiff has identified[18]—Plaintiff cites to no evidence to dispute Defendant Errington's testimony that he had read the Reading Police Department's Taser policy, which contained that very information.

---

[17]       In his opposition to the Reading Defendants' Motion, Plaintiff does not distinguish his discussion of the basis for Defendants Heim and Kloc's liability from his discussion of the basis for the City of Reading's liability. See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 22-25 ("Under these circumstances, a jury could find that Defendants City of Reading, Reading Police Department, Chief William Heim, and Captain Damond Kloc should have known of the risks using a Taser in these situations posed, but were 'deliberately indifferent' by failing to properly train its officers about these risks."). Thus, Plaintiff's claims against each of these three Defendants appear to be premised on the same theory of liability: a failure to train or supervise officers on the use of Tasers.
[18]       See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 24.

Accordingly, Plaintiff's supervisory liability claims fail for the same reason as Plaintiff's municipal liability claim, and Defendants Heim and Kloc are entitled to summary judgment.[19]

**VI.     The Reading Defendants and Defendant Michael Pavelko are entitled to Summary Judgment on Plaintiff's § 1983 Claim that Defendants Violated Plaintiff's Constitutional Right of Access to the Courts.**

Plaintiff asserts a § 1983 claim against the Reading Defendants and Defendant Pavelko founded on their denial to him of "adequate, effective, and meaningful access to the courts in violation of the Fourteenth Amendment, by interfering with Plaintiff's ability to recover damages in a meritorious civil lawsuit."[20] See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 16. For the following reasons, Plaintiff has failed to adduce evidence sufficient to sustain such a claim, and the motions of the Reading Defendants and Defendant Pavelko for the entry of summary judgment on this claim will therefore be granted.[21]

---

[19]     With respect to Defendant Kloc, Plaintiff's claim against him also fails because Plaintiff has not produced any evidence to suggest that Defendant Kloc's role as a captain of the Reading Police Department—by contrast to Defendant Heim's role as the chief of police—could make him "responsible for" or the "moving force [behind]" any training deficiencies that led to Plaintiff's harm. See Sample v. Diecks, 885 F.2d 1099, 1116-17 (3d Cir. 1989) (quoting City of Canton, 489 U.S. at 379). Plaintiff makes no argument and points to no evidence that Defendant Kloc had any responsibility for knowing the contents of or shaping the City's Taser training program, and without some suggestion of "a specific supervisory practice or procedure that [Defendant Kloc] failed to employ," liability cannot attach. See id. at 1118.

[20]     It is unclear from Plaintiff's arguments before the Court whether Plaintiff claims that each of the individual Reading Defendants were directly involved in this purported violation of his constitutional right of access to the courts, or whether Plaintiff's claims against certain of the Defendants, such as Defendant Heim as the chief of police of the Reading Police Department, instead sound in supervisory liability. See, e.g., Pl.'s Br. Opp'n Mot. Summ. J. 20 ("Reading Police Department, by and through the actions of officers present on the West Shore Bypass at the time of the incident, intentionally failed to interview key witnesses and preserve the scene of the incident."). Because the Court concludes that Plaintiff has failed to produce sufficient evidence from which a jury could conclude that any underlying constitutional violation occurred, the Court need not determine whether Plaintiff is also attempting to assert liability against certain of the individual Defendants or the City by virtue of their roles as policymakers or supervisors. See McCann v. Borough of Magnolia, 581 F. App'x 125, 126 (3d Cir. 2014) (per curiam) (citing Williams v. W. Chester, 891 F.2d 458, 467 (3d Cir. 1989)) ("Because no claim against the police officer survives, and because he does not allege their direct involvement, [plaintiff's] cannot maintain claims against the Borough, its Mayor, and the Chief of Police."); Gravely v. Speranza, 219 F. App'x 213, 216 (3d Cir. 2007) (per curiam) ("Because there was no underlying Constitutional violation, the claims of conspiracy and failure to train also fail.")

[21]     As an initial matter, Defendant Pavelko questions the procedural propriety of this claim, arguing that Plaintiff is asserting this claim for the first time in his opposition to the present motions for summary judgment, and that Plaintiff's Amended Complaint therefore failed to give Defendant Pavelko fair notice of this claim. See Def. Pavelko's Reply Supp. Mot. Summ. J. 1, ECF No. 96. The Reading Defendants appear to concur in Defendant Pavelko's assessment. See Reading Defs.' Reply 10.

The Supreme Court has recognized two theories under which a claim founded on a denial of access to the court may proceed.[22] See Christopher v. Harbury, 536 U.S. 403, 412-13 (2002). The first theory embraces "claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." See id. at 413.

> In cases of this sort, the essence of the access claim is that official action is presently denying an opportunity to litigate for a claim of potential plaintiffs. The opportunity has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed.

---

Defendant Pavelko's objection does not appear to be without some merit. Earlier in this case's history, Plaintiff had to confront Defendant Pavelko's motion to dismiss this claim on the grounds that it failed to state a claim upon which relief could be granted. See Michael Pavelko's Mot. Dismiss, ECF No. 31. Rather than arguing that he was entitled to relief for being denied meaningful access to the courts, Plaintiff argued instead that "[t]he Eastern District of Pennsylvania has made clear that there is 'a due process right to a fair trial.'" See Pl.'s Mem. Opp'n Def. Pavelko's Mot. Dismiss 5, ECF No. 36 (quoting Stepp v. Mangold, No. CIV. A. 94-2108, 1998 WL 309921, at *7 (E.D. Pa. June 10, 1998)). Thus, Plaintiff claimed, "there [could] be no doubt that Plaintiff has stated a cognizable claim under [§ 1983]" because Defendant Pavelko, "[b]y intimidating witnesses, destroying evidence, and concealing facts surrounding Defendant's unlawful actions during Plaintiff's arrest . . . has clearly violated Plaintiff's rights to a fair trial." See id. at 8. Plaintiff concluded by urging that Defendant Pavelko's alleged misdeeds would "undoubtedly have a significant effect on Plaintiff's upcoming criminal trial, inasmuch as key witnesses were threatened and intimidated." Id. at 9.

Plaintiff's current characterization of his claim bears little resemblance to these earlier arguments, and calls into question Plaintiff's candor in his present assertion that "Defendants have made the incorrect assumption that Plaintiff's claims under Section 1983 arise out of some challenge to his criminal conviction and sentence. This is not the case, and there has been no pleading or related testimony or other evidence to suggest that these were Plaintiff's claims." See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 17.

But, as Plaintiff observes, his statement of this claim in his Amended Complaint was sufficiently broad (and, this Court observes, sufficiently short on specifics with respect to the legal theory upon which he was purporting to rely) to be read as capable of embracing his current characterization of this claim. See Am. Compl. ¶ 96 (describing the legal basis for his claim as a violation of his "clearly established and well-settled rights to personal liberty under the Fourteenth Amendment to the United States Constitution."). Additionally, in the Court's disposition of the Reading Defendants' and Defendant Pavelko's respective motions to dismiss Plaintiff's claims, the Court explicitly declined to dismiss Plaintiff's claims under the reasoning of Heck v. Humphrey, 512 U.S. 477 (1994), which forbids a plaintiff from attempting to "impugn[] the validity" of an underlying criminal conviction by way of a § 1983 claim "unless the conviction has [first] been reversed on direct appeal or impaired by collateral proceedings." See Martin, 2013 WL 5429358, at *12 n.62 (quoting Giles v. Davis, 427 F.3d 197, 209 (3d Cir. 2005)). The Court reasoned that "it is not clear, at this stage of the litigation, that plaintiff's claims would impugn the validity of his plea and sentence in the underlying criminal proceeding." See id. Because both Plaintiff's Amended Complaint and the Court's earlier opinion in this matter allot Plaintiff the room to articulate his claim as he now does, the Court will proceed to evaluate the merits of the claim.

[22] The Court acknowledged that the constitutional locus for denial of access to courts claims is "unsettled," having been attributed variously to the Privileges and Immunities Clause of Article IV, the Petition Clause of the First Amendment, the Due Process Clause of the Fifth Amendment, and both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. See Harbury, 536 U.S. at 415 n.12. Plaintiff's identification of his "rights to personal liberty under the Fourteenth Amendment" as the constitutional source for his claim, see Am. Compl. ¶ 96, while more likely intended as a reference to Plaintiff's then-impending criminal prosecution, is thus approximately within the constitutional boundary of these claims.

Id. The second theory embraces denial of access claims brought "not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." Id. at 413-14. The Court observed that claims in this second category include claims that governmental officials "may allegedly have caused the loss or inadequate settlement of a meritorious case, . . . the loss of an opportunity to sue, . . . or the loss of an opportunity to seek some particular order of relief." See id. (internal citations omitted). Thus, these claims "do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." Id. "The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." Id.

But regardless of the particular theory upon which a denial of access claim relies, "the ultimate justification for recognizing each kind of claim is the same. Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." Id. at 414-15.

It is here that Plaintiff's claim fails, for Plaintiff has failed to point to any "litigating opportunity yet to be gained or any opportunity already lost" that would supply a basis upon which to conclude that Plaintiff has been denied access to the courts. The factual basis of Plaintiff's claim rests on his critique of the investigation conducted in connection with the events that occurred on the West Shore Bypass. Plaintiff claims that the "Reading Police Department, by and through the actions of the officers present on the West Shore Bypass at the time of the incident, intentionally failed to interview key witnesses and preserve the scene of the accident"

33

and "intentionally failed to keep a proper crime scene log detailing the identify [sic] of witnesses." See Pl.'s Br. Opp'n 18. Plaintiff also claims that a diagram of the scene created by the Pennsylvania State Police in connection with the Reading Police Department "contained intentional inaccuracies and/or misrepresentations." See id. at 18-19.

But, as Defendant Pavelko observes, "[g]iven that [Plaintiff] is currently litigating his excessive force claim," Plaintiff fails to explain how these alleged examples of misconduct on the part of either Defendant Pavelko or any of the individual Reading Defendants worked to deny Plaintiff access to the courts. See Def. Pavelko's Reply 2. Plaintiff's claim does not fall within the first category of denial of access claims articulated by the Harbury Court, for there is no "frustrating condition" that this Court must remove to enable Plaintiff to proceed with his underlying constitutional and state law claims—those claims are already before the Court. See Harbury, 536 U.S. at 413 (listing examples of impediments that have hampered access to the courts, such as the failure to provide a prison law library or the imposition of filing fees that prevent indigent plaintiffs from commencing actions). Thus, there is no need for an order from this Court to "open the courthouse door for [Plaintiff's] desired litigation." See id.

Plaintiff's claim is closer to home in the second Harbury category. The Court of Appeals for the Third Circuit has recognized that "[c]over-ups that prevent a person who was been wronged from vindicating his rights violate the right of access to the courts." Estate of Smith v. Marasco, 318 F.3d 497, 511 (3d Cir. 2003) (citations omitted).

> [I]f state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled, they may have committed a constitutional violation.

Id. (quoting Swekel v. City of River Rouge, 119 F.3d 1259, 1262-63 (6th Cir. 1997)). A cover-up is what Plaintiff alleges here:

> The evidence shows that Defendants were aware that Defendant Errington employed an excessive use of force and, in an effort to protect Defendant Errington as well as the Reading Police Department from potential civil liability, the Reading Police Department Officer at the scene of the incident, along with [Defendant Pavelko] engaged in an orchestrated cover-up of the events of April 19, 2012.

See Pl.'s Br. Opp'n 15.

Plaintiff's argument attempts to track the first two elements articulated by the Marasco court, but Plaintiff does not explain, or point to facts that tend to show, that the alleged concealment of information on the part of any Defendant or any resulting delay "substantially reduce[d] the likelihood of [Plaintiff] obtaining the relief to which [he] is otherwise entitled." See Marasco, 318 F.3d at 511 (quoting Swekel, 119 F.3d at 1262-63).

Plaintiff does not allege that the conduct of either Defendant Pavelko or the Reading Defendants prevented the prompt commencement of this action, which Plaintiff filed approximately two months after the events giving rise to his claims. See Naluan v. Purfield, No. 05-6186, 2006 WL 3208771, at *4 (E.D. Pa. Nov. 2, 2006) ("[Plaintiff] has not shown that his right to access the courts has been made ineffective or meaningless by the delay in bringing suit caused by defendants' conduct. In fact, [plaintiff] was able to file suit within less than two months from the night of his apprehension."); cf. Ryland v. Shapiro, 708 F.2d 967, 974-95 (5th Cir. 1983) (suggesting that a viable denial of access claim may exist where "the defendants successfully covered up [the plaintiffs' daughter's] murder for a period of eleven months," which "prevented [the plaintiffs] from discovering that their daughter had been murdered" and delayed their ability to bring a wrongful death action).

Instead, Plaintiff was "able to bring this action and," thus far, has been able to "present substantial evidence of central importance to [his] case." <u>See</u> <u>Marasco</u>, 318 F.3d at 512. Thus, there appears to be no basis to conclude that "the [D]efendants' efforts either prevented [Plaintiff] from filing suit or rendered [his] access to the courts ineffective or meaningless." <u>See</u> <u>id.</u>; <u>see also</u> <u>Cooper v. City of Chester</u>, No. 11-5381, 2011 WL 6046934, at *6-7 (E.D. Pa. Dec. 5, 2011) (dismissing a denial of access claim based on allegations that police officers covered up an unjustified use of deadly force against the plaintiff because the plaintiff was "able to identify the defendants and develop the facts of [his] claim in a timely Complaint" and his lawsuit provided him with "a forum to seek redress for Defendants' excessive use of force"); <u>Naluan</u>, 2006 WL 3208771, at *3-4 (rejecting a denial of access claim based on allegations that police officers covered up their mistaken use of force on plaintiff, where plaintiff alleged that the officers "provided four different versions of the events, . . . refrained from filling out requisite forms for arrest and use of force," and "inexplicably failed to acquire the name and address of the eye-witness to . . . shootings" that the officers had mistakenly attributed to plaintiff).

The shortcomings Plaintiff has identified in the investigation into Defendant Errington's use of force may, to the extent a jury so determines, be relevant to the merits of Plaintiff's underlying claims or provide Plaintiff with grounds to impeach evidence that Defendants may proffer in their defense. <u>See</u> <u>Naluan</u>, 2006 WL 3208771, at *4 ("[Plaintiff] can impeach defendants with their failure to acquire the name and address of the supposed eye-witness to the shooting who allegedly identified [plaintiff] as the shooter. [Plaintiff] can also impeach the credibility of [a defendant officer] with her multiple accounts of the night in question. . . . Indeed, I am sure that defendants' alleged deficiencies in their investigation and the claim of 'cover-up' which they entail will be used quite effectively by plaintiff's counsel at trial in

support of his other claims."). However, these shortcomings do not show that Plaintiff is in need of relief from this Court, independent from his underlying claims, to "provide some effective vindication" for his right to seek relief on the basis of those claims. See Harbury, 536 U.S. at 414-15 ("There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.").

Here, Plaintiff's "very presence before this court at this stage—his trial is imminent—demonstrates that he has been able to develop the facts in this case effectively" and avail himself of this forum in his attempt to vindicate his rights. See Naluan, 2006 WL 3208771, at *4. Accordingly, the Court concludes that Plaintiff has not been denied the constitutional right of access to the courts, and summary judgment is therefore warranted for the Reading Defendants and Defendant Pavelko on this claim.

## VII.   The Reading Defendants are entitled to Summary Judgment on Plaintiff's Tort Claims.

### A.   Defamation and False Light Invasion of Privacy

Plaintiff claims that the Reading Defendants are responsible for false statements contained in two articles published in the Reading Eagle; namely, for statements in those articles that Plaintiff "jumped off" the West Shore Bypass, which Plaintiff argues "gives the false impression that [he] was suicidal." See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 29-30. Plaintiff attributes the source of these statements to the Reading Defendants and argues that they are each liable for the torts of defamation and false light invasion of privacy.

The tort of defamation is concerned with conduct "detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." Joseph v. Scranton Times L.P., 2008 PA Super 217, ¶ 24 (citing Zartman v. Lehigh Cnty. Humane

Soc'y, 482 A.2d 266, 268 (Pa. Super. Ct. 1984)). In Pennsylvania, the tort requires the proof of

the following five basic elements: (1) the defamatory character of the communication; (2) its

publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the

recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be

applied to the plaintiff. See Tucker v. Fischbein, 237 F.3d 275, 281 (3d Cir. 2001) (citing 42 Pa.

Cons. Stat. Ann. § 8343(a) (West 1998)).

 The tort of "false light invasion of privacy," one of four separate torts that can arise from

an invasion of privacy, "imposes liability on a person who publishes material that is 'not true, is

highly offensive to a reasonable person, and is publicized with knowledge or in reckless

disregard of its falsity.'" Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) (quoting

Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181, 1188 (Pa. 1988)). This tort "is closely allied

to the law of defamation," leading to the application of some of the same principles across both

torts. See Weinstein v. Bullick, 827 F. Supp. 1193, 1202 (E.D. Pa. 1993) (quoting Fogel v.

Forbes, Inc., 500 F. Supp. 1081, 1088 (E.D. Pa. 1980)); see also Graboff, 744 F.3d at 137

(observing, with regard to the question of falsity, that "Pennsylvania inferior courts consistently

apply the same analysis to both types of claims when the causes of action are based on the same

set of underlying facts" (citing Krajewski v. Gusoff, 53 A.3d 793, 809 (Pa. Super. Ct. 2012))).

 Here, both Plaintiff's defamation claims and Plaintiff's false light claims fail for the

same reasons. With respect to Plaintiff's assertion of these claims against Defendant City of

Reading, Plaintiff's claims are barred by the immunity conferred on the City of Reading by

Pennsylvania's Political Subdivision Tort Claims Act. See Pa. Cons. Stat. § 8541. Under the Act,

local agencies such as the City of Reading[23] are "generally not liable 'for any damages on

---

[23] See Maloney v. City of Reading, No. Civ.A. 04-5318, 2006 WL 305440, at *5 (E.D. Pa. Feb. 8, 2006)
("The City of Reading is a municipality of the Commonwealth of Pennsylvania and as such the City and its

account of any injury to a person or property caused by any act of the local agency or an employee thereof," subject to eight exceptions enumerated in the Act. See Pa. Cons. Stat. § 8541(b); Spiker v. Whittaker, 553 F. App'x 275, 281 n.6 (3d Cir. 2014); Jewell v. Ridley Twp., 497 F. App'x 182, 186-87 (3d Cir. 2012). Neither the tort of defamation nor the tort of false light invasion of privacy fall within those enumerated exceptions, which means that Defendant City of Reading is entitled to summary judgment on these claims. Jakimowicz v. City of Phila., No. 07-3327, 2008 WL 383329, at *2 (E.D. Pa. Feb. 12, 2008); Klump v. Nazareth Area Sch. Dist., 425 F. Supp. 2d 622, 637 (E.D. Pa. 2006) (concluding that defendant school district, as a local agency under the Act, was entitled to immunity on plaintiff's false light invasion of privacy claim); Satterfield v. Borough of Schuylkill Haven, 12 F. Supp. 2d 423, 442 (E.D. Pa. 1998) ("Under Pennsylvania law, a local agency, such as the Defendant Borough, is immune from causes of action sounding in defamation." (citing 42 Pa. Cons. Stat. §§ 8541-42)); Petula v. Mellody, 631 A.2d 762, 765 (Pa. Commw. Ct. 1993) ("[A]n action in defamation falls within none of the eight enumerated exceptions to local agency immunity set forth in Section 8542(b) . . . .").

The individual Reading Defendants are also entitled to summary judgment on these claims. For them, Plaintiff's tort claims fail because Plaintiff has not produced sufficient evidence for a jury to conclude that any one of them was the source for the articles.[24] The only

---

employees are entitled to governmental immunity."); see also Boria v. Bowers, No. 06-4384, 2007 WL 2726338, at *5 (E.D. Pa. Sept. 17, 2007); Curry v. Huyett, No. CIV.A. 93-6649, 1994 WL 111357, at *2 (E.D. Pa. Mar. 30, 1994).

[24]      Employees of the City of Reading do not possess the same degree of immunity as the City itself. While employees share the same basis of immunity as the City, an employee "may be stripped of his immunity when he engages in conduct that is found to constitute 'a crime, actual fraud or willful misconduct.'" Maloney v. City of Reading, No. Civ.A 04-5318, 2006 WL 305440, at *5 (E.D. Pa. Feb. 8, 2006) (quoting 42 Pa. Cons. Stat. § 8550). Intentional torts fall within that category of misconduct, see id., which include the torts of defamation and false light invasion of privacy. See Altieri v. Pa. State Police, No. Civ.A.98-CV-5495, 2000 WL 427272, at *20 (E.D. Pa. Apr. 20, 2000) (refusing to dismiss a defamation claim against municipal employees on the basis of sovereign immunity);

evidence Plaintiff cites to support his claim that these particular Reading Defendants provided false information to the Reading Eagle for publication are the articles themselves, which make reference to various sources of information. In the first article, titled "Police Identify Man Who Crashed, Jumped Off Bypass Bridge," dated April 20, 2012, the writer's sources include "a hospital spokeswoman," "[s]ources," and "Troopers." See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. Ex. U, at 2, ECF No. 92-24. In the second article, written by Jason A. Kahl and entitled "Stun Gun Was Used on Bypass Jumper, Police Say," dated April 21, 2012, Mr. Kahl's sources included the "[s]tate police," "[i]nvestigators," "a hospital spokeswoman," "Trooper Michael Pavelko"—one of the Defendants to this action[25]—a "state police press release, and "city officers." See id. at 4. The various references to "troopers" and Pennsylvania State Police sources comport with the Reading Defendants' assertion that the Reading Police Department referred all media requests to the Pennsylvania State Police. See Reading Defs.' Br. 26. The latter reference to "city officers," which appears to be the only reference in either article that specifically refers to officers of the Reading Police Department, identifies the "city officers" as the source for only a specific piece of information: that a police officer had used a Taser on Plaintiff prior to his fall from the West Shore Bypass.[26]

But even if a jury could conclude that City of Reading police officers also provided the Reading Eagle with the information that Plaintiff had "jumped"—perhaps by inferring that such

---

Yakowicz v. McDermott, 548 A.2d 1330, 1334 n.5 (Pa. Commw. Ct. 1988) (citing Malia v. Monchak, 543 A.2d 184 (Pa. Commw. Ct. 1988)).

[25]     Given that Defendant Pavelko is the only source identified by name, he would seem to be Plaintiff's likely suspect, but the Court dismissed the defamation and false light invasion of privacy claims against him pursuant to the doctrine of sovereign immunity. See supra note 5. Thus, Plaintiff was left to assert these claims against the Reading Defendants.

[26]     The relevant passage of the article states, "The [state police] release goes on to say that a supplemental public information release was expected but makes no mention of a stun gun. However, according to city officers, a city policeman shot Martin with a stun gun at some point prior to his jump from the bridge. The officers spoke on the condition that their names would not be used because state police had taken over the investigation at the request of West Reading Police." See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. Ex. U, at 4.

officers were the unidentified "sources" to which the first article alludes—a jury could not conclude that any of the three particular Reading Defendants presently before the Court were those sources. The articles provide evidentiary support for the contention that some City of Reading police officers provided some information to the Reading Eagle, but, standing alone, they provide no basis to conclude that Defendant Errington, Defendant Heim, or Defendant Kloc was one of those officers.

In Cooper v. City of Chester, the plaintiff, who alleged that two City of Chester officers used excessive force to effect his arrest, also claimed that the officers placed him in a false light by telling a newspaper "that he was wanted for crimes that had already been dismissed at [his] preliminary hearing." 2013 WL 925067, at *4 (E.D. Pa. Mar. 11, 2013). The only evidence the plaintiff produced to link the two officers to the allegedly false newspaper article was "a hearsay statement by [his] own attorney" that "an unidentified employee of the paper (who was never deposed) told him that the paper received crime information from the Chester police." Id. The court granted the defendant officers' motion for summary judgment, concluding that "[e]ven if we could consider this hearsay statement, it falls short of the evidence necessary to create a factual dispute that Defendants were the ones who gave Plaintiff's information to the newspaper." Id. (citing Porter v. Joy Realty, Inc., 872 A.2d 846, 849 (Pa. Super. Ct. 2005)).

The same conclusion is warranted here. Plaintiff has failed to provide sufficient evidence from which a jury could conclude that any of the three individual Reading Defendants that are before the Court were the Reading Eagle's sources.[27] The individual Reading Defendants are

---

[27]     Similar to the problem of identifying the thief of Justice Scalia's jade falcon, a jury may be able to conclude that the possibility that one of these Defendants was the source is as likely as the possibility that any other City of Reading police officer was the source, but a jury would not be able to conclude that it is more likely than not that blame lies with one of these Defendants rather than with any other officer. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 329 (2007) (Scalia, J., dissenting).

therefore entitled to summary judgment on Plaintiff's claims of defamation and false light invasion of privacy.[28]

## B. Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim of intentional infliction of emotional distress against each of the Reading Defendants, claiming that the Reading Defendants, by "engag[ing] in an orchestrated conspiracy with one another to deprive Plaintiff of his constitutionally protected right to bring a civil action under Section 1983 against Defendants Brian Errington, the City of Reading, and the Reading Police Department for excessive use of force," caused Plaintiff to suffer severe emotional distress. See Pl.'s Br. Opp'n Reading Defs.' Mot. Summ. J. 28. But, as the Court observed in connection with Plaintiff's attempt to assert this tort claim against Defendant Errington for his allegedly excessive use of force, Plaintiff has not directed the Court to competent medical evidence from which a jury could conclude that he has suffered from

---

[28]    To the extent Plaintiff's claims against Defendant Heim, the Chief of Police of the Reading Police Department, are predicated not on Defendant Heim's personal involvement in any tortious conduct but on the theory that he is liable, under the doctrine of respondeat superior, for the tortious conduct of any City of Reading police officers, those claims would be barred by at least one, and possibly two, doctrines of immunity. First, the Political Subdivision Tort Claims Act confers immunity on employees of local agencies, except when the employee engages in conduct that constitutes a crime, actual fraud, actual malice, or willful misconduct or that involves certain negligent acts enumerated in the Act. See 42 Pa. Cons. Stat. § 8550; supra note 24. While Defendant Heim would therefore not be entitled to immunity under the Act if he directly engaged in the tortious conduct Plaintiff alleges, liability by virtue of the doctrine of respondeat superior does not constitute "willful misconduct" capable of stripping his immunity. See Reiff v. Marks, No. 08-CV-05963, 2009 WL 2058589, at *4 (E.D. Pa. July 15, 2009) (dismissing intentional tort claims asserted under the theory of respondeat superior against a police chief on the basis of the police chief's immunity under the Political Subdivision Tort Claims Act).

Second, as the chief of police of the Reading Police Department, Defendant Heim may also be entitled to immunity as a high public official under Pennsylvania law. See Heller v. Fulare, 454 F.3d 174, 177-78 (3d Cir. 2006) (citing Lindner v. Mollan, 677 A.2d 1194 (Pa. 1996)). His claim to that immunity would likely depend, however, upon "the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions." See Webb v. Bristol Borough, No. 11-7834, 2012 WL 3024761, at *3 (E.D. Pa. July 24, 2012) (determining that discovery was necessary to determine whether a police chief was entitled to immunity as a high public official); Mariano v. Borough of Dickson City, 40 F. Supp. 3d 411, 420 (M.D. Pa. 2014) (denying immunity to a police chief where the record did not indicate that he had sufficient policy-making authority to qualify as a high public official); see also Ammlung v. City of Chester, 53 Pa. D. & C.2d 168, 172 (Pa. Ct. C.P. 1971) ("The posts of mayor and chief of police fall into the class of 'high public officials.' The nature of their duties and the importance of their offices are obvious, and each makes policy.").

severe emotional distress. Therefore, the Reading Defendants are each entitled to summary

judgment on this claim.

## VIII.   Plaintiff is not entitled to Partial Summary Judgment.

Plaintiff seeks the entry of partial summary judgment for the purpose of precluding

Defendants "from denying, at the time of trial, that Plaintiff suffered the injures, [sic] and

underwent the surgeries, as enumerated" in Plaintiff's Motion and in Plaintiff's Statement of

Undisputed Facts that Plaintiff filed with his Motion. See Pl.'s Br. Supp. Mot. Partial Summ. J.

9, ECF No. 86-1. Specifically,

> Plaintiff is not, in this instant-motion, attempting to preclude Defendants from
> making any arguments with regard to damages at trial or attempting to assert that
> Defendants should be precluded from offering expert testimony on the impact that
> those injures [sic] will have on Plaintiff going forward. In contrast, Plaintiff is
> simply seeking to preclude Defendants from arguing that . . . Plaintiff suffered the
> enumerated injuries, and underwent the resulting surgeries, as a result of the fall
> on April 12, 2012.

Id. As the Reading Defendants observe, "it would seem that such items are more properly

addressed in a stipulation between counsel,"[29] rather than through the mechanism of summary

judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying

each claim or defense—or the part of each claim or defense—on which summary judgment is

sought.") (emphasis added); SEC v. Thrasher, 152 F. Supp. 2d 291, 297 (S.D.N.Y. 2001)

(observing that Rule 56, which permits the Court to resolve certain factual disputes after passing

on, and declining to grant, a request for summary judgment, "does not allow a party to bring a

motion for a mere factual adjudication" (quoting Capitol Records v. Progress Record Distrib.,

106 F.R.D. 25, 30 (N.D. Ill. 1985))).

Plaintiff himself acknowledges that granting this request would not alleviate the need to

resolve factual questions regarding the impact of these injuries or Plaintiff's damages at the time

---

[29]   See Reading Defs.' Resp. Opp'n Pl.'s Mot. Partial Summ. J. 3, ECF No. 93-1.

of trial, which suggests that even if Plaintiff has properly invoked the mechanism of summary judgment, this is an appropriate occasion for the Court to exercise its discretion to deny that request. "It is settled that summary judgment may be granted where there is no genuine issue of material fact presented. It is further settled that the trial court may exercise its discretion in denying summary judgment where a part of an action may be ripe for summary judgment but it is intertwined with another claim that must be tried." See Taylor v. Rederi A/S Volo, 374 F.2d 545, 549 (3d Cir. 1967) (citing 6 James Wm. Moore et al., Moore's Federal Practice ¶ 56.15(8), at 2440-41 (2d ed. 1965)).

Therefore, Plaintiff's Motion for Partial Summary Judgment is denied.

## IX.    Conclusion

For the foregoing reasons, the Court grants the Reading Defendants' Motion for Summary Judgment in part, grants Defendant Pavelko's Motion for Summary Judgment, and denies Plaintiff's Motion for Partial Summary Judgment. Specifically, judgment on all claims is entered in favor of Defendants Michael Pavelko, City of Reading, Reading Police Department, William Heim, and Damond Kloc. With respect to Defendant Errington, judgment is entered in favor of Defendant Errington on all claims, with the exception of (1) Plaintiff's claim, pursuant to § 1983, alleging that Defendant Errington, in his individual capacity, used an excessive level of force in violation of the Fourth Amendment, and (2) Plaintiff's tort claims of assault and battery. An appropriate order follows.

BY THE COURT:


_/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge